**ANTHONY E. COLOMBO, JR.**
California Bar No. 218411
The Senator Building
105 West "F" Street, Ste. 312
San Diego, California  92101
Tele. No.: (619) 236-1704
Email: anthonycolombolegal@gmail.com

Attorney for Ruben Oseguera-Gonzalez

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

**(HONORABLE BERYL A. HOWELL)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 16cr00229-BAH |
| Plaintiff, ) | |
| v. ) | **NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE** |
| RUBEN OSEGUERA-GONZALEZ, ) | |
| Defendant. ) | |
| _____ ) | |

**I.**

**INTRODUCTION**

Mr. Oseguera-Gonzalez respectfully requests the Court grant the instant motion to suppress all evidence obtained from the Government's interception of the Blackberry Messages ("BBM") recorded on Target Telephone Number 1 ("TT-1") (PIN2AA15E73, used by "Boss" - Abigael Gonzalez-Valencia), pursuant to a wiretap order granted in April of 2013.[1]  The interceptions made pursuant to the wiretap were unconstitutional,

_____

[1] TT-1 was subject to an initial thirty-day (30) wiretap order granted in April of 2013.  The initial application subject to challenge here has already been lodged with the Court.  *See* ECF No. 125 at 3 (wiretap affidavit attached underseal as Exhibit 1).  Based upon the information obtained from the initial wiretap of TT-1, the Government subsequently obtained wiretap orders on May 2, 2013, May 29, 2013, June  2013, July 2013, August 2013, September 2013, October 2013, November 2013, December 2013, and January 2014, for Target Telephones Numbers 2-39.  Mr. Oseguera-Gonzalez

1   and in violation of Title 18 U.S.C. § 2518.  The interceptions were unlawful for the

2   following reasons:

3       In contravention of the Due Process Clause of the Constitution, the Fourth

4   Amendment, and the specified requirements of Title III, the wiretap applications failed

5   to establish "probable cause" and "necessity."  In addition, the applications in support

6   of the wiretaps contained materially misleading information.  Furthermore, the issuing

7   court did not have jurisdiction to authorize the interceptions, or the intercepting agents

8   did not comply with the issuing court's jurisdictional restrictions.  Suppression of all of

9   the intercepted communications is the appropriate remedy.[2]

10                                    **II.**

11                          **STATEMENT OF FACTS**

12      The defendant, Ruben Oseguera-Gonzalez, was originally charged on December 14,

13   2016, in a two count indictment.  However, on February 1, 2017, a two-count

14   superseding indictment was filed charging Mr. Oseguera-Gonzalez with Count One,

15   conspiracy to distribute five kilograms or more of cocaine and five hundred grams or

16   more of methamphetamine knowing and intending that such controlled substances would

17   be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a),

18   960(b)(1)(B), 960(b)(1)(H), and 963, and aiding and abetting in violation to 18 U.S.C.

19   § 2; and Count 2, using and possessing a firearm or destructive device in furtherance of

20   the drug trafficking activity alleged in Count One, in violation of 18 U.S.C. §§

21   924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(B)(ii), and aiding and abetting in violation

22   of 18 U.S.C. § 2. *See* ECF No. 6.

23

_____

24   challenges each wiretap order for the reasons articulated, however, all the wiretap orders
     rise or fall with the initial application as the subsequent applications rely upon the
25   information obtained from the initial application. *See Wong Sun v. United States*, 371
     U.S. 471 (1963) (the exclusionary rule's prohibition extends to the direct and indirect
26   products of a Fourth Amendment invasion).

27      [2]

28      In the alternative to suppression, a "*Franks*" hearing is appropriate. *See*
     *Franks v. Delaware*, 438 U.S. 154 (1978).

The superseding indictment in this case appears to be almost entirely based upon information derived from court authorized wiretaps that intercepted BBMs.

The initial application in April of 2013 was submitted by Task Force Officer ("TFO") Kyle J. Mori of the Drug Enforcement Administration ("DEA").  The initial application requested an order authorizing "the interception of electronic communications, including, but not limited to, PIN-to-PIN, Peer-to-Peer, Blackberry Messaging, text messaging, Internet traffic, and electronic mail ("email"), over the network of Research In Motion Corporation ("RIM/Blackberry").  The target subjects alleged to be communicating over TT-1 included Abigael Gonzalez-Valencia, Jose Maria Gonzalez-Valencia, Rosa Zambrano, and Nemesio Oseguera-Cervantes, aka "El Mencho."

The application alleged "there is probable cause to believe that the Target Subjects have committed, are committing, and will continue to commit the following offenses ("Target Offenses"):

    a.    the distribution and of possession with the intent to distribute controlled substances and attempt and conspiracy to do so, in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

    b.    the importation of controlled substances and attempt and conspiracy to do so, violation of Title 21, United States Code, Sections 952 and 963;

    c.    the manufacturing and distribution of controlled substances with the knowledge or intent to import into the United States and attempt and conspiracy to do so, in violation of Title 21, United States Code, Sections 959 and 963; and

    d.    Money laundering and attempt and conspiracy to do so, in violation of Title 18, United States Code, Section 1956(a)"

The requesting agent, TFO Mori, asserted, "[i]n particular, there is probable cause to believe that evidence of these offenses [will be uncovered on TT-1], including:

    (1)    the nature, extent and methods of operation of the drug business of the Target Subjects and others as yet unknown;

    (2)    the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in their illegal activities;

    (3)    the distribution and transfer of the contraband and money involved in those activities;

    (4)    the existence and location of records;

3

(5)     the existence, location and source of resources used to finance their illegal activities;

(6)     the existence, location and disposition of the proceeds from those activities; and

(7)     the existence and locations of items used in furtherance of those activities"

In support of probable cause TFO provided the following background information in his application:

> Beginning in 2009, federal law enforcement officers in the United States began investigating the international drug trafficking activities of a DTO [Drug Trafficking Organization] called Los Cuinis (the Cuinis DTO) in Mexico.  The Cuinis DTO is lead by Target Subject Abigael Gonzalez-Valencia.  The Cuinis and Gonzalez-Valencia, are responsible for the importation of large quantities of illegal narcotics from sources of supply countries, including Colombia and Mexico into the United States, as well as purchasing precursor chemicals from China and elsewhere.  The Cuinis DTO is also responsible for laundering of drug proceeds from the United States to Mexico, as well as their association with the designated terrorist organization Fuerzas Armadas Revolucionaria de Colombia (The Colombian Revolutionary Armed Forces or the "Farc").  The Cuinis DTO also uses violence and extortionate methods to collect debts for the narcotics distribution.  The investigation has revealed that the Cuinis DTO operations [are] in Mexico, as well as several jurisdictions within the United States, Canada, Europe and Asia.
>
> The Cartel de Jalisco Generacion ("CJNG") is based in the Mexican state of Jalisco, is responsible for trafficking tonnage quantities of methamphetamine and cocaine, and according to multiple independent sources of information, is led by Nemesio Oseguera-Cervantes ("El Mencho").  According to multiple independent sources of information, CJNG works in close alliance with and is at primarily financed by Los Cuinis DTO.  The leader of Los Cuinis, according to several sources of information, is Target Subject [Abigael] Gonzalez-Valencia, the user of Target Device #1. . . .Target Subject Gonzalez-Valencia, through his relationship with El Mencho and CJNG, traffics in multi-hundred kilogram quantities of cocaine to various destinations in the United States, Spain and Holland.  Moreover, Target Subject Gonzalez-Valencia and El Mencho obtain pre-cursor chemicals from contracts in India and China, import the chemicals into Mexico, and produce multi-hundred kilogram quantities of methamphetamine for distribution and sale in the United States and other places. . . . [Target] tolls revealed that Target Device #1 has been in contact with BB PINS which were at least at one time subscribed in Colombia, China, Spain, Canada, Ecuador and the United States.

In support of probable cause specifically and in particular to TT-1, TFO Mori asserted  that between February and March of 2013 a confidential source and Abigael Gonzalez-Valencia discussed, on consensual recordings made by the confidential source, "a shipment of a large quantity (300 [kilograms]) of cocaine from Guatemala to send to

4

Mexico."  The probable cause section did not state there was any discussion that the cocaine would be imported or distributed to the United States and there was no statement by TFO Mori that in his training and experience the cocaine being exported from Guatemala to Mexico was destined for the United States.

In support of necessity, TFO Mori asserted, "Normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ."

The application's affidavit prepared by Agent Mori stated that "[i]nterceptions captured over the Target Device #1 are captured through RIM/Blackberry Corporation's server located in Texas, RIM/Blackberry subsequently sends the intercepted message data to a secure server at the DEA Office of Investigative Technology (ST) in Northern Virginia approximately every 15 minutes.  The DEA ST secure server automatically sends the messages upon receipt to specialized equipment located at the DEA Orange County Resident Office in Santa Ana, California."

The reviewing court issued the order authorizing the wiretap and interception of the targeted BBMs communications as requested.  The order included, relevant to jurisdiction and the argument below, the following: "It is ordered further, pursuant to 18 U.S.C. Section 2518(3), that in the event that Target Telephone Device #1 is transferred outside the territorial jurisdiction of this court, interceptions may continue in the Central District of California, where communications over Target Device #1 will be first heard and minimized."

## III.

## ARGUMENT

### A.    Standing

Mr. Oseguera-Gonzalez is an aggrieved person within the purview of Title III, as he was a party to the intercepted communications.

Title 18 U.S.C. § 2518(10)(a) states:

> [a]ny aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of

5

the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom. . .

Title 18 U.S.C. § 2510(a)(11) defines an "aggrieved person" as:

a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the intercept was directed.

Thus, as a party to the intercepted conversations Mr. Oseguera-Gonzalez has clear standing to challenge the legality of the authorized wiretaps and all the derivative evidence that results from the wiretaps.

Any "aggrieved person ... may move to suppress" wiretap evidence and its fruits "on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. 2518(10)(a)(i)-(iii); *see also United States v. Ford*, 183 F.Supp.3d 22, 27 (D.D.C. 2016); *United States Brodie*, 742 F.3d 1058, 1062-63 (D.C.Cir. 2014).

## B.   Applicable Law to Wiretaps and Argument

### 1.   Background

The Fourth Amendment provides that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." U.S. CONST. amend. IV.  The Supreme Court has recognized:

The Fourth Amendment was the founding generation's response to the reviled "general warrants" and "writs of assistance" of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.  Opposition to such searches was in fact one of the driving forces behind the Revolution itself.  In 1761, the patriot James Otis delivered a speech in Boston denouncing the use of writs of assistance.  A young John Adams was there, and he would later write that "[e]very man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance." 10 Works of John Adams 247-248, Adams ed. (1856).  According to Adams, Otis's speech was "the first scene of the first act of opposition to the arbitrary claims of Great Britain.  Then and there the child Independence was born."  *Id*., at 248 (quoted in *Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).

*Riley v. California*, 134 S.Ct. 2473, 2494 (2014).

6

The "bulwark of Fourth Amendment protection, of course is the Warrant Clause, requiring that, absent certain exceptions, police must obtain a warrant from a neutral and disinterested magistrate before embarking on a search." *Franks v. Delaware*, 438 U.S. 154 (1978).  It is also fundamental that "the Fourth Amendment protects a person's private conversations as well as his private premises." *Alderman v. United States*, 394 U.S. 165, 178 (1968).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510), was enacted as a safeguard to protect the privacy of both wire and oral communications, as well as a means of regulating "the use of electronic surveillance evidence obtained by law enforcement under specified conditions." *Bartnicki v. Vopper*, 532 U.S. 514, 523 (2001).  Thus, Title III considers the interception of electronic surveillance to be an "extraordinary investigative technique whose use 'is to be distinctly ***the exception not the rule***,'" available only upon satisfaction of strict requirements. *United States v. Lopez*, 300 F.3d 46, 51 (1st Cir. 2002) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987) (emphasis added)).  Thus, there is a statutory presumption against the use of wiretaps. *United Sates v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

When Congress enacted the wiretapping provisions of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522, it intended to "make doubly sure that the statutory authority [for wiretaps] be used with restraint and only where circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Giordano*, 416 U.S. 505, 515 (1974).  Narrow construction of the wiretapping provisions furthers Congress' duel purposes for the Act of "'(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications are authorized.'" *Gelbard v. United States*, 408 U.S. 41, 48 (1972) (quoting S.Rep. No. 90-1097, at 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2122, 2153). Where the  procedural requirements of §§ 2510 through 2522 are not met, the Fourth

Amendment and Title III require the exclusion of any evidence derived from the wiretap. *See* 18 U.S.C. § 2510-2522 (2024).

"Normal Fourth Amendment search and seizure principles and 'the judicially fashioned exclusionary rule' developed by the case law do not describe the outer bounds of the legitimacy of a wiretap." *Ford*, 183 F.Supp.3d at 28 (D.D.C. 2016) (citing *United States v. Scurry*, 821 F.3d 1, 7 (D.C. Cir. 2016) (quoting *Giordano*, 416 U.S. at 524)). Title III contains "its own exclusionary mandate." *Id*. The statute provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of [Title III].

18 U.S.C. § 2515.

"Suppression [of the wiretap evidence] is required only when the Government fails to comply with 'those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *Ford*, 183 F.Supp.3d at 28 (citing *Scurry*, 821 F.3d at 12) (quoting *Giordano*, 416 U.S. at 527). Probable cause and necessity directly and substantially implement the intent of Congress. *Id*.

**2.   Prior to Issuing a Wiretap Order Authorizing the Interception of Communications the Reviewing Court Must Find that the Affiant has Made a Showing of Probable Cause**

Prior to issuing a wiretap order a reviewing court must find probable cause that the targeted individual "is committing, has committed, or is about to commit a particular offense enumerated in Section 2016[,]" which includes drug trafficking and money laundering, and there is probable cause to believe that "communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a),(b) (2024).

"[T]he task of evaluating probable cause [is] 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability

that contraband or evidence of a crime will be found ....'" *United States v. Thorne*, 548 F.Supp.3d 70, 93 (D.D.C. 2021) (citing *United States v. Cardoza*, 713 F.3d 656, 659 (D.C.Cir. 2013) (first omission in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Florida v. Harris*, 568 U.S. 237, 240 (2013) (noting that, in evaluating probable cause, courts use a "'flexible, common-sense standard'" (quoting *Gates*, 462 U.S. at 239)).  This "objective standard," informed by "'a totality-of-the-circumstances analysis,'" *United States v. Burnett*, 827 F.3d 1108, 114 (D.C. Cir. 2016) (quoting *United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010)) (citing *Gates*, 462 U.S. at 230-32), reflects the reality that "[p]robable cause 'turn[s] on the assessment of probabilities in particular factual contexts' and cannot be 'reduced to a neat set of legal rules,'" *District of Columbia v. Wesby*, 583 U.S. 48 (2018) (second alteration in original) (quoting *Gates*, 462 U.S. at 232).

A showing of probable cause "'is not a high bar,'" *id*. at 586 (quoting *Kaley v. United States*, 571 U.S. 320 (2014)), and in the context of a search warrant, requires only a "fair probability that ... evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 238.  To evaluate whether this standard is met, courts focus on whether the warrant application provides "a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing[.]'" *Id*. (citations omitted).

"Title III imports the Fourth Amendment's probable cause standard: the authorizing court must 'make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before it, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence will be found in a particular place,'" *Scurry*, 821 F.3d at 16 (quoting *United States v. Eiland*, 738 F.3d 338, 347 (D.C. Cir. 2013)), or, more precisely, that there was "a 'fair probability' that the target phone was being and would be used to commit the specified narcotics offenses." *Id*.  The Court must restrict its probable cause inquiry to the four corners of the law enforcement agent's affidavit.  *United States v. Johnson*, 332 F.Supp.2d 35, 39 (D.D.C. 2004).  "Even if the affidavit does contain

general language, applications are not to be read in a piecemeal fashion." *Eiland*, 738 F.3d at 347 (internal quotation marks omitted).

### 3.   Probable Cause was Not Established Here

Probable cause was lacking for TT-1 as there was no evidence presented TT-1 was being used to commit any of the offenses enumerated in the application for the wiretap, as each enumerated offense requires a nexus to the United States. "[W]here, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, there is no violation of § 841(a)(1)...." or any of the other enumerated offenses. *See United States v. Lopez-Vanegas*, 493 F.3d 1305, 1313 (11th Cir. 2007); *see also United States v. Orozco-Prada*, 732 F.2d 1076, 1087-88 (2d Cir. 1984).

In the application for the wiretap Agent Mori presented general background with conclusory allegations based upon "multiple independent sources."[3]  There was no information the reviewing court could rely upon to establish the veracity, reliability, or basis of the conslusory hearsay information presented to the reviewing court.  General background conclusory information supported by hearsay does not establish probable cause.

The reviewing court had to specifically find that there was a "fair probability" that the target telephone was being used to commit the enumerated offenses.  There must "exist[] probable cause to believe that the phone to be tapped is or will soon be used in connection with particular enumerated criminal offenses." *Scurry*, 821 F.3d at 7. However, based upon the specific information presented in the four corners of the application the reviewing court could not have made this finding.  The recordings made by the confidential source with TT-1 demonstrated at most a conspiracy to import cocaine from Guatemala to Mexico.  Nothing in any of the summaries of the recordings

---

[3] It is important to note that the Government did not disclose any discovery relating to the investigation that predated the application for the wiretap, including any of the calls recorded by the confidential source, and the Court denied Mr. Oseguera-Gonzalez's request for disclosure.

presented to the reviewing court supported otherwise, and particularly did not support that the object of the conspiracy was to ultimately import the cocaine to the United States. In fact, nowhere in the affidavit did Agent Mori state based upon his training and experience the conversations recorded by the confidential source indicated the cocaine was destined for the United States. Nor did Agent Mori assert that in his training and experience once the cocaine was successfully imported from Guatemala to Mexico it would then be imported to the United States. If Agent Mori was in possession of this information or was of this opinion it would have been asserted in the application for the wiretap. It was not. It was not because in all likelihood Agent Mori could not make that representation as he was aware, as the affidavit sets forth in the background information, that controlled substances were sent to Asia, Canada, and Europe.

Therefore, based upon the lack of particularity that TT-1 was being used to commit offenses within the jurisdiction of the United States probable cause to support the wiretap did not exist. Suppression of the intercepted BBMs is the appropriate remedy. Suppression is required when the Government fails to comply with the statutory requirements that directly and substantially implement the congressional intention to limit the use of intercepts, and a lack of probable cause directly and substantially implements the intent of Congress. *See Ford*, 183 F.Supp.3d at 28 (citations omitted).

**4.    Prior to Issuing a Wiretap Order Authorizing the Interception of Communications the Reviewing Court Must Find that the Affiant has Made a Showing of Necessity**

In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets act of 1968, authorizing the Government's use of wiretaps under certain specified conditions. In enacting this unprecedented law, "Congress was well aware of the grave threat to privacy of every American posed by modern techniques of electronic surveillance." *United States v. King*, 478 F.2d 494, 503 (9th Cir. 1973) (citations omitted). "[I]n order to insure circumspection in their use, Congress established elaborate procedural requirements for the initiation of wiretaps." *Id*. Title III has been "declared constitutional only because of its precise requirements and its provisions for

close judicial scrutiny." *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975) (citations omitted).  The statutory procedural regulations set forth in 18 U.S.C. § 2510, *et seq.*, mandate "strict adherence." *Id.* at 588.

One of the procedural requirements of Title III to restrain the Government from overreaching is the requirement that the Government prior to obtaining a wiretap order exhaust all of its traditional investigative techniques and demonstrate the wiretap order's "necessity."

Title 18 U.S.C. § 2518(1)(c) states:

> [Each application for electronic surveillance must include] a full and complete statement as to whether or not the other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c) (2024).

This "necessity" requirement arises from the Fourth Amendment jurisprudence holding that courts should authorize "no greater invasion of privacy . . . than necessary." *Berger v. State of New York*, 388 U.S. 41, 57 (1967); *see also Katz v. United States*, 389 U.S. 347 (1973).  The necessity requirement has been called "a keystone of Congressional regulation of electronic eavesdropping." *United States v. Williams*, 580 F.2d 578, 587-88 (D.C. Cir. 1978).  Thus, this protection is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 (1964); *United States v. Smith*, 893 F.2d 1573, 1582 (9th Cir. 1990); *United States v. Brown*, 761 F.2d 1271, 1275 (9th Cir. 1985).  Such traditional investigative techniques include, *inter alia*:

> (1) standard visual or aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants.

*United States v. Van Meter*, 278 F.3d 1156 (10th Cir. 2002).

The Government carries the burden to demonstrate that traditional investigative techniques would not suffice to expose the crime investigated. *United States v. Ippolito*,

774 F.2d 1482, 1486 (9th Cir. 1985) (citation omitted).  A district court must reject a wiretap application if law enforcement officers have not first attempted, *without success*, traditional investigative methods.  *Ippolito*, 774 F.2d at 1486.  At the same time, where traditional investigative techniques have been attempted with success, the district court should not issue a wiretap order as there is no "necessity."  *Kahn*, 415 U.S. at 153.  This standard has been strictly applied by the Supreme Court.  *Dalia v. United States*, 441 U.S. 238 (1979).  The Supreme Court has recognized that "the plain effect of the detailed restriction of Sec. 2518 is to guarantee that wiretapping or bugging occurs only when there is a ***genuine need*** for it and only to the extent that it is needed."  *Dalia*, 441 U.S. at 238 (emphasis added).

The necessity provisions of Title III require the Government to submit a "full and complete statement of specific allegations establishing the necessity of the wiretap sought."  *United States v. Rodriguez*, 851 F.3d 931, 937-38 (9th Cir. 2017); *see also United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005).  The Government's affidavit in support of the wiretap order "must give a factual basis sufficient to show that ordinary investigative procedures have failed or will fail in the particular case at hand." *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977).  The affiant's statement must establish in the particular investigation, the Government employed normal investigative techniques "in good faith" and used a normal amount of resources which have failed to make the "case within a reasonable period of time."  *Gonzalez, Inc.*, 412 F.3d at 1112.  Boilerplate assertions that the necessity standard is met based on an agent's knowledge and experience will not suffice. *Id*. at 710.  Courts must reject any affidavits that misstate or overstate the difficulties involved in employing normal investigative procedures. *United States v. Lyons*, 507 F.Supp. 551, 555 (D.Md. 1981), aff'd., 695 F.2d 802 (4th Cir. 1982).  The requirement of a full and complete statement is absolute. *United States v. Salemme*, 978 F.Supp. 343, 348 (D.Mass.1997).

"[T]he reason for requiring specificity is to prevent the Government from making general allegations about classes of cases and thereby sidestepping the requirement that

there be necessity in the particular investigation in which a wiretap is sought." *Ippolito*, 774 F.2d at 1486.  Each wiretap authorization, standing alone, must satisfy the necessity requirement.  *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).  The Government is not free to transfer a statutory showing of necessity from one application to another– even within the same investigation." *Gonzalez, Inc.*, 412 F.3d at 1115.  The "[G]overnment may not dispense with the statutorily mandated showing of necessity to obtain a wiretap of the first suspect's telephone, despite the validity of the wiretap of his coconspirators' telephone.*"* *United States v. Brone*, 792 F.2d 1504, 1507 (9th Cir. 1996).

Therefore, pursuant to 18 U.S.C. § 2518(1)(c), the Government must first establish that the application for electronic surveillance contains a full and complete statement as to whether or not other investigative techniques have been tried and failed or why they reasonable appear to be unlikely to succeed if tried or to be too dangerous.  Second, the Government must establish necessity by demonstrating traditional investigative procedures have either (1) been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try.  *Rodriguez*, 851 F.3d at 937; *Gonzalez, Inc.*, 412 F.3d at 1112.  The reviewing court in evaluating necessity may only look to the "evidence presented within the four corners of the wiretap application." *Id*. at1112.  In reviewing the issuance of a wiretap, the court may consider the truthfulness, accuracy or completeness of any factual statements made in the wiretap application.  *Ippolito*, 774 F.2d at 1486 n.1.  The "utmost scrutiny" must be applied by the court in its review.  *Kalustian*, 529 F.2d at 589.

"In assessing the necessity of a wiretap application, courts must give close scrutiny to applications challenged for noncompliance and reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *United States v. Williams*, 827 F.3d 1134, 1147 (D.C. Cir. 2016) (alterations, internal quotations marks, and citation omitted) *cert. Denied sub nom. Edwards v. United States*, 137 S.Ct. 706 (2017).

**5.    The Initial April 2013 Application Fails to Satisfy the Necessity Requirement of 18 U.S.C. § 2518(1)(c)**

The initial application of April 2013 does not satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c).  In examining only the "four corners" of the application, the "necessity" showing of the Government's affidavit fails.  "Necessity" for the wiretap was not established as the application failed to establish that traditional law enforcement techniques either (1) had been tried and failed; or (2) were reasonably unlikely to succeed if tried; or (3) were too dangerous to try.

Here, Agent Mori's affidavit in support of the wiretap contains boilerplate recitations of what would be true in most narcotics investigations and failed to show that law enforcement had exhausted all other possible investigative techniques.  Agent Mori asserted that all traditional investigative techniques would prove unsuccessful given that all of the targets of the investigation "lived and worked in Mexico out of reach of many investigative tools available to U.S. law enforcement and the targets of the investigation had protected themselves by 'only deal[ing] with relatives, close friends, and longtime associates, typically in Mexico.'" *See* ECF No. 125 at 4.  However, the application itself belies this representation.

In examining the application's probable cause section Agent Mori explained in detail the history of Los Cuinis, its relation to CJNG, and the narcotics trafficking each engaged in together.  Agent Mori asserted that these groups had been investigated beginning in 2009, a full four years prior to the application for the wiretap.  And in fact, the investigation was so advanced that they had a confidential source in place communicating directly and recording those communications with the target of the wiretap, Abigael Gonzalez-Valencia.  The detailed background information and direct ability to communicate with and record the alleged leader of Los Cuinis demonstrates that traditional means of investigation, despite the physical location of the target subjects, was quite successful.  It belies the representation by Agent Mori.  In addition, despite apparently only dealing with family members, Agent Mori had a confidential source in place who was only an "acquaintance[,]" but was so trusted by Abigael

Gonzalez-Valencia that they communicated directly, and was so trusted that Abigael was willing to engage in significant transactions with the confidential source (300 kilograms of cocaine).  Again, this belies Agent Mori's representation that traditional means of investigation would fail because of the close-knit nature of the conspirators.  Here, it would appear that the wiretap application was premature and Agent Mori should've utilized further the confidential source in place directly communicating with the main target subject and alleged leader of Los Cuinis.  There is nothing in the application that suggests the confidential source was in danger, refused to continue acting as a source, or could not otherwise be utilized in the future.  In fact, this source was available and ready to continue working with law enforcement.

"A district judge must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods that 'easily suggest themselves and are potentially productive and not unduly dangerous.'" *Carneiro*, 861 F.2d at 1176, *quoting Ippolito*, 774 F.2d at 1486.  While the Government does not have to exhaust every possible investigative avenue, they cannot ignore methods of investigation that "easily suggest themselves." *Ippolito*, 774 F.2d at 1486.  In *Ippolito* the court instructed:

> Although the government need not pursue every alternative means of investigation,  neither should they be able to ignore avenues of investigation that appear both fruitful and cost-effective.  It is not unreasonable to expect the government to utilize methods that appear to be potentially productive.  We would flout the statutory intent that wiretaps be used only if necessary, were we to sanction a wiretap simply because the government pursued some "normal" investigative strategies that were unproductive, when more fruitful investigative methods were available.  In effect, the government would be able to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails.

*Id*.  In other words, with no efforts, there is no exhaustion, and therefore, there is no showing of necessity.  The protection required through a necessity showing is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153.  Much more could have been done by, and should have been required of, Agent Mori's task force

before it was permitted to resort to the extraordinary use of electronic surveillance.

Here, traditional means of investigation were not fully exhausted, and had proven to be successful. The necessity requirement is a central and a vitally important requirement of all statutory wiretapping schemes, and when it has been violated suppression is mandated. *See Giordano,* 416 U.S. at 527. *See* 18 U.S.C. §2515. For failure to establish necessity, here, suppression of the BBMs is required. Suppression is required when the Government fails to comply with the statutory requirements that directly and substantially implement the congressional intention to limit the use of intercepts, and a lack of necessity directly and substantially implements the intent of Congress. *See Ford*, 183 F.Supp.3d at 28 (citations omitted).

### 6. Where Material Misstatements or Omissions are Made in the Application a *Franks* Hearing is Required

The Supreme Court held in *Franks v. Delaware*, 438 U.S. 154 (1978), that an evidentiary hearing is required when the defense can establish that an affiant has made a knowing and intentional false statement, or a statement with reckless disregard for the truth, and that the statement was necessary to a finding of probable cause. *Id*. at 155-56. A *Franks* hearing is also required upon a preliminary showing that the wiretap applications contained a material misrepresentations or omissions. *United States v. Shryock*, 342 F.3d 948, 975 (9th Cir. 2003). A defendant may challenge false information supplied by another government agent to the affiant, even if the affiant did not know the information was false. *United States v. Leon*, 468 U.S. 897, 923 n. 24 (1984); *Franks*, 438 U.S. at 163 n.6. Declarations or sworn or otherwise reliable statements of witnesses, or explanations for their absence are sufficient to obtain the hearing. *Franks*, 438 U.S. at 71.

"A movant seeking to obtain a *Franks* hearing 'must show that (1) the affidavit contains false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" *Thorne*, 548 F.Supp.3d at 103 (D.C.C. 2021) (citing *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (quoting *United States v.*

*Richardson*, 861 F.2d 291, 293 (D.C. Cir. 1988) (per curiam)).  "'To mandate an evidentiary hearing,' the movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'" *Id*. (quoting *Franks*, 438 U.S. at 171); *see also United States v. Matthews*, 753 F.3d 1321, 1326 (D.C. Cir. 2014).

Here there appears to be a contradiction between what was represented in the Probable Cause section of the wiretap application and that contained in the Necessity section.  It simply cannot be true on the one hand the investigation revealed such detailed information to establish probable cause, but yet on the other no traditional means of investigation had been successful.  Mr. Oseguera-Gonzalez maintains that Agent Mori intentionally minimized and failed to disclose additional details of the investigation to support necessity for the wiretap.[4]

Furthermore, there is absolutely no explanation as to what general background information relied upon by Agent Mori is unverified or uncorroborated.  In the application for the wiretap Agent Mori asserts that he has relied upon "multiple independent sources of information."  The reviewing court was therefore left in the dark concerning the scope of the unverified and uncorroborated information relied upon to justify probable cause and necessity.  The reviewing court was also left in the dark with regard to whether there were payments made to these sources of information, or whether any bias might have existed.  Agent Mori had an obligation to advise the reviewing court fully what general background information relied upon in the application was not vetted before used, and whether any of the information was provided by confidential sources that may have had credibility issues based upon payment, or bias etc...  However, he did not.

Here, the Court should conduct of *Franks* hearing to determine if there were any material misstatements or omissions in the wiretap application.

---

[4] It appears from the applications's affidavit that target subject Abigael Gonzalez-Valencia may have been intercepted previously on wiretaps authorized in 2012 by a California state court and a federal district court in the Northern District of Illinois.

**7.    The Issuing Court Lacked Jurisdiction to Issue an Order for Communications in Another District or the Intercepting Agents Did Not Comply with the Issuing Court's Jurisdictional Restrictions and, thus, Any Intercepted Communications were Intercepted Unlawfully**

"Title III defines an "intercept" as the aural or other acquisition of the contents of any... communication[,]" [] and a federal judge has jurisdiction to authorize the "interception" of communications "within the territorial jurisdiction of the court in which the judge is sitting. []" *United States v. Fajardo-Campos*, 2018 WL 6448633 *4 (D.D.C. 2018) (citing Title III §§ 2510(4), 2518(3)). Blackberry messages qualify as an "other acquisition" under the plain language of the statute. *Id*. at *6. All circuits, including the D.C. Circuit, "have recognized that a Title III interception of an oral communication can take place in either of two locations: the location of the tapped phone, on the one hand, and 'the place where the redirected contents are first heard[,]' on the other[.]" *Id*. (citing *United States v. Cano-Flores*, 796 F.3d 83, 86 (D.C. Cir. 2015). "This latter location is referred  to as the 'listening post,' and under this theory, courts have long held that a district judge has territorial jurisdiction to authorize a Title III wiretap so long as the location that the Government sets up to listen to the recordings of the tapped calls is within the judicial district where the authorizing judge sits." *See e.g.*, *id*. at 86-87 (collecting cases).  In other words, "an intercept takes place *either* where the tapped telephone is located *or* where the Government's 'listening post' is located." *Dahda v. United States*, 584 U.S.__ (2018). "As so interpreted, the statute generally requires that one or the other or both of these locations must be found within the authorizing judge's 'territorial jurisdiction.'" And as so interpreted, Title III "could not lawfully allow a wiretap of a phone that was located outside [the Court's territorial jurisdiction] in instances where the Government's listening post was also located outside of [the Court's territorial jurisdiction]." *Dahda*, 584 U.S. __ (2018); *see also United States v. Glover*, 736 F.3d 509, 514-15 (D.C. Cir. 2014).

In the instant case, the application's affidavit prepared by Agent Mori stated that "[i]nterceptions  captured  over  the  Target  Device  #1  are  captured  through

19

1  RIM/Blackberry Corporation's server located in Texas, RIM/Blackberry subsequently
2  sends the intercepted message data to a secure server at the DEA Office of Investigative
3  Technology (ST) in Northern Virginia approximately every 15 minutes.  The DEA ST
4  secure server automatically sends the messages upon receipt to specialized equipment
5  located at the DEA Orange County Resident Office in Santa Ana, California."[5]

6      This procedure, however, ran afoul of what Title III authorizes.  Title III "c[an]not
7  lawfully allow a wiretap of a phone that was located outside [the Court's territorial
8  jurisdiction] in instances where the Government's listening post was also located outside
9  of [the Court's territorial jurisdiction]."  *Dahda*, 584 U.S. __ (2018).  Here the target
10 subjects were located outside of the United States, outside of the Central District of
11 California where the issuing court was located, and the Government's "listening post"
12 was located at the DEA Office of Investigative Technology (ST) in Northern Virginia,
13 also outside of the territorial jurisdiction of the issuing court in the Central District of
14 California.  The issuing court thus located in the Central District of California lacked
15 jurisdiction to order the intercept.  The issuing court for the wiretap in this instance
16 should have been located in Northern Virginia where the messages would be at the first
17 instance intercepted.  While the application does state "[t]he DEA ST secure server
18 automatically sends the messages upon receipt to specialized equipment located at the
19 DEA Orange County Resident Office in Santa Ana, California[,]" it does not limit what
20 is done in Northern Virginia with the intercepted messages before or after they are
21 rerouted to the DEA offices in the Central District of California.

22     In *United States v. Fajardo-Campos*, 2018 WL 6448633 (2018), the court
23 confronted a similar issue, but the case is distinguishable here in a dispositive way.  In
24 *Fajardo-Campos*, the defendant argued the Arizona federal court lacked jurisdiction to
25 authorize Title III wiretap intercepts.  *Id*. at *6.  In the application for the wiretap it was
26 explained that the defendant's communications would be "captured through

27

28

---

[5] Subsequent applications contain this same language.

RIM/Blackberry Corporation's server located in Texas[,]" and then automatically sent to a DEA server in Virginia. [] From there, the communications would be "automatically forward[ed] ... to specialized equipment located at the DEA Tucson, Arizona Division, where the messages are first received and reviewed by law enforcement agents and/or foreign language interpreters under law enforcement supervision." *Id*. The application further explained "[a]ll monitoring of the interceptions over the target devices will be performed in Tucson, Arizona." *Id*. The "agents reviewing the intercepted communications would employ 'minimization' procedures, and that communications that were not relevant to the investigation would not be shared with the investigative team." *Id*. The court determined jurisdiction existed. *Id*.

In *Fajardo-Campos*, while the intercepted communications would be routed from the Blackberry server in Texas through a DEA server in Virginia,  the application's affidavit made clear that "the DEA Tucson, Arizona Division, [was] ***where the messages are first received and reviewed by law enforcement agents***." *Id*. (emphasis added). Here, unlike *Fajardo-Campos*, the application's affidavit does not contain that restriction, and thus, the issuing court in the Central District would not have had jurisdiction to order the communications be intercepted.

In addition, in *Fajardo-Campos*, while it was made clear all of the interceptions would be minimized by the reviewing agents in Tucson, Arizona, where communications were first received and reviewed, the same cannot be said here.  The application here states, "All interceptions will be monitored by DEA personnel, other law enforcement officers deputized and assigned to the DEA[,] [] [a]nd will be minimized in accordance with [] Title 18 United States Code, Section 2518(b)."  There is no restriction or limitation to review and minimization by the agents located in the Central District of California where the wiretap was authorized.  The language in the application's affidavit is very broad and allows the DEA in Northern Virginia to review as desired all interceptions.

1       In contravention to the procedure in the application's affidavit submitted by agent

2   Mori, the order authorizing the wiretap issued by the Central District of California states

3   "in the event that Target Device #1 is transferred outside the territorial jurisdiction of this

4   court, interceptions may continue in the Central District of California, where

5   communications of Target Device #1 will first be heard and minimized." While the order

6   clearly directs that the "listening post" be within the issuing court's jurisdiction, which

7   would allow the issuing court to assert jurisdiction, it does not appear the procedure, at

8   least as outlined by Agent Mori in the application's affidavit, complied with the issuing

9   court's order.[6]  The procedure in the application's affidavit allowed for the intercepted

10  communications to be first received and reviewed by the DEA in Northern Virginia and

11  then sent to DEA agents in the Central District of California.   Therefore, any

12  communications that were intercepted either lacked jurisdiction for interception or were

13  in contravention to the issuing court's order and were intercepted unlawfully.  And where

14  communications were unlawfully intercepted suppression is mandated.   18 U.S.C.

15  2518(10)(a)(i)-(iii); *see also Ford*, 183 F.Supp.3d 22, 27 (D.D.C. 2016); *United States*

16  *Brodie*, 742 F.3d 1058, 1062-63 (D.C.Cir. 2014).

17

18

19

20

21

22

23

24

25

26          [6] To the extent there exists a question as to whether Agent Mori modified the

27  interception procedure to comply with the issuing court's order it appears he did not
    as subsequent applications contain the same procedure.  However, if there is any

28  doubt as to which procedure was followed, Mr. Oseguera-Gonzalez would request
    relevant discovery and an evidentiary hearing.

# IV.

## CONCLUSION

For the reasons stated above, Mr. Oseguera moves this Court to grant his motion to suppress wiretap evidence and its derivative evidence.

Respectfully submitted,

/s/ Anthony E. Colombo, Jr.

Dated: July 8, 2024                **ANTHONY E. COLOMBO, JR.**

Attorney for Mr. Oseguera-Gonzalez