**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 16-229 (BAH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RUBEN OSEGUERA-GONZALEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

The United States respectfully submits this opposition to the Defendant's Motion to

Suppress Evidence (hereinafter "Motion").  Dkt. No. 139.  The Defendant alleges that the

wiretap applications failed to establish probable cause and necessity and that the issuing court

did not have jurisdiction to authorize the interceptions or that the intercepting agents did not

comply with the issuing court's jurisdictional restrictions.  Therefore, the Defendant seeks to

suppress all Title III[1] intercepted communications.  In the alternative, the Defendant requests a

*Franks* hearing.

As set forth below, the government established probable cause in its application and

made the requisite showing that the interception of the electronic communications sent over

BlackBerry Messenger was necessary to reveal the full nature and scope of the conspiracy and

the criminal conduct, which primarily occurred outside the United States.  All monitoring of

interceptions occurred in the Central District of California, where the order was issued, which

satisfies the jurisdictional requirements of Title III.  Finally, the Defendant's Motion fails to

---

[1] Title III refers to Title III of the Omnibus Crime and Safe Streets Act of 1968, codified at 18
U.S.C. §§ 2510–2522, and commonly called the "Wiretap Act."

demonstrate the need for a *Franks* hearing because he does not identify any false statements, material or not, in the affidavit.

## I.   **Background**

The initial application for the wiretap at issue was filed on April 1, 2013, and contained an application signed by Assistant United States Attorney Amanda N. Liskamm (Exhibit A) and an affidavit in support of the application signed by DEA Agent Kyle J. Mori (Exhibit B) to intercept the communications of Target Device #1 used by Abigael Gonzalez Valencia, a leader of the Los Cuinis drug trafficking organization ("DTO") and the Defendant's uncle and co-conspirator.[2]

The application states that "there is probable cause to believe that the Target Subjects have committed, are committing, and will continue to commit" the Target Offenses: 21 U.S.C. §§ 841(a)(1) and 846 (distribution possession with intent to distribute a controlled substance and attempt and conspiracy to do so); 21 U.S.C. §§ 952 and 963 (importation of controlled substances and attempt and conspiracy to do so); 21 U.S.C. §§ 959 and 963 (manufacture and distribution of controlled substances with knowledge or intent to import into the United States and attempt and conspiracy to do so); and 18 U.S.C. § 1956(a) (money laundering).  Exhibit A at 3.

The application explains that there is probable cause to believe that the target device will contain evidence of these offenses, including:

> (1) the nature, extent and methods of operation of the drug business of the TARGET SUBJECTS and others as yet unknown; (2) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (3) the distribution and transfer of the contraband and money involved in

---

[2] The Defendant is moving to suppress all intercepted communications; however, he only challenges the initial application "as the subsequent applications rely upon the information obtained from the initial application."  Mot. at 1–2 n. 1.

> those activities; (4) the existence and location of records; (5) the
> existence, location and source of resources used to finance their
> illegal activities; (6) the existence, location and disposition of the
> proceeds from those activities; and (7) the existence and locations
> of items used in furtherance of those activities.

Exhibit A at 4.

The application requests that the court issue an order for interceptions to "continue in the Central District of California, where communications over Target Device #1 will first be heard and minimized" if that Target Device "is transferred outside the territorial jurisdiction" of the court.[3]  Exhibit A at 6.

Agent Mori's affidavit in support of the application describes in detail the objectives of the investigation; information to support a finding of probable cause; the traditional investigative procedures which were tried and failed, reasonably appeared unlikely to succeed, or were too dangerous to try; and how the communications would be intercepted and handled by DEA.  The affidavit explains that the user of Target Device #1 is the leader of the Los Cuinis DTO, based in Mexico, which is "responsible for the importation of large quantities of illegal narcotics from sources of supply countries, including Colombia and Mexico into the United States, as well as the purchasing of precursor chemicals from China and elsewhere."  Exhibit B at 10.  The DTO is "responsible for the laundering of drug proceeds from the United States to Mexico" and the use of "violence and extortionate methods to collect debts for the narcotics distribution."  *Id*. at 10–11.

---

[3] The application and affidavit make it clear that Target Device #1 is not believed to be in, or to ever have been in, the Central District of California.  *See* Exhibit A at 3–4 (Target Device #1 is using a phone number subscribed to a wireless carrier based in Mexico); Exhibit B at 17 ("Gonzalez Valencia operates mainly out of Guadalajara [Mexico] and the surrounding area."), 12 (same), 27 (same).

With regards to probable cause, the affidavit contains information provided by two specific confidential sources, CS-1 and CS-2; summaries of recorded communications between Target Device #1 and CS-2; information that is corroborated by multiple independent sources of information; analysis of toll records; and criminal history information. *Id*. at 10–17. CS-1 provided information that two named individuals are members of the Los Cuinis DTO and are responsible for facilitating Gonzalez Valencia's drug trafficking activities in Southern California. *Id*. at 11. The affidavit also contains an analysis of toll records, which shows that Target Device #1 was in contact on approximately 61 occasions in an 8-day period in March 2013 with one of the individuals CS-1 identified, and that individual was using a BlackBerry PIN registered to his/her true name at an address in Southern California. *Id*. at 18–19.

CS-2 provided communications to DEA that occurred between himself and Gonzalez Valencia, using Target Device #1, in March 2013. *Id*. at 14. As the affidavit explains, these conversations were about a shipment of 300 kilograms of cocaine from Guatemala to Mexico, which Gonzalez Valencia was going to transport from Guatemala to Guadalajara, Mexico, for a fee. *Id*. at 14–17. During the communications, Gonzalez Valencia discusses prices in U.S. dollars. Gonzalez Valencia says that he will charge CS-2 $1,300 per kilogram for transportation, and Gonzalez Valencia offers to arrange the sale of the cocaine for $17,000 per kilogram in Mexico. *Id*. at 16–17.

Additionally, Agent Mori included background information about the Los Cuinis DTO and the closely aligned Cartel de Jalisco Nueva Generacion ("CJNG") based on information provided by "multiple independent sources of information." *Id*. at 12. This background information primarily focused on establishing where Gonzalez Valencia resided (Guadalajara, Jalisco, Mexico), where he frequently traveled (Colombia), where he trafficked drugs (the United

4

States, Spain and Holland), and where he obtained precursor chemicals to manufacture drugs (India and China).  *Id*.  The affidavit also noted that this information is corroborated by toll records for Target Device #1, which was registered to a Mexican phone number and showed contacts with users in "Colombia, China, Spain, Canada, Ecuador and the United States."

The affidavit includes information about Gonzalez Valencia's 1996 arrest in California for conspiracy to distribute methamphetamine, and his subsequent failure to appear for sentencing after pleading guilty, resulting in the issuance of a bench warrant.  The affidavit also includes toll analysis and information from other investigations that explains that Target Device #1 was in communication with two BlackBerry PINs that were intercepted in two other wiretap investigations targeting suspected drug traffickers.  *Id*. at 18, 20.  The affidavit makes clear that Target Device #1 was <u>not</u> intercepted by the two other wiretap investigations.  *Id*. at 10, 18, 20. In other words, Gonzalez Valencia and two other suspected drug traffickers had contacts in common.

With regards to necessity, the affidavit explains that information provided by confidential sources and consensually monitored communications had furthered the investigation, but traditional investigative techniques needed to be supplemented with electronic interception "in order to ascertain the structure of the organization, identify all co-conspirators and the leaders, and gather sufficient evidence regarding all of the crimes of the drug trafficking organization to support prosecution."  *Id*. at 21.  Most of the information provided by confidential sources at the time of the application was historical or background information, and only CS-2 was in a position to communicate directly with Gonzalez Valencia.  *Id*. at 22.  However, Agent Mori assessed that CS-2 did not have "the ability to infiltrate Los Cuinis DTO at its highest levels." *Id*.

The affidavit explains that other investigative techniques, such as obtaining toll records, had been tried, but could not accomplish the investigation's objectives. *Id.* at 22–23. Other investigative techniques, such as physical and electronic surveillance, were unlikely to succeed or dangerous because "a large portion of the criminal activities in this case take place in foreign countries" and "corruption of foreign officials makes asking for assistance dangerous to both the operational security of the investigation and to the physical safety of U.S. agents stationed in foreign countries." *Id.* at 23. The affidavit also explains why mail covers, pole cameras, search warrants, grand jury subpoenas, witness interviews, trash covers, and financial investigative techniques had not been tried, and why they were unlikely to be successful in this case. *Id.* at 23–27.

Finally, the affidavit explains how the communications would be intercepted and handled by DEA:

> Interceptions . . . are captured through RIM/BlackBerry Corporation's server located in Texas. RIM RIM/BlackBerry subsequently sends the intercepted message data to a secure server at the DEA Office of Investigative Technology (ST) in Northern Virginia approximately every 15 minutes. The DEA ST secure server automatically sends the messages upon receipt to specialized equipment located at the DEA Orange County Resident Office in Santa Ana, California . . . . All monitoring of the interceptions over Target Device #1 will be performed at the OCRO [Orange County Resident Office] by law enforcement officers . . . .

*Id.* at 8–9.

## II.   Legal Analysis

### A.   Standard of Review

The standard of review on appeal for an issuing court's probable cause and necessity findings for a wiretap is abuse of discretion, and this Court should employ the same standard. *See United States v. Becton*, 601 F.3d 588, 597 (D.C. Cir. 2010) (reviewing issuing judge's probable cause findings for the wiretap for abuse of discretion); *United States v. Scurry*, 821 F.3d

1, 16–17 (D.C. Cir. 2016) ("This court reviews the authorizing judge's Title III necessity determination for abuse of discretion, although it does not grant additional deference to district court's subsequent review.").  Judges within this District have applied the abuse of discretion standard.  *United States v. Fajardo Campos*, No. 1:16-CR-00154 (KBJ), 2018 WL 6448633, at *4 (D.D.C. Dec. 10, 2018) (*citing United States v. Suggs*, 531 F. Supp. 2d 13, 18 (D.D.C. 2008)) (reviewing issuing judge's findings regarding necessity for the wiretap for abuse of discretion); *United States v. Eiland*, 398 F. Supp. 2d 160, 173 (D.D.C. 2005) (explaining that "[a]n issuing judge's finding of necessity is reviewed for abuse of discretion"), *aff'd*, 738 F.3d 338 (D.C. Cir. 2013)). Furthermore, the D.C. Circuit and other circuit courts of appeal consistently hold that the reviewing district court must give deference to an issuing court's probable cause and necessity determinations.  *See United States v. Johnson*, 437 F.3d 69, 71 (D.C. Cir. 2006) ("Like the district court, we must accord 'great deference' to the issuing official's determination of probable cause.") (quoting *Illinois v. Gates*, 462 U.S. 213, 236–37 (1983)); *United States v. Glover*, 681 F.3d 411, 419–20 (D.C. Cir 2012) (noting that "[a] district court gives deference to the authorizing judge's necessity determination"); *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (reasoning that in reviewing the validity of an electronic surveillance order, "great deference" is accorded the determinations of the issuing judge).  "[T]he fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Corrado*, 227 F.3d at 539 (quoting *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988)).

Whether the issuing court in the Central District of California had territorial jurisdiction to authorize the interception of the Defendant's electronic communications is a legal issue for this Court to resolve *de novo* based on the facts of this case.

**B.**     <u>**The Government Demonstrated Probable Case in its Initial Application**</u>

Title III requires the authorizing court to find probable cause that the target of the application "is committing, has committed, or is about to commit" an enumerated offense, which includes drug trafficking and money laundering offenses, and that there is probable cause to believe that "communications concerning that offense will be obtained through such interception."  18 U.S.C. § 2518(3)(a), (b).

The probable cause standard for Title III is the same as the standard for a search warrant. *United States v. Eiland*, 738 F.3d 338, 358 (D.C. Cir. 2013).  As the Defendant stated in his Motion, a showing of probable cause "is not a high bar."  Mot. at 9; *District of Columbia v. Wesby,* 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  "The determination requires the authorizing court 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Eiland*, 738 F.3d at 347 (quoting *Gates,* 462 U.S. at 238).

The Defendant's Motion asserts that all of the Target Offenses require a "nexus to the United States," and that the affidavit was insufficient to establish probable cause because the affidavit failed to show that "the object of the conspiracy was ultimately to import cocaine to the United States."  Mot. at 10–11.  In support of this argument, the Defendant only addresses the recorded communications provided by CS-2 and their interpretations and the background information based on multiple independent sources, concluding that the former only demonstrates "a conspiracy to import cocaine from Guatemala to Mexico" and that the latter is unreliable.  But the Defendant conspicuously fails to mention the information provided by CS-1.

According to the affidavit, CS-1 provided information that two named individuals were responsible for facilitating Gonzalez Valencia's drug trafficking activities in Southern California. The affidavit then tied the information from CS-1 to Target Device #1 through an analysis of toll records, which showed that not only was Target Device #1 in frequent and recent contact with one of the individuals CS-1 identified; but also that the individual was using a BlackBerry PIN registered to his/her true name at an address in Southern California. *Id*. at 11, 18–19. The information provided by CS-2 provides probable cause to believe Gonzalez Valencia is the user of Target Device #1 and that Target Device #1 was being used to discuss drug shipments, which the Defendant does not dispute in his Motion. *Id*. at 14–17. In other words, the affidavit establishes probable cause to believe that (1) Gonzalez Valencia was conspiring to send drugs to the United States, in violation of the Target Offenses; (2) Gonzalez Valencia was the user of Target Device #1, and (3) Target Device #1 was not only being used to discuss drug shipments from Guatemala to Mexico, but was also in recent and frequent contact with a known co-conspirator located in Southern California.

The Court should deny the Defendant's Motion because the authorizing court did not err in finding that there was probable cause to believe that Gonzalez Valencia was committing the Target Offenses and that communications concerning the Target Offenses would be obtained through the interception of Target Device #1.

### C.   The Government Demonstrated Necessity in its Initial Application

All applications under Title III seeking authorization to intercept communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Likewise, orders of authorization must include a

determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id*. § 2518(3)(c). These statutes constitute the Title III "necessity" requirement.  The necessity requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  Therefore, courts "should give close scrutiny to contested wiretap applications and reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Suggs*, 531 F. Supp. 2d at 18.

However, the government's "burden of showing 'necessity' is not high." *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991) (government affidavits satisfied necessity by asserting the investigation was having "trouble fingering other members of the conspiracy," undercover surveillance was difficult in an "ethnic neighborhood," and because of "possible danger to undercover agents and cooperating witnesses"); *see also United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994) (quoting *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977)) ("The burden . . . upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion.'").  To demonstrate necessity, the government "need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable." *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007) (quoting *Smith*, 31 F.3d at 1298). Courts are to assess whether the government has adequately demonstrated necessity "in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents." *Id.* (quoting *Smith*, 31 F.3d at 1297).

Further, the government's burden "is not tantamount to an exhaustion requirement." *United States v. Lopez*, 300 F.3d 46, 52–53 (1st Cir. 2002). Title III's necessity requirement "was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (quoting *United States v. Williams*, 580 F.2d 578, 588 (D.C. Cir. 1978)); *see also United States v. David*, 940 F.2d 722, 728–29 (1st Cir. 1991) (government satisfied necessity despite not attempting to use search warrant, pen registers, or undercover agents). Therefore, the necessity requirement does not require the government to show that it attempted every law enforcement technique available and that the government's investigation is at an absolute standstill. The government meets its burden where "it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of these avenues of investigation." *Carter*, 449 F.3d at 1293 (internal citations omitted).

Nor does the necessity requirement mean that other investigative measures must have been unfruitful. In *United States v. Brown*, the D.C. Circuit found that intercepted communications were correctly admitted into evidence, over a necessity challenge, where "[t]he affidavit did indicate that the traditional investigative techniques had yielded some evidence . . . . But the affidavit also showed that these techniques had failed—and would likely continue to fail—to disclose the full nature and extent of the conspiracy . . . ." 823 F.2d 591, 598 (D.C. Cir. 1987); *see also United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) ("The partial success of alternative investigative measures . . . does not necessarily render electronic surveillance unnecessary."). Similarly, in *Wilson*, the Fourth Circuit denied the defendant's argument that the government had not satisfied the necessity requirement because it "had previously been highly successful in its use of normal investigative procedures." 484 F.3d at 280. The court noted that,

"[i]n exhaustive fashion, [the affidavits] set forth the techniques used up to that point," including "confidential informants, undercover agents, surveillance, trash searches, interviews, search warrants, telephone records, reverse buys, GPS trackers, and financial and public records." *Id*. at 281. "The affiants then explained that despite the information they had been able to gain from these traditional sources, they believed that those sources, standing alone, were insufficient to achieve the goals of the investigation and prove the extent of the conspiracy." *Id*.

Finally, the D.C. Circuit recognizes that "a court may authorize a wiretap" where "traditional investigative techniques have proved inadequate to reveal the operation's full 'nature and scope.'" *Brown,* 823 F.2d at 598; *see also Glover,* 681 F.3d at 420; *Becton,* 601 F.3d at 596 ("Although normal investigative procedures 'ha[d] been probative in proving that an ongoing illegal narcotics business [wa]s operating,' the FBI had been unable to determine the identities of other co-conspirators who supplied and transported drugs into D.C. and who assisted in local redistribution using these methods."). This is particularly germane for an investigation into a "wide-ranging conspiracy." *United States. v. Jones*, 451 F. Supp. 2d 71, 82 (D.D.C. 2006), *aff'd in part, rev'd in part (on other grounds) sub nom. United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd in part sub nom. United States v. Jones*, 565 U.S. 400 (2012) ("in a case involving a wide-range conspiracy, the government must simply provide an adequate basis for the court to make a practical, common-sense determination that other methods would likely prove inadequate to reveal the operation's 'full nature and scope'"). "The issuing court has considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy." *United States v. Reed*, 575 F.3d 900, 909 (9th Cir. 2009) (citing *United States v. McGuire*, 307 F.3d 1192, 1197–98 (9th Cir. 2002)).

The Defendant claims the initial application lacked necessity because traditional means of investigation had been successful, despite the targets being in Mexico, and because the affidavit "failed to show that law enforcement had exhausted all other possible investigative techniques." Mot. at 15. The Defendant further argues that "where traditional investigative techniques have been attempted with success, the district court should not issue a wiretap order as there is no necessity." Mot. at 13. These arguments are completely foreclosed by the law. Indeed, his view of necessity would render Title III a dead letter. In order for the Government to establish probable cause, traditional investigative techniques have to be successful to some degree. The Defendant is arguing that if the Government can satisfy Title III's probable cause requirement, it cannot satisfy its necessity requirement.

Here, the affidavit explains that information provided by confidential sources and consensually monitored communications furthered the investigation into the wide-ranging conspiracy, but traditional investigative techniques needed to be supplemented with electronic interception "in order to ascertain the structure of the organization, identify all co-conspirators and the leaders, and gather sufficient evidence regarding all of the crimes of the drug trafficking organization to support prosecution." Exhibit B at 21. The success of two traditional investigative methods (confidential sources and consensually recorded communications) "does not necessarily render electronic surveillance unnecessary." *Perez*, 661 F.3d at 581. As in *Brown*, the affidavit explains that the wiretap was necessary "to disclose the full nature and extent of the conspiracy." 823 F.2d at 598.

Furthermore, contrary to the Defendant's repeated assertions, the necessity requirement "is not tantamount to an exhaustion requirement." *Lopez*, 300 F.3d at 52–53. The Defendant argues that the Government should have continued to use CS-2 before seeking a wiretap, Mot. at

16, but the affidavit did not ignore this possibility.  Rather, Agent Mori assessed that CS-2 did

not have "the ability to infiltrate Los Cuinis DTO at its highest levels."  Exhibit B at 22.  This

statement provided the authorizing court with a sufficient basis to find that CS-2's continued use

in the investigation "would likely prove inadequate to reveal the operation's 'full nature and

scope.'"  *Jones*, 451 F. Supp. 2d at 82.

The Defendant also argues that the affidavit "contains boilerplate recitations of what

would be true in most narcotic investigations."  Mot. at 15.  But the Defendant has not provided

any legal basis to support his argument that this renders the affidavit insufficient.  Instead, as

required with every wiretap affidavit, the affidavit contains "a full and complete statement as to

whether or not other investigative procedures have been tried and failed or why they reasonably

appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  In

addition to the discussion of the use of confidential sources and consensually recorded

communications, the affidavit explains that other investigative techniques, such as obtaining toll

records, had been tried and the affidavit explains what information was gathered.  But these

techniques could not accomplish the investigation's objectives to investigate and prosecute the

full scope of the Los Cuinis DTO's criminal conduct.  Exhibit B at 22–23.  Investigative

techniques, such as physical and electronic surveillance, were unlikely to succeed or dangerous

because "a large portion of the criminal activities in this case take place in foreign countries" and

"corruption of foreign officials makes asking for assistance dangerous to both the operational

security of the investigation and to the physical safety of U.S. agents stationed in foreign

countries."  *Id*. at 23.  The affidavit also explains why mail covers, pole cameras, search

warrants, grand jury subpoenas, witness interviews, trash covers, and financial investigative

techniques had not been tried, and why they were unlikely to be successful in this investigation based on specific facts and circumstances.  *Id*. at 23–27.

The affidavit established that interception of Target Device #1's electronic communications was essential to advance the goals of the investigation because other efforts "failed—and would likely continue to fail—to disclose the full nature and extent of the conspiracy."  *Brown*, 823 F.2d at 598.  Therefore, the issuing court in the Central District of California did not abuse its discretion when it authorized the initial wiretap.

**D.    Suppression is Not an Available Remedy for Statutory Violations Under Title III and the Authorizing Court Had Jurisdiction to Issue the Order in this Case**

Under 18 U.S.C. § 2518(3), a judge may issue an order that authorizes "interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting . . . ."  Section 2510(4) further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  Interception can occur in either: 1) the location of the tapped facility, or 2) "at the place where the redirected contents are first heard."  *United States v. Cano-Flores*, 796 F.3d 83, 86 (D.C. Cir. 2015) (citing *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992)).  Therefore, a court is authorized to order the interception of wire, oral, or electronic communications when either the tapped facility or the listening post is located within the territorial jurisdiction of the court.  *Id*.

The Second Circuit was the first circuit to adopt "listening post" jurisdiction in *Rodriguez*.  *Id*. at 136 ("[S]ince the definition of interception includes the 'aural' acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard.").  The D.C. Circuit adopted the listening-post interpretation in *Cano-Flores*:

> Although the statute does not supply an explicit rule for
> determining where interception occurs, courts have integrated the
> language allowing "interception . . . within the territorial jurisdiction
> of the court in which the judge is sitting with the language that
> defines intercept as the aural or other acquisition of the contents of
> any . . . communication.

*Cano-Flores*, 796 F.3d at 86 (internal citations omitted).

Since *Rodriguez*, listening-post jurisdiction has been accepted in every circuit that has considered this issue. *Id.* at 87 ("the basic reasoning [of the listening-post theory] has been accepted in all courts of appeals to address the issue."); *United States v. Henley*, 766 F.3d 893, 911 (8th Cir. 2014) (affirming listening-post jurisdiction for wiretap); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2007) (affirming jurisdiction of court in N.D. Cal. to issue wiretap of mobile phone used in E.D. Cal. where the calls were first heard by agents in N.D. Cal.); *United States v. Jackson*, 207 F.3d 910, 914–15 (7th Cir. 2000) *vacated on other grounds* (affirming listening-post jurisdiction for a wiretap); *United States v. Denman*, 100 F.3d 399, 401–03 (5th Cir. 1996) (same); *United States v. Jackson*, 849 F.3d 540, 551–52 (3d Cir. 2017) (adopting the same interpretation for a similar provision of Pennsylvania wiretap statute); *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994) (adopting the same interpretation for a similar provision of Oklahoma wiretap statute).

Moreover, the Supreme Court concluded, because petitioners did not dispute the government's contention, that "an intercept takes place *either* where the tapped telephone is located *or* where the Government's 'listening post' is located. . . . As so interpreted, the statute generally requires that one or the other or both of these locations must be found within the authorizing judge's 'territorial jurisdiction.'" *Dahda v. United States*, 584 U.S. 440, 444 (2018) (citing 18 U.S.C. § 2510(4)); *see also Tavarez*, 40 F.3d at 1499 ("As we discussed above, a listening post within the court's territorial jurisdiction could lawfully intercept communications

made to or from telephones located within [the authorizing jurisdiction] or outside [the authorizing jurisdiction].").  Another judge in this District held that listening post-jurisdiction applied to the interception of electronic, as well as telephonic, communications.  *Fajardo Campos*, 2018 WL 6448633, at *6.

However, Title III does not provide a statutory remedy of suppression for interceptions of electronic communications.  When first enacted by Congress, Title III only addressed the interception of oral and wire communications.  Congress amended Title III by enacting the Electronic Communications Privacy Act of 1986 (hereinafter "ECPA").  Pub. L. No. 99-508, 100 Stat. 1848 (1986).[4]  The legislative history of the 1986 amendments made clear that Title III itself provided the *only* remedies for statutory—versus constitutional—violations arising from the interception of electronic communications:

> Subsection 101(e)—Exclusivity of remedies with respect to electronic communications
>
> Subsection 101(e) of the Electronic Communications Privacy Act amends subsection 2518(10) of title 18 to add a paragraph (c) which provides that with respect to the interception of electronic communications, the remedies and sanctions described in this chapter are the only judicial remedies and sanctions available for nonconstitutional violations of this chapter involving such communications. In the event that there is a violation of law of a constitutional magnitude, the court involved in a subsequent trial will apply the existing Constitutional law with respect to the exclusionary rule.
>
> The purpose of this provision is to underscore that, as a result of discussions with the Justice Department, *the Electronic Communications Privacy Act does not apply the statutory*

---

[4] Specifically, Congress added electronic communications as a new category of communications whose interception is covered by Title III.  Electronic communications are non-voice communications made over a network in or affecting interstate commerce, which include communications sent over BlackBerry Messenger, text messages, electronic mail ("email"), other non-voice internet traffic, and communications over digital-display pagers.  *See* 18 U.S.C. § 2510(12).

> *exclusionary rule contained in title III . . . to the interception of*
> *electronic communications.*

S. Rep. No. 99-541, 103d Cong., 2d Sess. at 23 (1986) (emphasis added).  While 18 U.S.C. §§ 2511(1), (4), (5), and 2520 provides criminal and civil sanctions for the unlawful interception of electronic communications, the ECPA provides no basis for moving to suppress such electronic communications.

Courts across the United States consistently hold that Title III, as amended by ECPA, does not provide a statutory remedy of suppression for interceptions of electronic communications.  *See, e.g., United States v. Flores Apodaca*, 287 F. Supp. 3d 21, 35 n.15 (D.D.C. 2017) ("suppression of intercepted BBM [BlackBerry Messenger] communications is not available" for Title III statutory violations); *United States v. Amanuel*, 615 F.3d 117, 125 (2d Cir. 2010); *United States v. Steiger*, 318 F.3d 1039, 1050–51 (11th Cir. 2003); *United States v. Jones*, 364 F. Supp. 2d 1303, 1306–09 (D. Utah 2005); *United States v. Wells*, No. IP 99-140-CR-B/F, 2000 WL 1231722, at *5–6 (S.D. Ind. Aug. 29, 2000).

The Defendant seeks to suppress the intercepted electronic communications as unlawfully intercepted communications that were obtained outside the jurisdiction of the issuing court.  Mot. at 22.  But the Defendant does not demonstrate, and provides no legal authority for, the proposition that a territorial jurisdictional defect rises to the level of a constitutional violation.[5]

---

[5] "Suppression of the wiretap evidence is required only when the Government fails to comply with those statutory requirements that directly and substantially implement the Congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device."  *United States v. Ford*, 183 F. Supp. 3d 22, 27–28 (D.D.C. 2016) (citing *Scurry*, 821 F.3d at 12) (internal quotation marks omitted).  The Tenth Circuit in *Dahda*, in a holding undisturbed by the Supreme Court's subsequent affirmance, found the territorial jurisdiction limitation of Title III did not implicate a core concern of the statute and therefore suppression for lack of territorial jurisdiction is not warranted.  *United States v. Dahda*, 853 F.3d 1101, 1115–16 (10th Cir. 2017); *see also United States v. Nelson*, 837 F.2d 1519 (11th Cir. 1988) (same); *Adams v. Lankford*, 788 F.2d 1493 (11th Cir. 1986) (territorial jurisdiction not a core concern of Title III).

Therefore, the Defendant fails to make a colorable constitutional claim regarding the territorial jurisdiction of the Title III authorization. Thus, the Court need not reach the merits of Defendant's argument because he claims a legal remedy that is unavailable.

However, even if the Court were to rule on the merits, the authorizing court did have listening post jurisdiction to issue the wiretap order in this case. The Defendant does not challenge the application of listening post jurisdiction to electronic communications that are first read and viewed in the authorizing district, but rather argues that the wiretap in this case is distinguishable from the wiretap in *Fajardo Campos,* 2018 WL 6448633, at *6, because "there is no restriction or limitation to review and minimization by the agents in the Central District of California where the wiretap was authorized." Mot. at 21. The Defendant either purposely or inadvertently misreads the affidavit to reach this conclusion. The affidavit explains that the BlackBerry Messenger communications will be captured on the company's servers in Texas, sent to a DEA server in Virginia, and then the server in Virginia "automatically sends the messages upon receipt to specialized equipment" in the Central District of California. Exhibit B at 8. Further, the affidavit explains that "[a]ll monitoring of the interceptions over Target Device #1 will be performed at the OCRO [Orange County Resident Office] by law enforcement officers." *Id*. at 9. The affidavit makes clear, and the Defendant does not dispute, that the Orange County Resident Office is located in the Central District of California. This is the exact same procedure that the court held satisfied listening post jurisdiction in *Fajardo Campos*. *See* 2018 WL 6448633, at *6.[6]

---

[6] As the Defendant acknowledges in his Motion, the order authorizing the wiretap was consistent with this procedure, ordering that "interceptions may continue in the Central District of California, where communications of Target Device #1 will be first heard and minimized." Mot. at 22.

Accordingly, the Defendant's Motion should be denied because it seeks a remedy that is not available and because the authorizing court had jurisdiction to issue the order.

### E.   The Defendant Failed to Demonstrate the Need for a *Franks* Hearing

"An affidavit offered in support of a wiretap application enjoys a 'presumption of validity.'" *United States v. Williams*, 827 F.3d 1134, 1147 (D.C. Cir. 2016) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010)).  Thus, when—as here—a defendant seeks to challenge a wiretap affidavit by claiming that it contained false statements or omitted a fact that would have defeated probable cause, the defendant must make a substantial preliminary showing before obtaining a *Franks* hearing. *Williams*, 827 F.3d at 1145–46.[7]  Specifically, the defendant "'must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" *Id.* at 1146 (quoting *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010)). "'To mandate an evidentiary hearing,' the movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'" *Id*. (quoting *Franks*, 438 U.S. at 171); *see also United States v. Matthews*, 753 F.3d 1321, 1326 (D.C. Cir. 2014).

The Defendant has failed to meet his burden.  In support of his request for a *Franks* hearing, Defendant makes three claims: (1) "[i]t simply cannot be true on the one hand the investigation revealed such detailed information to establish probable cause, but yet on the other no traditional means of investigation had been successful"; (2) that Gonzalez Valencia "may have been" intercepted on other wiretaps; and (3) that the general background information in the affidavit was unverified or uncorroborated.  Mot. at 18.  First, for the reasons explained *supra*,

---

[7] The D.C. Circuit has specifically held that *Franks* applies in the wiretap context. *Williams*, 827 F.3d at 1146.

the Defendant's claim that having sufficient evidence for probable cause vitiates necessity is illogical.  Furthermore, the Defendant has not identified any specific false statement or misrepresentation in the affidavit with this claim.  The affidavit lays out the evidence supporting probable cause, and then clearly explains why that evidence and the traditional investigative techniques employed had failed to uncover the full scope the Los Cuinis DTO conspiracy.

As to the second claim, the Defendant appears to have misread the affidavit.  The affidavit explains that Gonzalez Valencia communicated with two BlackBerry PINs that were themselves intercepted in two other wiretap investigations into suspected drug traffickers, but Gonzalez Valencia was <u>not</u> intercepted by those two other wiretap investigations.  Exhibit B at 10, 18, 20.  In other words, Gonzalez Valencia and two other suspected drug traffickers had contacts in common.

Finally, while the Defendant takes issue with the fact that there are not more details about the multiple independent sources, he does not actually identify anything false or misleading about the information that was provided by them.  Nor does the Defendant explain why this background information would be material to the issue of probable cause.  In fact, the Defendant argues elsewhere in his Motion that the authorizing judge could not rely on this background information for a probable cause finding.  Mot. at 10.  While the Government does not concede either that this background information was false or misleading or that the authorizing judge could not rely on it, as explained *supra*, probable cause to issue the wiretap could be based on the information provided by CS-1, CS-2, and the toll analysis in the affidavit, without having to reach the information provided by the multiple independent sources.

The Defendant has failed to demonstrate that the affidavit contained false or misleading statements, that those statements were material to the issue of probable cause, and that the

statements were made knowingly and intently.  Therefore, the Court should deny his request for a *Franks* hearing.

### III.   <u>Conclusion</u>

For the foregoing reasons, the United States respectfully requests that this Court deny the Defendant's motion to suppress intercepted electronic communications.

Respectfully submitted this 22nd day of July, 2024.

Marlon Cobar, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:   */s/ Kate Naseef*
Kate Naseef
Jonathan Hornok
Trial Attorneys
Kaitlin Sahni
Acting Assistant Deputy Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 353-9076

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the defendant, this 22nd day of July 2024.


By:    */s/ Kate Naseef*
       Kate Naseef
       Trial Attorney
       Narcotic and Dangerous Drug Section
       Criminal Division
       U.S. Department of Justice