UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 16-229 (BAH) |
| RUBEN OSEGUERA-GONZALEZ, | Judge Beryl A. Howell |
| Defendant. | **UNDER SEAL** |

**MEMORANDUM OPINION AND ORDER**

In advance of his trial, scheduled for September 9, 2024, on two charges of conspiracy to distribute large quantities of cocaine and methamphetamine for importation into the United States, and possession of a firearm, including a destructive device, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963, and 18 U.S.C. §§ 924(c)(1)(A)(i) & (ii), 924(c)(1)(B)(ii), and 2, respectively, *see* Superseding Indictment, ECF No. 6, defendant Ruben Oseguera-Gonzalez moves to suppress evidence obtained by the government, under a court order issued, pursuant to 18 U.S.C. 2518, by a federal judge in the Central District of California, on April 2, 2013, to intercept Blackberry Messages ("BBM") on a device associated with a telephone number used by defendant's uncle ("Target Telephone Number 1" or "TT-1"), and that incidentally intercepted defendant's own communications. Def.'s Mot. to Suppress Evidence ("Def.'s Mot.") at 1–2, ECF No. 139. In support of this motion, defendant argues that the original wiretap application failed to establish probable cause or necessity, and may have contained materially misleading information, and that the original order was issued by a court lacking proper jurisdiction, in violation the Due Process clause and the Fourth Amendment of the U.S. Constitution, and the statutory requirements of Title III of the Omnibus Crime and Safe Streets Act of 1968 ("Title III"). *Id.* Due to the purported flaws in the original April 2013

1

Application, Affidavit and Order for TT-1, defendant seeks suppression of all communications intercepted by this order and any subsequent orders predicated on the "information obtained from the initial wiretap . . . for Target Telephone Numbers 2-39." *Id.* at 1 n.1.  The government opposes defendant's motion, arguing that the April 2013 Order, with supporting documentation, and progeny interception orders, complied with all statutory and constitutional requirements, and that the issuing court had jurisdiction to issue the wiretap orders.  *See generally*, Gov't's Opp'n to Def.'s Mot. to Suppress Evidence ("Gov't's Opp'n"), ECF No. 150.

Defendant filed no reply in support of his motion to suppress.  For the following reasons, defendant's motion to suppress is **DENIED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The original indictment in this case was filed against defendant in December 2016, Indictment, ECF No. 1, and superseded in February 2017, with two Counts charging him with conspiring, from in and around 2007 and continuing to February 1, 2017, to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine knowing and intending that such controlled substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963 (Count 1), and using and possessing a firearm or destructive device in furtherance of the drug trafficking activity alleged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(B)(ii) (Count 2), and aiding and abetting on both Counts, in violation of 18 U.S.C. § 2. Superseding Indictment.  The April 2013 Order at issue in this motion was executed during the charged conspiracy, and defendant claims that "[t]he superseding indictment in this case appears to be almost entirely based upon information derived from court authorized wiretaps that intercepted BBMs."  Def.'s Mot. at 3.

The initial wiretap application at issue was submitted in April of 2013, and consisted of an application signed by Assistant United States Attorney ("AUSA") Amanda N. Liskamm, and an Affidavit in support of the application prepared by Task Force Officer ("TFO") Kyle J. Mori of the Drug Enforcement Administration ("DEA"). App. for Interception of Electronic Comms ("April 2013 App.") at 11, ECF No. 157 (sealed); *id.*, Att. 1, Aff. in Supp. of App. to Intercept Electronic Comms. ("April 2013 Aff.") ¶ 61, ECF No. 157-1 (sealed).[1]  Both the Application and Affidavit requested an order authorizing "the interception, for a period of 30 days, of electronic communications, including, but not limited to, PIN-to-PIN, Peer-to-Peer, Blackberry Messaging, text messaging, Internet traffic, and electronic mail ('email'), transmitted over the network of Research In Motion Corporation ('RIM/Blackberry') over BlackBerry device with permanently assigned BlackBerry PIN 2AA15E73." April 2013 Aff. ¶ 5; April 2013 App. ¶¶ 2, 5.  The target persons alleged to be communicating over the phone number at issue, TT-1, included Abigael Gonzalez Valencia, ███████████████████████, and Nemesio Oseguera-Cervantes, aka "El Mencho".  Def.'s Mot. at 3; *see also* April 2013 Aff. ¶ 1; April 2013 App. ¶ 2.[2]  Defendant was not named in the Application or Affidavit as a person whose communications may be intercepted over TT-1.  The Affidavit alleged that there was probable cause to believe that these target subjects committed, were committing, and would continue to commit offenses, in violation of 21 U.S.C. §§ 841(a) 846, 952, 963, and 18 U.S.C. § 1956(a),

---

[1]     These documents remain under seal, but discussion of their contents is necessary to explain the reasoning for resolution of defendant's pending motion to suppress. The parties are directed to file within 48 hours of the filing of this Memorandum Opinion and Order a joint status report, providing their positions on whether this Memorandum Opinion and Order may be unsealed in full, without redaction; and if not, providing a full explanation for why partial sealing is necessary, with any proposed redactions to the Memorandum Opinion and Order.

[2]     Two of the targets are related to defendant: Abigael Gonzalez Valencia is defendant's uncle and Nemesio Oseguera-Cervantes, aka "El Mencho," is defendant's father.

and that evidence of these offenses would be uncovered through monitoring of TT-1.  April 2013 Aff. at ¶¶ 16–33; *see also* April 2013 App. ¶¶ 5–6.

In support of probable cause, the requesting agent provided ten pages of details from the investigation, which pages are briefly summarized as follows:

- Information about the target individuals' international narcotics trafficking activities as part of large drug trafficking organizations ("DTO") provided by two confidential sources ("CS"), CS-1 and CS-2.  Gov't's Opp'n at 4 (citing April 2013 Aff. ¶¶ 17–27).

- Information that two of the targeted individuals are members of the Los Cuinis DTO and are responsible for facilitating Abigael Gonzalez Valencia's drug trafficking activities in Southern California.  Gov't's Opp'n at 4 (citing April 2013 Aff. ¶¶ 30).

- An analysis of toll records showing that TT-1 was in contact in March 2013 with one of the named individuals, and that said individual "was using a BlackBerry pin registered to his/her true name at an address in Southern California." *Id.*.

- A discussion between a CS and Abigael Gonzalez Valencia, who was using TT-1, about transporting a large shipment of hundreds of kilograms of cocaine from Guatemala to a stash house in Jalisco, Mexico, controlled by Gonzalez Valencia, using United States dollars to discuss pricing and quantities, during which discussion Gonzalez Valencia expressed interest in lining up a buyer promptly to avoid the cost of storing the cocaine in the stash house for an extended period of time.  Gov't's Opp'n at 4 (citing April 2013 Aff. ¶ 27).

- The fact that Abigael Gonzalez Valencia was previously arrested, on April 26, 1996, for conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and pleaded guilty to that charge in the Eastern District of

California, Gov't's Opp'n at 5 (citing April 2013 Aff. ¶ 21), but then failed to appear for his sentencing on May 1, 1997, prompting issuance of a bench warrant, which was still active and viable. *Id.*

The April 2013 Affidavit includes eight pages describing the investigative steps used by the government as to TT-1's suspected use in the furtherance of a drug-trafficking conspiracy, including analysis of "[t]oll records" obtained using a court order showing over 5,000 BBM PIN messages over a two-week period, "between March 1, 2013 and March 14, 2013." *Id.* ¶¶ 28–29. The Affidavit states that "the volume associated with these communications on this type of device is consistent with drug trafficking and money laundering because drug traffickers commonly communicate on a frequent basis with customers, suppliers and associates." *Id.* ¶ 28.

The order authorizing the interception of communications over TT-1 was apparently issued in April 2013, and included a paragraph stating that, "[i]t is ordered further, pursuant to 18 U.S.C. Section 2518(3), that in the event that Target Telephone Device #1 is transferred outside the territorial jurisdiction of this court, interceptions may continue in the Central District of California, where communications over Target Device #1 will be first heard and minimized." Def.'s Mot. at 5.[3] Similar language is included in both the April 2013 Application and Affidavit. *See* April 2013 Aff. ¶ 12; April 2013 App. at 6.

Defendant now asks for suppression of all BBMs for which interception was authorized by the April 2013 Order, as well as all subsequent wiretap applications and orders predicated on information derived from the April 2013 Order. Def.'s Mot. at 1. He asserts that "all the wiretap orders rise or fall with the initial application as the subsequent applications rely upon the

---

[3]     The government docketed the April 2013 Application and Affidavit, under seal, at ECF Nos. 157 and 157-1, but the Order has not been docketed nor submitted to the Court. The government does not dispute the accuracy of defendant's quoted portion of the Order contained in his suppression motion, however.

information obtained from the initial application." *Id.* at 1 n.1 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).   In bringing this suppression motion, defendant claims that he "is an aggrieved person within the purview of Title III," because "he was a party to the intercepted communications," *id.* at 5–6 (citing 18 U.S.C. § 2518(10)(a)(i)–(iii), (11)), and that the wiretap orders violated his constitutional and statutory rights, *see generally id.*  While opposing his arguments, the government does not contest defendant's standing as an "aggrieved person" to bring this motion, *see generally* Gov't's Opp'n.

## II.    LEGAL STANDARD

The Fourth Amendment prohibits law enforcement from conducting "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  A government search found to be in violation of the Fourth Amendment's protections is generally subject to the exclusionary rule, requiring suppression of evidence obtained through unconstitutional means. *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015) (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684 (1961); *Weeks v. United States*, 232 U.S. 383, 398 (1914)).  Excluded evidence extends to both "the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380 (1984)) (cleaned up).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., "allows judges to issue wiretap orders authorizing the interception of communications to help prevent, detect, or prosecute serious federal crimes." *Dahda v. United States*, 584 U.S. 440,

442 (2018). This statute "authorizes the suppression of evidence gleaned from a wiretap upon a showing that 'the order of authorization or approval under which it was intercepted is insufficient on its face.'" *United States v. Bell*, 811 F. App'x 7, 8 (D.C. Cir. 2020) (citing 18 U.S.C. § 2518(10)(a)(ii). In assessing the sufficiency of a wiretap order, "a reviewing court must examine the four corners of the order and establish whether, on its face, it contains all that Title III requires it to contain." *United States v. Scurry*, 821 F.3d 1, 8 (D.C. Cir. 2016).

## III.   DISCUSSION

Defendant argues for suppression of BBMs obtained through interceptions of TT-1 judicially authorized in the April 2013 Wiretap Application and Order, as well as additional BBMs obtained through interceptions of TT-2 through 39, on four grounds: (1) that the wiretap Affidavit failed to establish probable cause, (2) that the Affidavit failed to establish necessity, (3) that the Affidavit contained materially misleading information, and (4) that the wiretap order was issued by a court lacking proper jurisdiction. Def.'s Mot. at 2. Each argument raised by defendant is addressed below, and none has merit.

### A. The Wiretap Application Was Supported by Probable Cause

Defendant's challenge to the sufficiency of probable cause to support the April 2013 Order is a narrow one: without contesting the sufficiency of the evidence to establish probable cause to believe the targets were using TT-1 in connection with their narcotics trafficking activities, defendant argues only that probable cause was lacking to "support that the object of the conspiracy was to ultimately import the cocaine to the United States." Def.'s Mot. at 11.[4] This challenge may be easily dispatched.

---

[4]      Defendant is moving to suppress all intercepted communications from TT-1, but only challenges the first of the wiretap orders, "as the subsequent applications rely upon the information obtained from the initial application." Mot. at 1 n.1.

The probable cause standard for a wiretap application under Title III is the same as that for the Fourth Amendment, *United States v. Eiland*, 738 F.3d 338, 358 (D.C. Cir. 2013), and is not a high bar, *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018).  "[T]he authorizing court must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before it, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Scurry*, 821 F.3d at 16 (quoting *Eiland*, 738 F.3d at 347) (internal quotation marks omitted).  When reviewing an order granting a wiretap application, the reviewing court "gives deference to the authorizing court's probable cause determinations." *Id.* (citing *Untied States v. Johnson*, 437 F.3d 69, 71 (D.C. Cir. 2006)).

Defendant characterizes the factual proffer in the April 2013 Affidavit as failing to establish probable cause, because "there was no evidence presented TT-1 was being used to commit any of the offenses enumerated in the application for the wiretap," as each enumerated offense requires a nexus to the United States.  Def.'s Mot. at 10 (citing *United States v. Lopez-Vanegas*, 493 F.3d 1305, 1313 (11th Cir. 2007) ("where, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, there is no violation of § 841(a)(1)").

Here, the April 2013 Affidavit and Application listed the following as the "Target Offenses" for which probable cause was presented to believe that "the Target Subjects have committed, are committing, and will continue to commit":

- the distribution and possession with the intent to distribute controlled substances and attempt and conspiracy to do so, in violation of Title 21, United States Code, Sections 84l(a)(1) and 846;

- the importation of controlled substances and attempt and conspiracy to do so, in violation of Title 21, United States Code, Sections 952 and 963;

- the manufacturing and distribution of controlled substances with the knowledge or intent to import into the United States and attempt and conspiracy to do so, in violation of Title 21, United States Code, Sections 959(a) and 963;

- money laundering and attempt and conspiracy to do so, in violation of Title 18, United States Code, Section 1956(a)

April 2013 App. at 3; April 2013 Aff. ¶ 6.

Defendant contends that each of these enumerated offenses requires a nexus to the United States, which defendant claims the Affidavit fails to supply, explaining that "nowhere in the affidavit did Agent Mori state based upon his training and experience the conversations recorded by the confidential source indicated the cocaine was destined for the United States," because "in all likelihood Agent Mori could not make that representation as he was aware, as the affidavit sets forth in the background information, that controlled substances were sent to Asia, Canada, and Europe." Def.'s Mot. at 11. To bolster this critique, defendant further complains that the Affidavit contains only "conclusory allegations," with no "information the reviewing court could rely upon to establish the veracity, reliability, or bases of the conslusory [sic] hearsay information presented to the reviewing court." *Id.* at 10.

Contrary to defendant's characterization, the April 2013 Affidavit makes clear the nexus to the United States of the alleged illegal narcotics trafficking activities of the subjects using TT-1. For example, the Affidavit states that DTO Cuinis is responsible for "importation of large quantities of illegal narcotics . . . into the United States," and for "the laundering of drug proceeds from the United States to Mexico." Gov't's Opp'n at 3 (quoting April 2013 Aff. ¶ 16).

In addition, the Affidavit describes two of the target subjects, ███████████, as being responsible for facilitation DTO Cuinis's drug trafficking activities in Southern California, and that toll records indicate that TT-1 was in contact with a CS who used a BlackBerry pin registered to an address in Southern California. April 2013 Aff. ¶¶ 11, 18–19. Further, in a discussion between a CS and Abigael Gonzalez Valencia, who was communicating through TT-1 about transporting cocaine from Guatemala to Mexico, the pair exclusively used United States dollars to discuss pricing and quantities, again supporting a nexus to the United States, along with the facts that the purpose of the discussion was to move the cocaine shipment into Mexico and thereby closer to the border with the United States and that Gonzalez Valencia expressed his desire for a prompt sale of the shipment. April 2013 Aff. ¶¶ 27–28.

As to defendant's contention that the Affidavit was supported by only conclusory allegations, "the affidavit contains information provided by two specific confidential sources, CS-1 and CS-2; summaries of recorded communications between TT-1 and CS-2; information that is corroborated by multiple independent sources of information; analysis of toll records; and criminal history information." Gov't's Opp'n at 4 (citing April 2013 Aff. ¶¶ 16–33). The multiple corroborated sources referenced in the Affidavit bely any suggestion that the Affidavit was unsupported by credible sources.

Finally, in support of the conclusion that the targeted individuals were committing violations of law that had a nexus to the United States, the Affidavit describes that Abigael Gonzalez Valencia, defendant's uncle, was previously arrested on April 26, 1996, for conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and pleaded guilty to that charge in the Eastern District of California. April 2013 Aff.

¶ 21.  Abigael Gonzalez Valencia did not serve any punishment for that offense, as he failed to appear at his sentencing and has been a fugitive since May 1, 1997. *Id.*

Overall, the Affidavit describes multiple reasons to believe that the controlled substances trafficked by the targets were destined, at least in part, for the United States.  Collectively, this information established probable cause to believe that interception of communications from TT-1 would uncover evidence of the offenses referenced in the Affidavit.  *See Scurry*, 821 F.3d at 16 (holding that descriptions of a months-long history of coordinating drug transactions by phone was sufficient for probable cause in a wiretap application).

**B.   The Wiretap Application Demonstrated Necessity**

An application for an interception order under Title III must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  This so-called "necessity" requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  Defendant argues that the necessity requirement has not been met here in the April 2013 Application and Affidavit, as those documents contain only "boilerplate recitations of what would be true in most narcotics investigations and failed to show that law enforcement had exhausted all other possible investigative techniques."  Def.'s Mot. at 15.

The government carries the burden to demonstrate necessity in an application for a wiretap order, *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985), but the "burden of proving 'necessity' is not high." *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991).  In *Farmer*, the affidavits were found to satisfy the necessity requirement when they stated that the

government was experiencing "trouble fingering other members of the conspiracy," and they were concerned about "possible danger to undercover agents and cooperating witnesses." *Id.* The necessity requirement "is not tantamount to an exhaustion requirement," *United States v. Lopez*, 300 F.3d 46, 52–53 (1st Cir. 2002), and "was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (quoting *United States v. Williams*, 580 F.2d 578, 588 (D.C. Cir. 1978)). Rather than require that every other investigative technique was attempted, the government may simply show that "other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Id.* Additionally, necessity is not undercut if other investigative techniques prove to be somewhat fruitful, as long as the government indicates that these techniques have not been sufficient to achieve the complete goals of the investigation. *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987). Necessity for a wiretap application may be demonstrated where "normal investigative procedures 'ha[d] been probative in proving that an ongoing illegal narcotics business [wa]s operating,' [but] the FBI had been unable to determine the identities of other co-conspirators who supplied and transported drugs into D.C. and who assisted in local redistribution using these methods." *United States v. Becton*, 601 F.3d 588, 596 (D.C. Cir. 2010).

In support of his challenge to the sufficiency of the necessity showing in the April 2013 Application and Affidavit, defendant identifies the Affidavit's only showing of necessity as the statement that the targets of the investigation "lived and worked in Mexico out of reach of many investigative tools available to U.S. law enforcement and the targets of the investigation had protected themselves by 'only deal[ing] with relatives, close friends, and longtime associates,

typically in Mexico.'" Def.'s Mot. at 15 (quoting April 2013 Aff. ¶ 36). Defendant challenges

the veracity of this claim of necessity by the fact that the government conducted an investigation

for four years before the granting of the April 2013 Order, and that the government had a

confidential source in place who communicated directly with and recorded conversations of the

targets. *Id.* at 15–16. Doubling down on the confidential source, defendant points out that

"[t]here is nothing in the application that suggests the confidential source was in danger, refused

to continue acting as a source, or could not otherwise be utilized in the future," and that the

investigation could continue through the use of confidential sources and traditional investigative

methods. *Id.* at 16.

Here, the Application states, in pertinent part, that "[n]ormal investigative procedures

have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too

dangerous to employ, as is described in further detail in the attached Affidavit." April 2013 App.

¶ 7. The April 2013 Affidavit, in turn, contains more than eight pages dedicated to explaining

why alternative investigative techniques have been unsuccessful in achieving the goals of the

investigation or would be too dangerous to conduct. April 2013 Aff. ¶¶ 34–53. Contrary to

defendant's assertions, the Affidavit explains in detail why additional confidential sources or

undercover agents, pen registers or toll records, other physical and electronic surveillance, pole

cameras, search warrants, grand jury subpoenas or witness interviews, trash covers, and financial

investigative techniques would not be sufficient to further the investigation. *Id.*

Specifically, according to the Affidavit, electronic interception of TT-1 was necessary "in

order to ascertain the structure of the organization, identify all co-conspirators and the leaders,

and gather sufficient evidence regarding all of the crimes of the drug trafficking organization to

support prosecution." *Id.* ¶ 34. Although the government had one confidential source still in

place, the Affidavit describes that the source did not have "the ability to infiltrate Los Cuinis

DTO at its highest levels." *Id.* ¶ 37. The Affidavit also explains that other surveillance

techniques were unlikely to succeed or dangerous for investigators because "[a] large portion of

the criminal activities in this case take place in foreign countries" and "corruption of foreign

officials makes asking for assistance dangerous to both the operational security of the

investigation and to the physical safety of U.S. agents stationed in foreign countries." *Id.* ¶ 40.

The eight pages of the Affidavit dedicated to describing why other investigative techniques

would not be able to uncover the full scope of the conspiracy are more than sufficient to establish

necessity in this case.

### C. A *Franks* Hearing is Not Warranted Here

Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), based on

what he perceives "to be a contradiction between what was represented in the Probable Cause

section of the wiretap application and that contained in the Necessity section." Def.'s Mot. at 18.

In defendant's view, "[i]t simply cannot be true on the one hand the investigation revealed such

detailed information to establish probable cause, but yet on the other no traditional means of

investigation had been successful." *Id.* He speculates that "Agent Mori intentionally minimized

and failed to disclose additional details of the investigation to support necessity for the wiretap."

*Id.*

"An affidavit offered in support of a wiretap application enjoys a 'presumption of

validity.'" *United States v. Williams*, 827 F.3d 1134, 1147 (D.C. Cir. 2016) (quoting *Franks v.

Delaware*, 438 U.S. 154, 171 (1978); *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir.

2010)). To establish entitlement to a *Franks* hearing, a defendant "must show that (1) the

affidavit contained false statements; (2) the statements were material to the issue of probable

cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *Id.* at 1146.  Any such showing must consist of more than mere conclusory accusations.  *Id.*

A *Franks* hearing based on defendant's baseless assertions of misrepresentations in the Affidavit is wholly unwarranted in this case.  This challenge to the April 2013 Order is based on fundamentally flawed reasoning that the government cannot both demonstrate such ample probable cause for the interception order and, at the same time, satisfy the necessity requirement. *See* Def.'s Mot. at 18.  If this reasoning were sound, a strong showing on the former would almost automatically defeat the latter.  That is simply not the law because satisfaction of the necessity requirement does not mean that all other investigative methods have been completely unfruitful.  *Brown*, 823 F.2d at 598.  Indeed, as the government points out, in order for the government to establish probable cause for a wiretap application at all, traditional investigative techniques must have had some success.  Gov't's Opp'n at 13.  The fact that traditional investigative techniques have had some modicum of success to establish probable cause for a wiretap application but cannot uncover the entire scope of a wide-ranging conspiracy, does not lead to the conclusion defendant urges here that the April 2013 Affidavit must contain misrepresentations or omissions, though he identifies none.  That conclusion is based solely on speculation and is a logical leap too far.

Defendant also claims that Abigael Gonzalez Valencia, one of the targets named in the April 2013 Application and Affidavit, may have been intercepted in other wiretaps, and that the general background information in the Affidavit was insufficiently corroborated.  Def.'s Mot. at 18, 18 n.4.  The government explains that this complaint regarding Gonzalez Valencia being intercepted in a previous wiretap without sufficient elaboration in the April 2013 Affidavit, is

based on a misreading of the Affidavit. Gov't's Opp'n at 21. "The affidavit explains that Gonzalez Valencia communicated with two BlackBerry PINs that were themselves intercepted in two other wiretap investigations into suspected drug traffickers, but Gonzalez Valencia was not intercepted by those two other wiretap investigations." *Id.* (citing April 2013 Aff. ¶¶ 10, 18, 20).

Lastly, defendant complains about the dearth of information provided about the confidential sources cited in the Affidavit, suggesting these sources are "unverified or uncorroborated" and "may have had credibility issues based upon payment, or bias etc." Def.'s Mot. at 18. This attack on the confidential sources simply ignores relevant information in the Affidavit provided to the issuing court, including that one of the sources, who had no prior arrests or criminal liability in the United States, had provided DEA with reliable and significant information, for payment, for several years that had led to arrests and seizures of large quantities of narcotics, April 2013 Aff. at 11 n.3, and another confidential source, who had been convicted of narcotics trafficking, had also provided DEA with significant and reliable information that was corroborated by surveillance, seizure of narcotics and other witnesses, *id.* at 23 n.4. Moreover, the confidential source's BBM communications with Abigael Gonzalez Valencia was confirmed by review of the communications themselves as well as toll records. *Id.* at 14 n.5. In any event, without identifying any false or misleading information about the government's confidential sources, he fails to "explain why this background information would be material to the issue of probable cause." Gov't's Opp'n at 21.

In sum, defendant falls far short of satisfying the standard under *Williams* to demonstrate the need for any *Franks* hearing.

### D.   The Issuing Court Had Jurisdiction to Issue April 2013 Order

Finally, defendant challenges the April 2013 Order on the basis that the issuing court lacked jurisdiction to issue an order in another district. Def.'s Mot. at 19. Even if the issuing court had jurisdiction, defendant also posits the agents did not comply with the court's jurisdictional restrictions. *Id.* These arguments, once again, fail to establish the need for suppression of any evidence derived from the April 2013 Order.

Judges are authorized to issue an order for the "interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting . . . ." 18 U.S.C. § 2518(3). Interception for purposes of this subsection can occur either at the location where the communications are tapped or "at the place where the redirected contents are first heard." *United States v. Cano-Flores*, 796 F.3d 83, 86 (D.C. Cir. 2015) (quoting *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992)); *Dahda v. United States*, 584 U.S. 440, 444 (2018) ("[A]n intercept takes place *either* where the tapped telephone is located *or* where the Government's 'listening post' is located."). "As so interpreted, the statute generally requires that one or the other or both of these locations must be found within the authorizing judge's 'territorial jurisdiction.'" *Dahda*, 584 U.S. at 444.

Defendant acknowledges the process described in the April 2013 Affidavit: "'[i]nterceptions captured over the Target Device #1 are captured through RIM/Blackberry Corporation's server located in Texas, RIM/Blackberry subsequently sends the intercepted message data to a secure server at the DEA Office of Investigative Technology (ST) in Northern Virginia approximately every 15 minutes. The DEA ST secure server automatically sends the messages upon receipt to specialized equipment located at the DEA Orange County Resident Office in Santa Ana, California." Def.'s Mot. at 19–20 (quoting April 2013 Aff. ¶ 12). The

premise of defendant's jurisdictional challenge to the execution of the April 2013 Order is that the "listening post" in this case is the secure server in Northern Virginia because this server was used to send messages automatically to the DEA offices in Santa Clara, California. *Id.* at 20. In defendant's view, this transmission method for the intercepted BBM communications "ran afoul of what Title III authorizes" because "it does not limit what is done in Northern Virginia with the intercepted messages before or after they are rerouted to the DEA offices in the Central District of California." *Id.*

Defendant's argument is based on another misreading of the April 2013 Affidavit. The Affidavit clearly states that "[a]ll monitoring of the interceptions over Target Device #1 will be performed at the OCRO [Orange County Resident Office] by law enforcement officers." April 2013 Aff. ¶ 12(d). The Orange County Resident Office is thus the "listening post" and is located within the jurisdiction of the issuing court. Gov't's Opp'n at 19 (noting that the defendant does not dispute that the Orange County Resident Office is in the Central District of California, the jurisdiction of the issuing court).

As the government points out, this precise transmission process was sanctioned in *United States v. Fajardo Campos*, No. 1:16-CR-00154 (KBJ), 2018 WL 6448633, at *4 (D.D.C. Dec. 10, 2018), where then Judge Ketanji Brown Jackson concluded Section 2518(3)'s jurisdictional requirement was met where communications were captured through the Blackberry server in Texas, automatically sent to a DEA server in Virginia, and then automatically forwarded to specialized equipment located at the DEA Tucson, location "where the messages are first received and reviewed by law enforcement agents and/or foreign language interpreters under law enforcement supervision," *id.* at *2. In an effort to distinguish *Fajardo Campos*, defendant highlights that the affidavit in that case states that "the DEA Tucson, Arizona Division, [was]

18

*where the messages are first received and reviewed by law enforcement agents,*" while the April 2013 Affidavit "does not contain that restriction." Def.'s Mot. at 21 (emphasis in original). He is incorrect. As described above, the April 2013 Affidavit states that "[a]ll monitoring of the interceptions over Target Device #1 will be performed at the OCRO [Orange County Resident Office] by law enforcement officers." April 2013 Aff. ¶ 12(d). To be sure, these are different words used but both Affidavits describe the same process of reviewing and monitoring the intercepted communications.

In a last gasp effort to challenge the April 2013 Order, defendant protests that no guarantee was provided in the underlying Affidavit that minimization procedures would be performed by agents in the Central District of California, in contrast to language in the affidavit at issue in *Fajardo Campos*. Def.'s Mot. at 21–22. Again, this is an incorrect reading of the April 2013 Affidavit, which contains an assurance that minimization will be conducted in accordance with the minimization requirements of 18 U.S.C. § 2518(b), April 2013 Aff. ¶¶ 54–60, and defendant acknowledges that the April 2013 Order specifically stated that "interceptions may continue in the Central District of California, where communications of Target Device #1 will be first heard and minimized," Def.'s Mot. at 22. Thus, there is no meaningful difference between this case and *Fajardo Campos*, and no reason to reach a different conclusion as to where the exercise of listening post jurisdiction occurred here.[5]

## IV.    CONCLUSION AND ORDER

The April 2013 Affidavit underlying the April 2013 Order authorizing the interception of BBM communications over a telephone device used by named targets other than defendant, but

---

[5]    The government's argument that even if the statutory jurisdictional requirement were violated, "Title III does not provide a statutory remedy of suppression for interceptions of electronic communications," Gov't's Opp'n at 17, need not be addressed because no jurisdictional defect in the April 2013 Order is present, based on the record before this Court.

challenged by defendant in this case, was supported by probable cause and necessity, and the issuing court had jurisdiction to issue the Order.  Moreover, defendant has failed to make any adequate showing to warrant a *Franks* hearing.  Accordingly, for the foregoing reasons, it is hereby—

**ORDERED** that defendant's Motion to Suppress Evidence, ECF No. 139, is **DENIED**; and it is further

**ORDERED** that the parties shall file, by 2:00 PM ET on **August 15, 2024**, a joint status report, providing their positions on whether this Memorandum Opinion and Order may be unsealed in full, without redaction; and if not, providing a full explanation for why partial sealing is necessary, with any proposed redactions to the Memorandum Opinion and Order.

**SO ORDERED.**

Date: August 13, 2024

**BERYL A. HOWELL**
United States District Judge