UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL NO. 16-CR-229-BAH |
| | : | |
| v. | : | |
| | : | |
| **RUBEN OSEGUERA-GONZALEZ**, also known as "Menchito," "Rubencito," "Rojo," "Ruso," "Junior," and "El Nino," | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MOTION FOR PRELIMINARY ORDER OF FORFEITURE AND BRIEF IN SUPPORT THEREOF

The United States of America, by and through its counsel, pursuant to Federal Rule of Criminal Procedure 32.2(b)(2), respectfully moves this Court for entry of a Preliminary Order of Forfeiture as to the defendant, Ruben Oseguera-Gonzalez ("Defendant"). Based on the admissions in the Defendant's statement of facts, Dkt. No. 146-3, and the evidence presented at trial, the United States seeks entry of a money judgment in the amount of $12,599,026,000.

**I.   BACKGROUND**

On February 1, 2017, a grand jury in the District of Colombia returned a Superseding Indictment charging the Defendant with the following two counts: conspiring to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that such substances would be unlawfully imported into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963, and 18 U.S.C. § 2 (Count One); and brandishing, using, carrying, and possessing a firearm, including a destructive device, in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(B)(ii), and 18 U.S.C. § 2 (Count Two). Dkt. No. 6 at 1–3. On September 20, 2024—after an eleven-day jury trial—the Defendant was

convicted on both counts and all enhancements. Dkt. No. 197 at 1–2. The sentencing hearing is scheduled for February 7, 2025. Min. Entry, Nov. 5, 2024.

The Superseding Indictment included notice to the Defendant that upon conviction, the government would seek to forfeit "all property constituting or derived from any proceeds the Defendant obtained directly or indirectly as a result of the alleged Title 21 violation, and all property used or intended to be used in any manner or part to commit and to facilitate the commission of such offense." Dkt. No. 6 at 3 (citing 21 U.S.C. §§ 853 and 970). The Superseding Indictment further specified that such property includes "[a] sum of money equal to all proceeds the Defendant obtained directly or indirectly as a result of" his drug trafficking activities.

Before the trial, the parties stipulated that "in the event that the defendant is convicted of Count One . . . the Court—not the jury—should make all legal and factual determinations regarding the forfeiture allegations in this matter, including the amount of any monetary judgment." Dkt No. 190 at 1.

## II. DISCUSSION

### A. Statutory and Procedural Framework

Federal Rule of Criminal Procedure 32.2(b) provides that "[a]s soon as practical after a verdict . . . the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay," *id.*, and enter a Preliminary Order of Forfeiture "setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A). Furthermore, "[t]he court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an

ancillary proceeding under Rule 32.2(c)." *Id*. The rule states that "[u]nless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant." Fed. R. Crim. P. 32.2(b)(2)(B). The Preliminary Order of Forfeiture becomes final at sentencing, and "the court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing." Fed. R. Crim. P. 32.2(b)(4)(A), (b)(4)(B).

The Court's authority to order forfeiture of property for narcotics offenses, such as the Defendant's conduct in violation of 21 U.S.C. §§ 959, 960, and 963, is founded upon 21 U.S.C. § 853. *See* 21 U.S.C. § 970 (applying 21 U.S.C. § 853 to violations of 21 U.S.C. §§ 959, 960, and 963). Section 853(a) provides for the criminal forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [a violation of the Controlled Substances Act]," as well as "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." 21 U.S.C. § 853(a)(1)–(2); 21 U.S.C. § 970.

Such forfeiture is mandatory. Section 853(a) provides that "[t]he court, in imposing sentence on such person, *shall* order, in addition to any other sentence imposed . . . , that the person forfeit to the United States all property described in this subsection." 21 U.S.C. § 853(a) (emphasis added). Forfeiture is thus mandatory in this case. *See United States v. Monsanto,* 491 U.S. 600, 607 (1989).

Under Section 853, the Court must use the preponderance-of-the-evidence standard to determine the appropriate amount of forfeiture. *See United States v. Leyva*, 916 F.3d 14, 29 (D.C. Cir. 2019). It is proper for the Court to order the Defendant to forfeit the estimated proceeds of his narcotics trafficking. *See id.* And in determining that amount, the Court may rely on

"evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

Additionally, proceeds in Section 853 "means gross receipts, not net profits." *Leyva*, 916 F.3d at 29. "The Court may rely on the quantities of drugs distributed and the price of those drugs to determine the amount of the money judgment." *United States v. Carey*, 268 F. Supp. 3d 29, 34 (D.D.C. 2017) (citing *United States v. Alexander*, 714 F.3d 1085, 1092–93 (8th Cir. 2013)). While a district court may not attribute to a defendant the proceeds earned by the entire cartel of which the defendant was only a mid-level member, *id.* at 30 (citing *United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015)), the Court must consider the gross proceeds of the drug trafficking activates the Defendant supervised. *See id.*

Finally, the government need not prove that the Defendant has the means to pay the forfeiture money judgment; it need only prove by a preponderance of the evidence that the amount it seeks is forfeitable. *See United States v. Day*, 524 F.3d 1361, 1378 (D.C. Cir. 2008). As the D.C. Circuit explained, Section 853 "contains no language limiting the amount of money available in a forfeiture proceeding to those assets in the defendant's possession at the time of forfeiture." *Id.* at 1377. To hold otherwise would "permit defendants who unlawfully obtain proceeds to dissipate those proceeds and avoid liability for their ill-gotten gains." *Id.* at 1378 (internal quotation and citation omitted).

For example, in *United States v. Leyva*, the D.C. Circuit upheld the district court's order for Leyva to forfeit $529.2 million following a contested sentencing hearing. 916 F.3d at 29. Leyva and his two brothers ran a Mexico-based DTO from the early 2000s to the 2010s. *Id.* at 19. In determining the amount of the forfeiture money judgment, "[t]he court principally relied upon

evidence from [a witness], who conducted a security evaluation of Leyva's outfit in Culiacán for three to six months in 2005. [The witness] reported seeing planes being loaded with cocaine in Culiacán to be flown to the U.S. border." *Id.* at 29. Using this evidence, the court settled on "a conservative estimate of the revenue obtained by the operation in Culiacán that Leyva personally oversaw." *Id.* at 30. For example, the court used the "low-end estimates" of the quantity of drugs and timeframe the witness provided. Leyva argued that the district court erred because the government "failed to show that the entire $529.2 million allegedly earned by the drug organization was personally acquired by the defendant, as required by *Honeycutt v. United States*, [581 U.S. 443] (2017), and *Cano-Flores*, 796 F.3d 83." 916 F.3d at 30. The D.C. Circuit upheld the forfeiture order because "Leyva, unlike Cano-Flores, was a leader of his organization, and the district court attributed to him only proceeds from activities directly supervised by Leyva in Culiacán." *Id.* at 31. Put another way, an "estimate" of a defendant's drug proceeds is appropriately "conservative" when it is based on the actual evidence of the drug trafficking that the defendant oversaw versus an extrapolation without an evidentiary basis.

Similarly, in *United States v. Joaquin Archivaldo Guzman Loera*, the district court ordered the defendant, who also goes by the moniker "Chapo," to forfeit over $12.6 billion in drug proceeds, No. 1:09-cr-00466-BMC-RLM, Dkt. No. 650-1 (E.D.N.Y. July 18, 2019), adopting the calculations proposed by the government which were based on the quantity and value of the drugs trafficked by the cartel, No. 1:09-cr-00466-BMC-RLM, Dkt. No. 634 at 5–9, and Ex. D (E.D.N.Y. July 5, 2019). In reaching that number, the government applied an evidence-based, average computation to estimate the gross proceeds of the cartel. For example, the government valued the cocaine at $22,354 per kilogram, which was "the *average price* for which the Cartel sold a kilogram of cocaine from the late 1990s through approximately late 2008, based on evidence

provided" by several witnesses. *Id.* at 8 (emphasis added). The government then multiplied that price by the "total quantity of cocaine *supplied to* the Sinaloa Cartel by" three cooperating witnesses to reach "the total amount of money obtained by the defendant and the Cartel from the sale of this cocaine." *Id.* (emphasis added). After adding the value of heroin and marijuana, which were also calculated conservatively, the government concluded that "the total forfeiture money judgement related to the defendant *and the Cartel's* drug trafficking activity [was] $12,666,181,704.00." *Id.* (emphasis added). Simply put, the equation used in Guzman's case was this: the amount of the money judgment equals the quantity of drugs supplied to the cartel multiplied by the average price of that type of drug in the United States.

  **B.** **Evidence**

    **1.** **The Defendant is personally responsible for distributing at least 49,850 kilograms of cocaine and at least 1,045,666 kilograms of methamphetamine.**

  The evidence in this case established that the Defendant personally supervised, and was thus responsible for, the trafficking of at least 49,850 kilograms of cocaine and at least 1,045,666 kilograms of methamphetamine. To begin, Oscar Nava Valencia testified that in 2009 the Defendant supervised the trafficking of at least 24,000 kilograms of cocaine. *See* Trial Transcript (Sept. 9, 2024, AM) ("Sept. 9 AM Trial Tr.") at 64–68. At the time, the Defendant was the "No. 2 in charge of Puerto Vallarta." *Id.* at 64–65. In this position, the Defendant was "in charge of receiving the drugs that [the Milenio Cartel] were dealing with and, also, selling them to [the cartel]." *Id.* at 66. During this time, the Milenio Cartel had "[a]bout 2,000 kilos per month" of "cocaine . . . coming into Puerto Vallarta." *Id.* at 67. "[O]nce [the cocaine] arrived at Puerto Vallarta, it was then taken to Guadalajara or to other parts of Mexico, and also to be distributed to the U.S." *Id.* The Defendant "provide[d] the assurance that the drugs would make it to their destination" and on at least three occasions Mr. Nava saw the Defendant personally arrive in

Guadalajara with the tractor-trailer trucks, which were carrying "[b]etween 2,000 and 3,000 kilograms" of cocaine. *Id.* at 68. Thus conservatively, in 2009 the Defendant was personally responsible for at least 2,000 kilograms of cocaine each month: 24,000 kilograms of cocaine in 2009.

Mr. Nava also testified that by October 2009, the Defendant and his father "were in charge" of methamphetamine production for the Milenio Cartel and "were managing about five laboratories." *Id.* at 53, 71. On about ten occasions, the Milenio Cartel supplied fifty to three hundred kilograms of ephedrine—an essential ingredient for methamphetamine—to the Defendant and his father; three hundred kilograms of ephedrine was enough to "produce up to a ton" of methamphetamine. *Id.* at 73. Thus conservatively, before October 2009, the Defendant was personally responsible for producing at least 1,666 kilograms of methamphetamine.[1]

Separately, Herminio Gomez Anciro testified that the Defendant directed him to transport 25,850 kilograms of cocaine over four separate occasions from 2012 to April 2015. Trial Transcript (Sept. 11, 2024, PM) ("Sept. 11 PM Trial Tr.") at 26–38. First, in 2012, the Defendant directed Mr. Gomez to "unload 250 kilos from a small plane on the runway in Casimiro Castillo." *Id.* at 27. The cocaine shipment consisted of "20-kilo packages and one of 10 kilos." *Id.* at 29. Second, in 2013, the Defendant directed Mr. Gomez "to pick up 600 kilograms that had been thrown overboard from a boat." *Id.* at 31. The cocaine "was along the beach by the edge of the sea" near "Punta Perula." *Id.* It took "four hours" for Mr. Gomez and the twelve "policemen that

---

[1] At a rate of 300 kilograms of ephedrine per 1000 kilograms of methamphetamine, ten deliveries of 50 kilograms of ephedrine was enough precursor to produce 1,666 kilograms of methamphetamine. But as Mr. Nava described, the cartel supplied between 50 and 300 kilograms of ephedrine each time. Sept. 9 AM Trial Tr. at 73. Using an average of 175 kilograms of ephedrine for the ten deliveries would render 5,833 kilograms of methamphetamine.

were, in fact, hitmen,"[2] to collect the cocaine because "[i]t was very difficult to walk with 20 kilograms in the sand." *Id.* at 32. Then in April 2015, the Defendant "moved his operations to Villa Purificación" where his father and Mr. Gomez were located. *Id.* at 33. On the third occasion, the Defendant, "[i]n person," asked Mr. Gomez "to pick up five tons [of cocaine] in a fishing boat in Punta Perula." *Id.* at 34. It took Mr. Gomez and his twelve men "[a]lmost all night" to unload the cocaine, which was again packaged in twenty-kilogram units. *Id.* at 35. Mr. Gomez and his men transported the five tons of cocaine in two trailers that were as long as "the distance from the witness box to the doors of the courtroom." *Id.* at 36. "All of that cocaine was just Menchito's," who was at the warehouse to personally inspect the cocaine. *Id.* at 36. Later the same month, the Defendant directed Mr. Gomez and his men to unload "20 tons" of cocaine from a fishing boat, which took "22 people" "all night." *Id.* at 37–38. The Defendant was at the warehouse when Mr. Gomez arrived with the twenty tons of cocaine, transported in two tractor trailers. *Id.* at 38. Thus, conservatively counting only the four cocaine loads that Mr. Gomez testified specifically about, the Defendant was personally responsible for 250 kilograms of cocaine in 2012, 600 kilograms of cocaine in 2013, and 25,000 kilograms of cocaine in April 2015.

Mr. Gomez also described moving over a million kilograms of methamphetamine for the Defendant. Beginning in 2012, Mr. Gomez was responsible for collecting methamphetamine from "only" seven labs in the municipality of Villa Purificación. *Id.* at 15. "Every month," Mr. Gomez and his men "would pick up 180 to 200 barrels of 200 liters" of methamphetamine. *Id.* "[E]ach liter is equivalent to one kilo." *Id.* at 15–16. In other words, each of the 180 to 200 barrels contained approximately 200 kilograms of methamphetamine. *Id.* at 16. Mr. Gomez continued picking up

---

[2] Mr. Gomez explained that these twelve men "were policemen that [he] supervised. But, in fact, they were just hitmen belonging to the cartel that were in charge of doing these special jobs." Sept. 11 PM Trial Tr. at 33.

36,000 to 40,000 kilograms of methamphetamine per month the "entire time" from 2012 through April 2015. *Id.* "[A]ll of [the methamphetamine]" belonged to the Defendant. *Id.* 38–39. The Defendant "would handle all of the business"; Mr. Gomez and the Defendant's "dad, " "up in the Sierra," "would send it all to Menchito." *Id.* at 39. In April 2015, the Defendant personally came to Mr. Gomez's warehouse "when the labs were asked to speed up production." *Id.* at 39. On that occasion, the Defendant sent "180 barrels" of methamphetamine to Guadalajara, from where it was destined for the "'Blondies'" in "the United States." *Id.* at 40. Thus, conservatively the Defendant was personally responsible for at least 1,044,000 kilograms of methamphetamine from 2012 through April 2015.[3]

In sum, the preponderance of the evidence established that the Defendant personally supervised, and was thus responsible for, the trafficking at least 49,850 kilograms of cocaine and at least 1,045,666 kilograms of methamphetamine.

### 2. The drugs for which the Defendant is responsible were worth at least $12,599,026,000.

The evidence presented at trial established that the drugs that the Defendant was trafficking to the United States were worth at least $22,000[4] per kilogram for cocaine and at least $11,000 per kilogram for methamphetamine. To begin, the Defendant was trafficking drugs across the United States, including "Los Angeles, Atlanta, and Texas." Sept. 9 AM Trial Tr. at 77; *see also* Sept. 11

---

[3] Two hundred kilograms of methamphetamine per barrel at a rate of 180 barrels per month for one month in 2012, all of 2013, all of 2014, and January through April or 2015 (29 months) equals 1,044,000 kilograms of methamphetamine. But Mr. Gomez testified that he would pick up 180 to 200 barrels per month. Sept. 11 PM Trial Tr. at 15. Using an average of 190 barrels per month would render 1,102,000 kilograms of methamphetamine.

[4] This price for cocaine is more conservative than, but comparable to, the $22,354 per kilogram used to calculate Guzman's forfeiture judgment. *Guzman*, No. 1:09-cr-00466-BMC-RLM, Dkt. No. 634 at 8. The court in *Guzman* used an average value. Based on *Leyva*, these calculations use the more conservative low-end value.

PM Trial Tr. at 40. In the United States, according to Jose Antonio Torres Marrufo, a kilogram of cocaine was worth $22,000 in El Paso, Texas, and $30,000 in Atlanta, Georgia, in 2011 and early 2012. Trial Transcript (Sept. 17, 2024, AM) ("Sept. 17 AM Trial Tr.") at 23–25. And between 2010 and 2013, methamphetamine was selling in southern California for $11,000 to $13,200 per kilogram according to Jesus Contreras Arceo.[5] Trial Transcript (Sept. 18, 2024, AM) ("Sept. 18 AM Trial Tr.") at 54.

During this conspiracy—as in all international drug conspiracies—the Defendant obtained drugs in Mexico for less than they were worth in the United States. According to Elpidio Mojarro Ramirez's drug ledger, the Defendant paid $15,000 per kilogram for cocaine in Guadalajara in 2009. Government Exhibit ("GX") 15A; Trial Transcript (Sept. 10, 2024, PM) ("Sept. 10 PM Trial Tr.") at 4. Mr. Torres testified that in late 2011 or early 2012 he paid $13,000 per kilogram of cocaine in Guadalajara and $17,000 per kilogram of cocaine in Juarez, the Mexican city bordering El Paso, Texas. Sept. 17 AM Trial Tr. at 23–25. Intercepted BBM communications included discussions of a cocaine price in Guadalajara in July 2013 of $16,500 per kilogram. GX 71A; Sept. 18 AM Trial Tr. at 19. According to DEA Special Agent Steve Paris, in Guadalajara, methamphetamine was worth $3,300 per kilogram in July 2013. *Id.* And Mario Ramirez Trevino testified that while he was in prison with the Defendant, he heard another prisoner tell the Defendant, "Rubencito, I got a message for you from [one of the leaders of the Zetas cartel]. Tell your dad that he is going to buy you a ton of cocaine at the Port of Veracruz for $15 million," Transcript of Deposition (Feb. 21, 2024) ("Feb. 21 Depo. Tr.") at 32,[6] which equals a price of

---

[5] Mr. Contreras testified that methamphetamine was worth between $5,000 and $6,000 per pound. With 2.2 pounds per kilogram, a kilogram was thus worth $11,000 to $13,200.

[6] Mr. Ramirez's deposition testimony was video recorded and replayed during the trial. Trial Transcript (Sept. 16, 2024, PM) ("Sept. 16 PM Trial Tr.") at 27.

$15,000 per kilogram. Bottom line, the Defendant was able to profit from his drug trafficking because he was able to obtain the drugs in Mexico for less than what he sold them for in the United States.

The evidence established that the Defendant was trafficking drugs almost exclusively to the United States—not within Mexico. For example, Mr. Nava testified that, the methamphetamine that the Defendant's labs produced "was transported to Guadalajara; and from there, distributed mainly to the U.S.," including "Los Angeles, Atlanta, and Texas." Sept. 9 AM Trial Tr. at 72, 77. Similarly, the Defendant told Mr. Contreras that he was concerned about "how the price [of methamphetamine] was coming down here . . . in the U.S." Sept. 18 AM Trial Tr. at 52. As Mr. Contreras put it, "a lot of crystal was coming in" to the United States. *Id.* Mr. Torres described meeting with the Defendant and his father, who wanted "to traffic methamphetamine through Juarez" into the United States. Sept. 17 AM Trial Tr. at 16. Finally, Mr. Gomez recounted how the Defendant told him that the methamphetamine he was producing was going to the "Blondies" in the United States. Sept. 11 PM Trial Tr. at 40. The Defendant explained to Mr. Gomez that he sent the methamphetamine to the United States, "through Texas and through California," in "many ways," but "[m]ainly by" "plane" and "trucks." *Id.*

Additionally, the evidence established that the Defendant was getting paid for his drugs in the United States—not Mexico. For example, the Defendant murdered five men and told Mr. Gomez that it was because the men owed him money for drugs in the United States. Trial Transcript (Sept. 12, 2024, AM) ("Sept. 12 AM Trial Tr.") at 28. Mr. Gomez also described an occasion when he picked up a truck full of money for the Defendant. Sept. 11 PM Trial Tr. at 42. The "back part" of the truck "was full of" "American money"—"100- and 50-dollar bills packed

in clear plastic." *Id.* at 42–43. The Defendant told Mr. Gomez that the money was "[f]rom the United States." *Id.* at 43.[7]

Accordingly, the preponderance of the evidence establishes that a "conservative estimate of the revenue obtained by the operation" the Defendant supervised, *Leyva*, 916 F.3d at 30, should be based on the prices of least $22,000 per kilogram for cocaine and at least $11,000 per kilogram for methamphetamine.[8] And since the Defendant personally supervised, and is thus responsible for, trafficking at least 49,850 kilograms of cocaine and at least 1,045,666 kilograms of methamphetamine, he must forfeit $12,599,026,000.[9]

## III. CONCLUSION

Based upon the foregoing, and the record in this case, the government respectfully requests that this Court enter the proposed Preliminary Order of Forfeiture against the Defendant pursuant to Federal Rule of Criminal Procedure 32.2(b)(2)(A) and 21 U.S.C. §§ 853 and 970. The government further requests that the Court announce the money judgment at the time of sentencing and include the Order of Forfeiture in the Judgment pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(B).

---

[7] "[The defendant] told [Mr. Gomez], I am going to lend this money to my father because he is broke right now. And he just laughed." Sept. 11 PM Trial Tr. at 43.

[8] The evidence established that the average value of these drugs in the United States was $26,000 per kilogram of cocaine and $12,100 per kilogram of methamphetamine.

[9] Consistent with *Leyva*, this amount is based on low-end values and is thus more conservative than the calculation used in *Guzman*, which used averages. The *Guzman* average method would render a forfeiture of $14,700,879,300 in this case based on 49,850 kilograms of cocaine at $26,000 per kilogram plus 1,107,833 kilograms of methamphetamine at $12,100 per kilogram.

Respectfully submitted,

MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By: */s/ Jonathan R. Hornok*
JONATHAN R. HORNOK
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE, Second Floor East
Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant on January 17, 2025.

                                            By: */s/ Jonathan R. Hornok*
                                                 JONATHAN R. HORNOK
                                                 Trial Attorney
                                                 Narcotic and Dangerous Drug Section
                                                 Criminal Division
                                                 U.S. Department of Justice