## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 16-CR-229-BAH** |
| **v.** | |
| **RUBEN OSEGUERA-GONZALEZ, also known as "Menchito," "Rubencito," "Rojo," "Ruso," "Junior," and "El Nino,"** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully requests that this Court sentence the defendant, Ruben Oseguera Gonzalez (the "Defendant"), to life in prison on Count One and to a consecutive sentence of life in prison on Count Two. The Court should also order the Defendant to forfeit $12,599,026,000 in drug proceeds. *See* Dkt. No. 209.

The Defendant was found guilty by a jury on September 20, 2024, of conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963 and 18 U.S.C. § 2; and brandishing, using, and carrying a firearm, including a destructive device, during and in relation to a drug trafficking crime and possessing a firearm, including a destructive device, in furtherance of a drug trafficking crime, in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(B)(ii) and 18 U.S.C. § 2. Based on the Defendant's history and conduct, including the amount of drugs imported into this country for which he was personally responsible and the prolific and extreme violence he committed, only consecutive life sentences are sufficient to accomplish the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

# I.    BACKGROUND

## A.    Brief Factual Summary[1]

The Defendant was born in the United States and later moved to Jalisco, Mexico, where he joined his father in drug trafficking. By 2009, when the Defendant was nineteen years old, he and his father, Nemesio Oseguera Cervantes, also known as "Mencho" ("Mencho"), were running Puerto Vallarta, Jalisco, for the Milenio Cartel, a significant drug trafficking organization (DTO) that controlled the Mexican states of Michoacán, Colima, and Jalisco until around 2010. As the second-in-command of Puerto Vallarta, the Defendant supervised five methamphetamine laboratories and was trafficking approximately two tons of cocaine every month. The drugs the Defendant was manufacturing and trafficking were being imported into the United States.

In around 2010, the Defendant and his father broke with the Milenio Cartel and formed *Cártel de Jalisco Nueva Generación* (the "CJNG"), which has since grown into a drug trafficking empire that is arguably the most prolific and most violent cartel in Mexico today. The Defendant is one of CJNG's top leaders. Mencho himself told others that he and the Defendant—also known as "Menchito"—were equals in the CJNG. Only out of respect to his father, Menchito called himself "number two." By 2013, the Defendant was ruling his drug empire from Guadalajara, Jalisco, which is known in Spanish as *La Perla*—the pearl. The Defendant was known as *Señor de la Perla*—the "Owner of Guadalajara."

The Defendant ruled his empire with profound violence. For example, in around April 2015, the Defendant personally butchered five bound men who owed him money for drugs sold in the United States. As described by one of the eyewitnesses, the Defendant slashed each of the five

---

[1] The facts in this section are supported by either the Defendant's own admission, evidence presented at trial, or both. Specific citations to the evidentiary support are presented in later sections where these facts are recounted.

bound men's throats using a half-moon shaped knife, and after he was done, asked for a clean shirt. In the same month, the Defendant shot one of his drivers in the head when the man did not repark a vehicle quickly enough. And on May 1, 2015, the Defendant ordered his men to shoot down a Mexican military helicopter that was pursuing him and his father, killing nine and permanently disfiguring a Mexican Federal Police officer. Simply put, the Defendant is a mass murderer.

The Defendant trafficked staggering quantities of cocaine and methamphetamine. Based only on the specific instances of drug trafficking recounted by witnesses at trial, the Defendant is personally responsible for trafficking more than fifty metric tons of cocaine and for producing more than a thousand metric tons of methamphetamine. These drugs were conservatively estimated to be worth at least $12,599,026,000.

In June 2015, the Defendant was finally arrested. Surrounded by Mexican soldiers and police on a dark street in Guadalajara, the Defendant threatened to shoot them with a rifle and grenade launcher that bore his monikers "Menchito" and "JR" and his position "02" within the "CJNG." The Defendant defiantly demanded that the authorities let him go because he was part of the CJNG. While incarcerated in Mexico awaiting his extradition to the United States, the Defendant continued operating the CJNG's drug trafficking activities.

### B.    Procedural History

On December 14, 2016, the Defendant was indicted by a grand jury in the District of Colombia. Dkt. No. 1. On February 1, 2017, the same grand jury returned a Superseding Indictment charging the Defendant with the following two counts: conspiring to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963 and 18 U.S.C. § 2 (Count One); and brandishing, using, and carrying a firearm, including a destructive device, during and in relation

to a drug trafficking crime and possessing a firearm, including a destructive device, in furtherance of a drug trafficking crime, in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (c)(1)(A)(ii), and (c)(1)(B)(ii) and 18 U.S.C. § 2 (Count Two). Dkt. No. 6. On September 20, 2024—after an eleven-day jury trial—the Defendant was convicted of both counts and all enhancements. Dkt. No. 197. The sentencing hearing is scheduled for March 7, 2025. Min. Entry, Jan. 24, 2025.

## II.    SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

This Court must begin the sentencing proceeding by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). On December 31, 2024, the U.S. Probation Office issued a Presentence Investigation Report ("PSR") for the Defendant. Dkt. No. 206. On January 17, 2025, the Probation Office issued an amended and final PSR, Dkt. No. 210, which incorporated the factual and calculation adjustments that the Government proposed, Dkt. No. 207. The PSR correctly sets out the sentences that the Court can impose in this case, including life in prison for Count One and a consecutive term of life in prison for Count Two. Dkt. No. 210 ¶¶ 83–85. The PSR also correctly concluded that the Defendant's U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range for Count One is life in prison and that he must be sentenced to a minimum of thirty years' imprisonment for Count Two, which must be served consecutively to the sentence imposed for Count One. *Id.* ¶¶ 83–87. The PSR's Guidelines calculation is correctly comprised of the following:

| | | |
|---|---|---|
| 35. | Base Offense Level (U.S.S.G § 2D1.1(a)(5), (c)(1)): | 38 |
| 36. | Violence or credible threats of violence were used in connection with the drug conspiracy (U.S.S.G § 2D1.1(b)(2)): | +2 |
| 36a. | The object of the offense was the distribution of drugs in a prison (U.S.S.G § 2D1.1(b)(5)): | +2 |

37.    The Defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense (U.S.S.G § 2D1.1(b)(11)): ......................................................................... +2

37a.   The Defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance (U.S.S.G § 2D1.1(b)(12)): ......................................................................... +2

38.    The Defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood (U.S.S.G § 2D1.1(b)(16)(E)):........... +2

39.    A victim was physically restrained in the course of the offense (U.S.S.G § 3A1.3):................................................................................... +2

40.    The Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (U.S.S.G § 3B1.1(a)): .............................................................................. +4

                                                                                                        =

42.    Adjusted Offense Level: ...........................................................................56

44.    Acceptance of Responsibility (U.S.S.G § 3E1.1): .................................... -0

                                                                                                        =

46.    Total Offense Level: Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43......................43

*Id.* ¶¶ 35–46. The Probation Office has recommended that the Court impose a sentence of life in prison for Count One and a consecutive thirty-year term of imprisonment for Count Two. Dkt. No. 211 at 1. While the PSR has correctly calculated the Guidelines, the Government recommends— for the reasons below—that the Court sentence the Defendant to consecutive terms of life imprisonment.

### A.    The Defendant's PSR Objections should be rejected.

The Defendant raised multiple objections to the PSR. Dkt. No. 208. The Probation Office correctly rejected most of the Defendant's arguments. Dkt. No. 210 at 29–31. Insofar as the Defendant maintains those objections, the Court should reject them because of the following: (A)

the Defendant was arrested for these charges on April 19, 2017; (B) the Court can use foreign conduct to enhance the Defendant's sentence; (C) the Court can consider the Defendant's signed statement of facts at sentencing; and (D) the trial witnesses were credible.

### 1.    The Defendant was arrested for these charges on April 19, 2017.

The Defendant argues that he should receive pretrial detention credit from December 14, 2016, reasoning that his Mexican "charges were dismissed, and as of December 14, 2016, [the Defendant] was detained in custody solely on the instant case." Dkt. No. 208 at 3. December 14, 2016, is the date when the first indictment in this case was returned. Dkt. No. 1. The Superseding Indictment was returned on February 1, 2017. Dkt. No. 6. The United States transmitted its provisional arrest request to Mexico in February 2017, and the Defendant was arrested pursuant to that request on April 19, 2017. Thus, April 19, 2017, is the earliest date on which the Defendant was held on the charges in this case.

### 2.    The Court can use foreign conduct to enhance the Defendant's sentence.

The Defendant operated the CJNG from Mexico, which is where his personal acts of violence and bribery occurred. The Defendant argues that the violence and bribery enhancements provided in U.S.S.G. sections 2D1.1(b)(2) and (b)(11) "were not intended to have extraterritorial application" and thus cannot apply to his conduct in Mexico. Dkt. No. 208 at 6. In support, the Defendant cites *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991), and *United States v. Chunza-Plazas*, 45 F.3d 51, 57–58 (2d Cir. 1995).[2]

---

[2] The Defendant's arguments closely track the arguments his uncle has raised on appeal. Brief of Appellant at 43–48, *United States v. Gerardo Gonzalez Valencia*, Case No. 23-3126 (D.C. Cir. 2024).

*Azeem* and *Chunza-Plazas* are outliers. Even in the Second Circuit, those cases have not been interpreted as a complete ban on using foreign conduct to apply a guideline enhancement. *See, e.g.*, *United States v. Turner*, 624 F. Supp. 2d 206, 232 (E.D.N.Y. 2009) (examining *Azeem* and U.S.S.G. § 1B1.3(a) and concluding that foreign conduct is relevant conduct under the Guidelines in some circumstances). To the extent that *Azeem* and *Chunza–Plazas* may be proffered as support for the proposition that criminal conduct committed by a foreigner in a foreign country cannot be considered as relevant conduct or be used as the basis of an upward departure, a district court judge of the Southern District of New York has opined that "[n]either case can be so broadly construed." *United States v. Teyer*, 322 F.Supp.2d 359, 367 n.3 (S.D.N.Y. 2004).

Indeed, the Seventh, Eighth, Tenth, and Eleventh Circuits have rejected the Second Circuit's position. *United States v. Spence*, 923 F.3d 929, 931 (11th Cir. 2019) (rejecting *Azeem* and *Chunza-Plazas* by citing *United States v. Dawn*, 129 F.3d 878, 881–84 (7th Cir. 1997); *United States v. Wilkinson*, 169 F.3d 1236, 1238–39 (10th Cir. 1999); and *United States v. Zayas*, 758 F.3d 986 (8th Cir. 2014)). Moreover, the Third and Ninth Circuits have approved of courts considering foreign conduct during sentencing. *United States v. Castro-Valenzuela*, 304 F. App'x 986, 992 (3d Cir. 2008); *United States v. Juarez-Torres*, No. 22-10165, 2023 WL 6366700, at *2 (9th Cir. Sept. 29, 2023) (upholding the application of section 2D1.1(b)(11) to bribery of a foreign law enforcement officer because the text of the enhancement "is not facially limited to bribery of domestic officers"). Likewise, this Court has previously applied the enhancements provided by section 2D1.1(b) to foreign conduct. *See, e.g.*, *United States v. Gonzalez-Valencia*, Dkt. 185 at 5, Case No. 16-CR-65-BAH (D.D.C.) (applying both the firearms and violence enhancement in the Defendant's uncle's case based on conduct committed outside of the United States).

The Defendant also cites *United States v. Flores*, 912 F.3d 613 (D.C. Cir. 2019). Dkt. No. 208 at 5. In that case, the D.C. Circuit held that a Mexican kidnapping and murder could not be used "to calculate [the defendant's] base offense level because § 2E1.1(a)(2) circumscribes relevant conduct to 'underlying racketeering activity.'" *Id.* at 622. But the court's reasoning in that case turned explicitly on a unique restriction in the text of section 2E1.1—that the act at issue must be a "racketeering activity"—a textual restriction which section 2D1.1 does not share. *Id.* at 621–23. *Flores* is thus inapposite.

Finally, the Defendant cited *In re Sealed Case*, 936 F.3d 582, 590 (D.C. Cir. 2019), for the proposition that "there is no constitutionally permissible basis to impose sentencing enhancements for purely foreign conduct that did not economically impact the United States." Dkt. No. 208 at 5–6. But as with *Flores*, this case is irrelevant. *In re Sealed Case* addressed "how the Foreign Commerce and Due Process Clauses of the Constitution limit the extraterritorial application of [21 U.S.C. § 960a]." 936 F.3d at 585. The D.C. Circuit concluded that "Congress had the authority to criminalize Appellant's conduct even though his actions occurred outside of the United States, and that his plea agreement precludes his other arguments on appeal." *Id.* There is simply nothing in the opinion that requires foreign conduct to "economically impact the United States" before it can be used to enhance a sentencing.

### 3.    The Court can consider the Defendant's signed statement of facts at sentencing.

Before the Defendant proceeded to trial, he signed a plea agreement, Dkt. No. 146-2, and statement of facts, Dkt. No. 146-3, and gave notice to the Court that he intended to plead guilty. Dkt. No. 163 at 3. But at the scheduled change of plea hearing, the Defendant did not plead guilty. *Id.* at 3–5. In response to a motion in limine, this Court ruled that the Defendant's statement of facts was not admissible in the government's case-in-chief at trial. *Id.* at 12, 20. The PSR cited and

incorporated the Defendant's statement of facts when reciting the offense conduct. Dkt. No. 210 ¶ 12.

The Defendant objected to the PSR relying on his signed statement of facts. Dkt. No. 208 at 3–4.[3] Relying on his briefing in advance of trial, the Defendant has failed to cite any legal authority for the proposition that his statement cannot be used at sentencing.

This Court can rely on evidence that has "sufficient indicia of reliability." *In re Sealed Case*, 246 F.3d 696, 700 (D.C. Cir. 2001) (citing U.S.S.G. § 6A1.3). And this Court has already recognized that the "Defendant and his counsel signed both the Plea Agreement and [statement of facts]," Dkt. No. 163 at 3. Next, there is nothing in the Court's opinion regarding the admissibility of the statement at trial that prevents the Court from considering it at sentencing. In its thorough opinion, this Court ruled that the Defendant's statements were not admissible in the government's case-in-chief at trial under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. *Id.* at 12, 20. But the Court's ruling was specific to the government's case-in-chief at trial. *Id.* at 6. As the Defendant conceded, "statements made by him during plea negotiations are admissible for impeachment or rebuttal purposes." *Id.* Critically, Rule 410 does not apply to sentencing. Fed. R. Evid. 1101(d)(3). And therefore, this Court can, and should, rely on the Defendant's signed

---

[3] Relatedly, the Defendant asks that he be given a reduction for acceptance of responsibility if his statement of facts is considered. Dkt. No. 208 at 12. But the Defendant has failed to engage with the requirements of U.S.S.G. § 3E1.1 and could not credibly explain how he has "clearly demonstrate[d] acceptance of responsibility for his offense" or how he has "assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1. As the comments explain, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* cmt. 2. Finally, this is not one of the rare cases where, for example, a defendant proceeds to trial but stipulates to his guilt to preserve an issue for appeal. *See In re Sealed Case*, 350 F.3d 113, 119–24 (D.C. Cir. 2003).

statement of facts—along with the trial evidence—when calculating the Guidelines range and determining the appropriate sentence under 18 U.S.C. § 3553(a).

As described in detail below, the Defendant's admissions are corroborated extensively by the evidence presented at trial. The Defendant's signed statement of facts thus "has sufficient indicia of reliability to support its probable accuracy," and this Court may therefore consider it at sentencing. U.S.S.G. § 6A1.3.

### 4.     The trial witnesses were credible.

The Defendant argues that "the evidence presented by the Government was unreliable and should not be relied upon by the Court when considering any fact of consequence at sentencing and in considering the applicability of aggravated role." Dkt. No. 208 at 12. Simply put, the Defendant is asking this Court to disregard as unreliable all of the trial evidence during sentencing.

In support of this argument, the Defendant plucks several snippets of witness testimony and argues they are inconsistent. *Id.* On this basis, the Defendant urges the Court to disregard all the testimony. *Id.* But, as this Court is well aware, it is not only normal but also expected for different witnesses with independent bases of knowledge to perceive events differently and to articulate their recollections differently—especially through a translator. What is important is whether the witnesses are consistent on the legally relevant facts and major details, not uniformity.

In this case, the witnesses and the physical evidence overwhelmingly corroborate each other and establish the facts relevant to sentencing. To begin, the guilty verdict reveals that the jury necessarily found that significant aspects of the trial testimony and evidence were credible beyond a reasonable doubt. Applying the lower standard of proof applicable at sentencing, this Court should likewise credit the testimony of these witnesses. In fact, this Court previously heard and found credible testimony from several of these witnesses in other cases. First, this Court heard and credited the testimony of Oscar Nava Valencia and Drug Enforcement Administration

("DEA") Special Agent Kevin Novick during the sentencing of Gerardo Gonzalez-Valencia. *United States v. Gonzalez-Valencia*, Dkt. 185 at 5, Case No. 16-CR-65-BAH (D.D.C.). Second, this Court heard and credited the testimony of Elpidio Mojarro Ramirez during the sentencing of Raul Flores Hernandez. *United States v. Flores-Hernandez*, Dkt. 88 at 5, Case No. 17-CR-51-BAH (D.D.C.). Third, this Court heard and credited the testimony of Jesus Contreras Arceo and Agent Novick during the trial of Javier Algredo Vazquez. *United States v. Algredo Vazquez*, Dkt. 156 at 5, Case No. 21-CR-597-BAH (D.D.C.).[4]

Next, the testimony of the witnesses was corroborated by the testimony of other witnesses and by exhibits, including intercepted communications, photographs, and physical evidence. Take the Defendant's role in the CJNG as an example. Mr. Nava, Jose Antonio Torres Marrufo, Mario Ramirez Trevino,[5] Herminio Gomez Anciro, and Mr. Contreras all described the Defendant's role as second only to his father. Dkt. No. 207 at 9–11; Trial Tr., Sept. 11, 2024, PM ("Sept. 11 PM Trial Tr.") at 24, 26. Their consistent testimony is also corroborated by the rifle and grenade launcher—painted with "CJNG 02 JR"—which the Defendant was holding when he was arrested:

---

[4] In this Court's statement of reasons, the Court found the following: "Witnesses at trial provided testimony about defendant's knowledge of the illegal use by the CJNG cartel of the chemicals defendant ordered for delivery in Mexico to manufacture methamphetamine." *Algredo Vazquez*, Dkt. 156 at 5. In its order denying a motion for new trial, this Court described Mr. Contreras's testimony in detail and found that his "testimony was repeatedly corroborated" by, among other things, "DEA Special Agent Novick's" testimony. *Algredo Vazquez*, Dkt. 137 at 6. Similarly, this Court noted that Mr. Contreras's "testimony that defendant used his company to export chemicals from China to Mexico was confirmed by a plethora of documentary evidence." *Id.*

[5] Mr. Ramirez testified during a deposition on February 21, 2024, which was recorded and played during the trial. Trial Tr., Sept. 16, 2024, PM ("Sept. 16 PM Trial Tr.") at 27.



Government Exhibit No. ("GX") 367; Trial Tr., Sept. 11, 2024, AM ("Sept. 11 AM Trial Tr.") at 46, 49, 55–56. The CJNG's Christmas greeting also corroborates their testimony: the Defendant signed the BBM message with the same monikers "2" and "JR":

| 1 | Huesos (2A0FB4E9)<br><br>Tue, 24 Dec 2013 19:03:03 | Buen día para todos los q formamos esta familia llamada cartel de jalisco nueva generación. De parte del sr 1 y 2 les deseamos q pasen una feliz navidad al lado de sus seres queridos,que dios y san judas los cuide y los bendiga. Se les agradece el empeño esfuerzo y coraje q ponen día a día para q esto siga adelante, ya q para nosotros cada uno de ustedes son nuestra fuerza. Siempre contarán con nuestro apoyo en buenas y malas. UN FUERTE ABRAZO Y ARRIBA CJNG SEÑORES. ATT. MV y JR | Good day to everyone who is part of this family called the cartel de jalisco nueva generacion [New Generation Jalisco Cartel]. On behalf of Mssrs. 1 and 2 we hope you have a merry christmas alongside your loved ones, may god and jude the apostle take care of you and bless you. Thank you for the resolve effort and bravery you put in day after day to keep this going forward, because each one of you is our strength. You can always count on our support in good times and bad. A WARM EMBRACE AND HERE'S TO CJNG GENTLEMEN. SINCERELY MV and JR |

GX 96A at 1 (emphasis added); Trial Tr., Sept. 18, 2024, AM ("Sept. 18 AM Trial Tr.") at 54; Sept. 11 PM Trial Tr. at 8.

The trial witnesses are also consistent on other legally relevant aspects of this case. For example, Mr. Torres and Mr. Ramirez independently testified that the Defendant continued operating the CJNG while he was in prison in Mexico. Dkt. No. 207 at 2–3 (marshalling Mr. Ramirez's testimony regarding the Defendant controlling the distribution of drugs in the prison);

Trial Tr., Sept. 17, 2024, AM ("Sept. 17 AM Trial Tr.") at 30–31 (describing the Defendant controlling weapons purchases for the CJNG while in prison).

For another example, Mr. Nava, Mr. Mojarro, Mr. Gomez, Mr. Torres, Mr. Ramirez, and Mr. Contreras were highly consistent on the Defendant's involvement in trafficking massive quantities of cocaine and methamphetamine to the United States. Dkt. No. 209 at 6–12 (marshalling testimony regarding drug quantity and importation); Dkt. No. 207 at 3–4 (marshalling testimony regarding drug importation). Their consistent accounts were corroborated by the Defendant's own statements captured by intercepted BBM communications, establishing that the Defendant was personally responsible for delivering 452 kilograms of cocaine to his uncle Abigael Gonzalez Valencia during the month of June 2013. The Defendant, using the BBM moniker "Ice man," and his uncle Abigael, using the BBM moniker "Boss," discussed the delivery of 102 "notebooks," which DEA Special Agent Steve Paris explained was code for 102 "kilos of cocaine":

| 26 | Boss (2AA2DE0C) Sat, 08 Jun 2013 22:31:26 | Cuanta | How much |
|---|---|---|---|
| 27 | *File name: 2872031_2AA2DE0C^BBMESSENGER^09-06-2013 01_40_42_9840* | | |
| 28 | Ice man (28C3157F) Sat, 08 Jun 2013 22:34:02 | 102 cuademos y de ahÃle vamos a dar al 40 5 cuademos pa alivianarlo | 102 notebooks and from that we're going to give 40 5 notebooks just to be cool |

GX 36A at 4 (emphasis added); Sept. 18 AM Trial Tr. at 17. Later the same month, the Defendant agreed to prepare "150" "squares" for his uncle, and Agent Paris explained that the Defendant was again talking about 150 "kilograms of cocaine":

| 5 | **Boss (2AA2DE0C)** Tue, 25 Jun 2013 22:06:09 | A por que hoy entregue unos cuadros al senor y manana quiere otros y ya no tengo para que me pases unos | Oh because I delivered some squares today to the man and tomorrow he wants more and I don't have any if you can send me some |
|---|---|---|---|
| 6 | **Ice man (28B3661F)** Tue, 25 Jun 2013 22:06:36 | Cuantos ocupa tio pa alistarlos | How many do you need uncle to get them ready |
| 7 | *File name: 2980265_2AA2DE0C^BBMESSENGER^25-06-2013 23_26_00_2056* | | |
| 8 | **Boss (2AA2DE0C)** Tue, 25 Jun 2013 22:15:31 | Pues no se cuantos me pidan dale unos 150 si quieres | Well I don't how many they'll ask me for make it 150 if you want |

| 9 | **Ice man (28B3661F)** Tue, 25 Jun 2013 22:21:50 | Ok ay se los dan a yiyo pa que se cordine el con prieto | Ok they'll give them to yiyo so he can coordinate with prieto |
|---|---|---|---|
| 10 | **Boss (2AA2DE0C)** Tue, 25 Jun 2013 22:22:36 | Ya esta | Alright |

GX 69A at 1–2 (emphasis added); Sept. 18 AM Trial Tr. at 11. Finally, the Defendant agreed to supply "50," GX 20A at 1, "squares" but was offended that his uncle thought he might "cheat[]" him with "cut," GX 20A at 2, bricks of cocaine:

| 1 | Ice man (28B3661F) Tue, 18 Jun 2013 01:07:35 | La verdad tio no me diga eso porque yo jamas le e echo una chuecura ni pienso hacersela si gusta cheke los cuadros pero la verdad no creo que aiga nesecidad nunka les he fallado a ustedes en algo ni les pienso fallar jamas pa mi antes de todo esta la sangre y uste es mi tio | Honestly uncle don't say that to me because I have never cheated you nor do I plan to if you want check the squares but really I don't think there's any need I have never let you all down in anything nor do I plan to let you down ever for me family comes before everything and you are my uncle |
| 2 | Boss (2AA2DE0C) Tue, 18 Jun 2013 01:08:45 | No te enojes rojo solo le ise el comentario que no me fueras a dar de esos por que me enredo en vebderlos no que me ayas echo chuecuras | Don't get mad rojo I just said to him that you shouldn't give me any of those because it's a hassle for me to sell them, not that you've done anything shady |
| 3 | Boss (2AA2DE0C) Tue, 18 Jun 2013 01:11:05 | Disculpame si te sentiste ofendido no fue mi intencion | Forgive me if you felt offended it was not my intention |

GX 22A at 1–2 (emphasis added). Later in the conversation, the Defendant said 150 more kilograms of cocaine were "coming":

| 12 | Boss (2AA2DE0C) Tue, 18 Jun 2013 01:15:00 | Ya esta y que paso con la chata si encontro los demas | Alright and what happened with la chata did he find the rest |
| 13 | Ice man (28B3661F) Tue, 18 Jun 2013 01:16:19 | Yo pienso que hoy salen 150 mas si dios quiere | I think that 150 are coming out today god willing |

GX 22A at 2 (emphasis added). These three conversations establish that during a single month, June 2013, the Defendant supplied at least 452 kilograms of cocaine to his uncle, therefore corroborating the testimony of other witnesses who said the Defendant was involved in this massive scale of drug trafficking with Los Cuinis during this time.

Additionally, the cross-examination of the witnesses bolstered their credibility. For example, the Defendant's counsel questioned Mr. Torres at length about how the Defendant could possibly obtain contraband photographs of weapons in the prison. Dkt. No. 204 at 39–47. In

response, Mr. Torres's described in detail how visitation booths "number one, number two and number four" had a security flaw in the window seal that he and the Defendant "would frequent[ly]" exploit. *Id.* at 40, 42, 59. Similarly, the Defendant's counsel examined Mr. Gomez extensively about a journal that he kept from 2011 to 2015. Trial Tr., Sept. 12, 2024, AM ("Sept. 12 AM Trial Tr.") at 41–58. In the journal, Mr. Gomez recorded "all of the events that [he] experienced with the [CJNG] and Ruben Oseguera." *Id.* at 42. When pressed on how Mr. Gomez could have recorded his experiences despite being illiterate, Mr. Gomez replied, "I am illiterate, I am not dumb. I lived all of that. I could write it all today." *Id.* at 43. After having testified for hours, Mr. Gomez readily agreed to let the Defendant's counsel review the journal. *Id.* at 47–48. And after a break, Mr. Gomez returned to the stand with the journal, confirming that it contained "everything that was related to things from 2010 to 2015." Dkt. No. 203 at 4–5. The Defendant's counsel received a copy of the journal to review, *id.* at 72–74, and received express permission from the Court to recall Mr. Gomez if necessary, *id.* at 4. But the Defendant's counsel never recalled Mr. Gomez to the stand.

After the trial, the government obtained translations of two excerpts from Mr. Gomez's journal. The government will seek to introduce translated passages from the journal at the sentencing hearing to rebut the Defendant's claims that Mr. Gomez's testimony was contradicted by the journal entries.

Finally, the Defendant's own written admissions corroborate the witnesses who testified at trial. For example, regarding the leadership role of the Defendant and his father, the Defendant admitted the following: "the Defendant was a leader of a Mexico-based drug-trafficking organization (DTO) known as the Cartel de Jalisco Nueva Generacion (CJNG). The top leader of the CJNG was and is the Defendant's father, Nemesio Oseguera Cervantes, also known as 'El

Mencho.'" Dkt. No. 146-3 at 3. The Defendant's own admissions also corroborate witness testimony pertaining to multiple Guidelines enhancements, *see, e.g.*, Dkt. No. 146-3 at 3–6 (discussing importation); *id.* at 5–6 (discussing kidnapping), including his admissions on committing prolific and extreme violence:

> 10. The Defendant acknowledges that as a leader of the CJNG, the Defendant gave orders to kill members of a rival cartel. The CJNG members who took orders from the Defendant were responsible for the murder of more than 100 people for perceived affronts to the CJNG, including stealing drugs belonging to the CJNG, failing to deliver drugs or chemicals used in drug production to the CJNG, and providing information about the CJNG to law enforcement.

> 11. The Defendant further acknowledges that, in approximately 2008, he personally shot and killed a member of a rival cartel.

Dkt. No. 146-3 at 5. Accordingly, this Court should credit the testimony of each of the trial witnesses.

**B.    The Court should find that the Defendant committed multiple first-degree premeditated murders under U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1(a).**

Guidelines Section 2D1.1(d)(1) provides an alternative minimum offense level of forty-three: when "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder) . . . as appropriate[.]" U.S.S.G. § 2D1.1(d)(1). "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree." 18 U.S.C. § 1111(a). The *Criminal Jury Instructions for the District of Colombia*, also known as the "Redbook," provide the following relevant instructions:

The elements of first-degree premeditated murder, each of which the government must prove beyond a reasonable doubt,[6] are that:

1.[The Defendant] caused the death of [the Defendant's victim];

2.[The Defendant] intended to kill [the Defendant's victim];

3.[He] did so after premeditation; and

4.[He] did so after deliberation.

Premeditation means forming an intent to kill. To premeditate is to give thought, before acting, to taking a human life, and then to reach a definite decision to kill.

Deliberation means considering and reflecting on the intent to kill, turning it over in the mind, giving it second thought.

Premeditation—the formation of an intent to kill—may be instantaneous, as quick as thought itself. Deliberation, however, requires some time to have elapsed between formation of this intent and the fatal act, within which one pauses and actually gives second thought and consideration to the intended act. The law does not require that deliberation take any particular amount of time. It can be days, hours or minutes, or it can be as brief as a few seconds. It varies according to the circumstances of each case. It is the fact of deliberation that the government must prove, not the length of time it may have gone on.

Criminal Jury Instructions for D.C. Instruction § 4.201 (2024). "In the case of premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case." U.S.S.G. § 2A1.1 cmt. 2(A).

The D.C. Circuit has upheld the application of the section 2D1.1(d)(1) cross reference to impose a minimum offense level of forty-three when a murder "was undertaken at least in part to further the profits and operations of the [charged] drug conspiracy." *United States v. Bostick*, 791

---

[6] Because the standard of proof at sentencing is preponderance of the evidence, *United States v. Khan Mohammed*, 89 F.4th 158, 165 (D.C. Cir. 2023), the Court may find that the elements of first-degree premeditated murder have been met and that the cross reference in section 2D1.1(d)(1) applies using the preponderance of the evidence standard instead of the beyond a reasonable doubt standard.

F.3d 127, 158–59 (D.C. Cir. 2015), judgment entered, 839 F. App'x 556 (D.C. Cir. 2021);[7] *see also* U.S.S.G. § 1B1.3(a)(1)(A). Even if "[the Defendant] did not physically participate in [a] murder[]," cross-reference 2D1.1(d)(1) still applies if a "murder[] w[as] reasonably foreseeable to [the Defendant] and within the scope of his particular conspiratorial agreement." *Bostick*, 791 F.3d at 159–60; *see also* U.S.S.G. § 1B1.3(a)(1)(B) (including "acts . . . of others" in a defendant's Relevant Conduct).

The trial evidence revealed that the Defendant committed first-degree premeditated murder when he slashed the throats of the five bound men who owed him drug money. The details of that incident expose the ease with which the Defendant killed other human beings: Mr. Gomez described traveling with the Defendant to a mango field where CJNG sicarios were waiting with five men who were bound and kneeling. Sept. 12 AM Trial Tr. at 25–27. Before killing the five men, the Defendant told each of them that they no longer owed the Defendant any money. *Id.* at 28. Then one by one, the Defendant slashed the throat of each man with a half-moon-shaped knife. *Id.* 26–27. After the Defendant was done, he asked for a clean shirt. *Id.* at 28. These facts demonstrate that the Defendant intended and caused the death of the five men willfully, deliberately, maliciously, and premeditatedly: the Defendant traveled to meet the victims in a remote mango field; the victims were waiting for the Defendant, bound, on their knees, and with their heads being held back by sicarios; the Defendant first spoke to each victim individually about why they were being killed; the Defendant then killed the five victims in succession—giving him time to reflect between each murder; and the Defendant used a knife that appears to have been

---

[7] In *Bostick*, the drug conspiracy was charged as a violation of 21 U.S.C. § 846. 791 F.3d at 137. Courts have also applied section 2D1.1(d)(1) to violations of 21 U.S.C. § 963 like the one charged in this case. *See, e.g., United States v. Brown*, No. 99-CR-00125-KMM, 2019 WL 8348952, at *1 (S.D. Fla. Aug. 7, 2019).

specific to the purpose of execution. Finally, after butchering his victims, the Defendant asked for a clean shirt. These facts demonstrate that the Defendant is nothing less than a cold, calculated mass murderer.[8]

According to Mr. Gomez, "[i]t was very common for them to kill people who owed . . . not just for drugs, for anything." Sept. 12 AM Trial Tr. at 29. Moreover, Mr. Contreras described using acid to dissolve the bodies of murder victims "[a]ll the time." Sept. 18 AM Trial Tr. at 65. Finally, the Defendant himself admitted that "as leader of the CJNG, [he] gave orders to kill members of a rival cartel. The CJNG members who took orders from [him] were responsible for the murder of more than 100 people for perceived affronts to the CJNG, including stealing drugs belonging to the CJNG, failing to deliver drugs or chemicals used in drug production to the CJNG, and providing information about the CJNG to law enforcement." Dkt. No. 146-3 at 5.

In sum, the preponderance of the evidence established that the Defendant committed multiple first-degree murders. Accordingly, the Defendant's alternative minimum[9] offense level is forty-three and "life imprisonment is the appropriate sentence." U.S.S.G. § 2A1.1 cmt. 2(A). Furthermore, "[a] downward departure would not be appropriate in such a case." *Id*.

### C. The Court should depart upward to a sentence of life in prison for Count Two.

Turning to Count Two, section 2K2.4(b) of the Guidelines provides that "if the defendant . . . was convicted of violating [18 U.S.C. §] 924(c) . . . , the guideline sentence is the minimum term of imprisonment required by statute"—thirty years in this case—which must be

---

[8] The Congress has defined the term "mass killings" to mean "3 or more killings in a single incident." 28 U.S.C. § 530C(b)(1)(M).

[9] Even if the Court finds that the total offense level under section 2D1.1 is higher than forty-three, the Court should find that the Defendant committed multiple first-degree murders and thus that the total offense level cannot be less than forty-three.

served consecutively to the term of imprisonment imposed on Count One. U.S.S.G. § 2K2.4(b). 18 U.S.C. § 924(c)(1)(B)(ii). Section 2K2.4(b) prohibits the application of Chapters Three and Four of the Guidelines to this count of conviction but contemplates that the Court may depart upward to the statutory maximum sentence: life in prison. *See* 18 U.S.C. § 924(c)(1)(B)(ii); U.S.S.G. § 2K2.4 cmt. 2(B).

Chapter Five provides multiple, applicable grounds for an upward departure on Count Two. Section 5K2.0(a)(3) provides that a "departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that kind of offense." U.S.S.G. § 5K2.0(a)(3). For example, "departure may be warranted if several persons were injured" but the applicable guideline "does not deal with injury to more than one victim." *Id.* cmt. (3)(B)(ii).

The guideline applicable to Count Two, section 2K2.4(b), does not deal with injury to more than one victim—let alone the death of multiple victims. Indeed, the minimum sentence is required even if the Defendant only "possessed" the qualifying weapon, a "destructive device" in this case; it does not account for the death and injury that results from the use of such a weapon. 18 U.S.C. § 924(c)(1)(B)(ii). Section 5K2.1 provides that "[i]f death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1. One of the factors in determining whether to depart upward is "whether multiple deaths resulted." *Id.* Similarly, "a substantial increase may be appropriate if the death was intended or knowingly risked." *Id.* Section 5K2.2 provides a similar analysis for physical injuries, directing the Court to consider "the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was

intended or knowingly risked." U.S.S.G. § 5K2.2. Thus, "[w]hen the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be appropriate." *Id.*

To begin, the Defendant admitted "that, in approximately 2008, he personally shot and killed a member of a rival cartel." Dkt. No. 146-3 at 5. And in April 2015, Mr. Gomez witnessed the Defendant personally shoot a subordinate in the head when the man failed to obey quickly. Sept. 11 PM Trial Tr. at 29.

Additionally, the trial evidence revealed that the Defendant personally ordered his sicarios to shoot down a military helicopter, which resulted in the death of at least nine people and the permanent disfigurement of a Mexican Federal Police officer. Mr. Gomez testified that on May 1, 2015, the Defendant "himself" gave the order to "shoot down the helicopter." Sept. 11 PM Trial Tr. at 67. At that time, the Defendant and his father were fleeing Mexican authorities. *Id.* The Defendant knew that the helicopter carried Mexican authorities, ordering Mr. Gomez, "shoot down the helicopter. Let them send reinforcement to the soldiers." *Id.* The Defendant, who "was the main one talking," *id.* at 67, "ordered [Mr. Gomez] to contact everyone that [he] had communication with and to knock down bridges and set up checkpoints, block roads, burn down banks." *Id.* at 66. Put another way, the Defendant "wanted Jalisco to burn." *Id.*

The helicopter was one of four Mexican military helicopters pursuing the Defendant and his father. Trial Tr., Sept. 16, 2024, AM ("Sept. 16 AM Trial Tr.") at 11–12. Before it was shot down at the Defendant's order, the helicopter looked similar to this:



*Id.*; GX 366 at 1. Eighteen members of the Mexican Federal Police and the Mexican National Defense Secretariat were inside the helicopter that was shot down. Sept. 16 AM Trial Tr. at 12. Those eighteen set out early that morning on a secret operation; only after they were in the air, they learned that they "were pursuing a convoy of trucks." *Id.* at 15. Ivan Morales Corales, a Mexican Federal Police Officer who was riding in the back of the helicopter, survived the crash and testified at trial. *Id.* at 14. Shortly after Mexican authorities spotted the convoy, the shooting started. *Id.* at 15. After numerous smaller impacts followed by "a loud explosion," "the helicopter started to burn" and fell from the sky. *Id.* at 15–16. Half of the people on board died. *Id.* at 19. Mr. Morales escaped through the flames and was badly burned. *Id.* at 16–19. As he fled gunfire, he "did not see any of the people who were with [him]" because the helicopter was "engulfed in flames." *Id.* 17. After he was rescued, he "was taken to a hospital in Guadalajara" and was hospitalized for five months, enduring "[c]ountless surgeries" because his "body was 70 percent burnt." *Id.* at 18–19. When investigators found the downed helicopter, it was almost unrecognizable:



GX 100 at 1.

Corroborating Mr. Gomez's account, Mexican authorities found multiple items, at or near the scene of crash, tying the Defendant to the helicopter crash. First, investigators found multiple hats that bore the custom logo for the CJNG "Special Group of the high command":



GX 365; GX 244. The Defendant was wearing a hat with the same logo when he was arrested less than two months later. Sept. 11 AM Trial Tr. at 50. Second, investigators found an embroidered belt with ammunition pouches that bore the Defendant's moniker "JR":



GX 307. And third, investigators found five luxury watches—worth approximately $190,000, Sept. 16 AM Trial Tr. at 43—one of which was a limited-edition Swiss made watch with a map of the State of Jalisco, Mexico, on the dial:



GX 410 (emphasis added); *see also* GX 320. On the day of Mr. Gomez's wedding, which took place about a month before the helicopter crash, the Defendant "was wearing a watch that had the map of Jalisco." Sept. 11 PM Trial Tr. at 62.

Mr. Contreras described seeing the Defendant and Mencho "four or five hours" after the helicopter was shot down. Sept. 18 AM Trial Tr. at 72. The Defendant and Mencho told Mr. Contreras that the helicopter had been shot down near "a little ranch," which Mr. Contreras pointed

out on a map of Jalisco. *Id.* at 73. Mr. Contreras saw the Defendant in "Union de Tula," which is near "Villa Purificacion" "where they shot the helicopter down":



*Id.* at 74; GX 99 at 8 (emphasis added). From Union de Tula, the Defendant "went to [Puerto] Vallarta or Guadalajara. And Mencho went into hiding." Sept. 18 AM Trial Tr. at 74.

Separately, Mr. Torres recounted conversations with the Defendant about the helicopter while the two of them were in prison together. Sept. 17 AM Trial Tr. at 35. After the two listened to a narcocorrido (or drug ballad) "about taking down the federal police helicopter," the Defendant said that "they had had a really hard time that day; that it had been quite difficult, but that they had been able to escape, both him and his father" and his father's dog. *Id.* at 40–41. The Defendant then bragged that "[o]ne of his people" "had taken [the helicopter] down." *Id.*

The preponderance of the evidence thus established that the Defendant ordered his men to shoot down a government helicopter, causing at least nine deaths and at least one permanent disfigurement, all of whom were Mexican service members and federal law enforcement officers. This is "an exceptional case" and "the circumstance that forms the basis for the departure"—even after being "taken into consideration in determining the guideline range"—is "substantially in excess of . . . that which ordinarily is involved in that kind of offense." U.S.S.G. § 5K2.0(a)(3).

Accordingly, the Court should depart upward and impose a sentence of life imprisonment for Count Two.[10]

## III.  THE 18 U.S.C. § 3553(A) SENTENCING FACTORS REQUIRE CONSECUTIVE LIFE SENTENCES FOR THE DEFENDANT.

After correctly calculating the advisory Guidelines range, this Court must consider the factors set out in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. Section 3553(a) directs this Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and then "impose a sentence sufficient, but not greater than necessary," to achieve the following purposes:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). While the Court may not presume that the appropriate sentence lies within the correctly calculated Guidelines range, the Court "must begin the[] analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. As this Court is uniquely aware, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Id.* at 46; *see also Rita v. United States*, 551 U.S. 338, 349 (2007). Thus, to the extent this Court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that

---

[10] Alternatively, this evidence justifies an upward variance to life in prison under 18 U.S.C. § 3553(a).

the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### A.   Nature and circumstances of the offense, and need for the sentence to reflect the severity of the offense

Over the course of almost a decade, the Defendant led a vast and violent drug trafficking operation. The nearly unprecedented severity of the Defendant's crimes is acutely reflected in the mind-boggling quantity of drugs for which the Defendant is responsible, the Defendant's years as the second-in-command of the CJNG, and the Defendant's brutal violence.

First, the Defendant is personally responsible for trafficking over fifty tons of cocaine and over a thousand tons of methamphetamine, based only on evidence introduced at trial. These drugs were worth over twelve billion dollars. These staggering amounts are more than twenty-three thousand times more than the minimum amount of cocaine and methamphetamine required to trigger the highest possible offense level under the Guidelines. And in around 2013, right before synthetic opioid-overdose deaths started rising sharply in this country, the Defendant was discussing with a co-conspirator about his desire to "do it big" with fentanyl and counterfeit OxyContin pills. GX 78A at 1; Sept. 18 AM Trial Tr. 25–29. Simply put, this is a historically severe drug offense.

Second, the Defendant founded the CJNG with his father and then led the cartel as second-in-command for approximately seven years. During the Defendant's tenure, the CJNG grew to be known for its brazenness and brutality, including public executions, ostentatious displays of sophisticated weaponry, murders of Mexican public officials, and expansion by force. *See* June S. Beittel, Cong. Rsch. Serv., R41576, *Mexico: Organized Crime and Drug Trafficking Organizations*, 33–34 (June 7, 2022). The Defendant led thousands of people in the CJNG and was outranked by only his father—the leader of the CJNG. *See, e.g.*, Sept. 11 PM Trial Tr. at 48;

Sept. 18 AM Trial Tr. at 47. In fact, the Defendant's father said that he and the Defendant were equals; but the Defendant called himself number 2 "out of respect." Sept. 11 PM Trial Tr. at 26. Consistent with the Defendant's leadership role, he was the only person besides his father who controlled the distribution of the methamphetamine that the CJNG was producing. Sept. 18 AM Trial Tr. at 47. And the Defendant was one of only three people in the CJNG—along with his father and his brother—who had authority to order a murder. *Id.* at 65. Because of his position, the Defendant traveled with one hundred sicarios in a convoy of twenty trucks. Sept. 11 PM Trial Tr. at 48. Put another way, the Defendant traveled with protection akin to a head of state. In fact, the Defendant's sicarios were able to shoot down a Mexican military helicopter, keeping the Defendant from being captured by Mexican authorities. *See, e.g.*, Sept. 17 AM Trial Tr. at 40–41. Bottom line, the Defendant outranked everyone in the CJNG except his father.

Third, the Defendant is a mass murderer and engaged in unconscionable violence. In April 2015, the Defendant personally butchered five bound men and then calmly asked for a clean shirt. In the same month, the Defendant shot one of his drivers in the head because the man was too slow to obey. And on the first day of the next month, the Defendant ordered a military helicopter shot out of the sky—killing at least nine and permanently disfiguring a Mexican Federal Police officer.

Accordingly, only a sentence of consecutive terms of life imprisonment is sufficient to reflect the seriousness of this offense.

### B.    History and characteristics of the Defendant

The Defendant's history and characteristics also warrant a sentence of consecutive life terms of imprisonment. To begin, the Defendant is a United States citizen who could have, at any time, ceased his criminal activity and left Mexico. Instead, the Defendant decided year after year—for almost a decade—to continue living a life of crime. And by continuing in that life, the Defendant enjoyed the lavish profits of the drug trafficking operation he managed, including a

truck filled with United States currency, a watch collection worth almost two hundred thousand dollars, an entourage fit for a head of state, and thousands of people at his disposal, just to name a few. *See, e.g.*, Sept. 11 PM Trial Tr. at 42–43, 48; Sept. 16 AM Trial Tr. at 43.

The Defendant's conduct also demonstrates a complete disregard for lawful authority. When the Defendant was arrested, he used a rifle and grenade launcher to threaten law enforcement authorities before trying to flee. Sept. 11 AM Trial Tr. at 44–56. After Mexican authorities cornered the vehicle in which the Defendant had been traveling, the Defendant and another man got out and "threatened [the officers] with weapons." *Id.* at 44. The Defendant, who was also carrying a black pistol with a silver handle, pointed a rifle and grenade launcher (depicted below), which bore his nicknames "Menchito," "02," and "JR," at the police officers who were pursuing him:





GX 367; Sept. 11 AM Trial Tr. at 46, 49, 55–56. When asked what he understood the Defendant was prepared to do with the rifle and grenade launcher, one of the officers who were at the scene

testified, "Obviously, shoot at us." Sept. 11 AM Trial Tr. at 47. When the police officers ordered the Defendant to put down the weapon, the Defendant told the police "[t]o let him go because he was from the Jalisco New Generation Cartel." *Id.* at 48. This conduct demonstrates the Defendant's complete disregard for the law. It also demonstrates his unwillingness to accept responsibility for his criminal conduct; an unwillingness that has continued to this day and reflects the absolute impunity he cultivated as a notorious cartel leader.

Accordingly, only consecutive sentences of life imprisonment are sufficient to address the Defendant's history and characteristics.

### C.    Adequate deterrence

Given the extreme suffering that the CJNG—using violence, corruption, and drug trafficking—has inflicted upon communities in the United States, Mexico, and elsewhere, it is imperative that the Court impose a sentence that deters others. It is extraordinarily difficult to capture cartel leaders and bring them to justice. For example, despite the March 2017 announcement of a $10 million reward for information leading to the arrest or conviction of the Defendant's father, he remains a fugitive and continues to lead and grow the CJNG.[11] Similarly, despite the February 2015 arrest in Mexico of the Defendant's uncle, Abigael Gonzalez Valencia,[12] he has still not been extradited to face justice in this country. This case is therefore an extraordinarily rare opportunity to deter future criminal conduct by would-be cartel leaders; and

---

[11] *Wanted: Nemesio Ruben Oseguera-Cervantes*, U.S. DEPT. OF STATE (Mar. 26, 2017), https://2017-2021.state.gov/narcotics-rewards-program-target-information-wanted/nemesio-ruben-oseguera-cervantes/. The reward is now $15 million. *Reward Increased Up to $15 Million for Information Leading to Arrest and/or Conviction of Cartel Leader*, U.S. DEPT. OF STATE (Dec. 4, 2024), https://www.state.gov/reward-increased-up-to-15-million-for-information-leading-to-arrest-and-or-conviction-of-cartel-leader/.

[12] *Indictments against 11 high level Mexican drug cartel members unsealed*, U.S. Drug Enforcement Adm. (Oct. 16, 2018), https://www.dea.gov/press-releases/2018/10/16/indictments-against-11-high-level-mexican-drug-cartel-members-unsealed.

only the most stringent sentence will be likely to provide effective deterrence to those who are tempted to follow in the Defendant's footsteps.

Accordingly, only consecutive sentences of life imprisonment are sufficient to provide adequate deterrence.

### D.     Protect the public from further crimes of the Defendant

The Defendant was able to lead the CJNG because of his family, relationships, knowledge, and brutality. Those are resources the Defendant will be able to maintain and cultivate despite incarceration. And, as demonstrated by Ismael "El Mayo" Zambada Garcia, the founding leader of the Sinaloa Cartel: a septuagenarian is fully capable of running a drug cartel.[13] The Defendant's actions demonstrate that if he is ever released and returns to Mexico, he will return to his criminal empire.

Accordingly, only consecutive sentences of life imprisonment are sufficient to protect the public from future crimes of the Defendant.[14]

### E.     Need for sentence imposed to avoid unwarranted sentence disparities among similarly situated defendants

Section 3553(a)(6) directs this Court "to avoid *unwarranted sentence* disparities among defendants with similar records who have been found guilty of *similar conduct*."

---

[13] *Ismael "El Mayo" Zambada Garcia, Co-Founder of the Sinaloa Cartel, Arraigned in Brooklyn on International Drug Charges*, U.S. DEPT. OF JUSTICE (Sept. 13, 2024), https://www.justice.gov/opa/pr/ismael-el-mayo-zambada-garcia-co-founder-sinaloa-cartel-arraigned-brooklyn-international.

[14] In the event that the Court is inclined to sentence the Defendant to a term of years instead of life in prison, the Court should impose a life term of supervised release and include a condition that the Defendant, who is a U.S. citizen, Dkt. No. 210 at 3, reside in the United States, where he will be subject to the jurisdiction of the Court and the supervision of the U.S. Probation Office. *See* 18 U.S.C. §§ 3583(d), 3563(b)(13)–(14); U.S.S.G. § 5D1.3(c)(3). If the Defendant is ever able to return to Mexico, this Court will have no means to ensure that the Defendant does not return to his criminal empire.

18 U.S.C. § 3553(a)(6) (emphasis added). When determining whether a sentence creates an unwarranted disparity, this Court should consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history and whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to his case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).[15]

As described above, the Defendant is a mass murderer who led a vast and violent drug trafficking operation for almost a decade. A sentence of consecutive terms of life imprisonment is consistent with sentences received by defendants engaged in similar conduct and holding similar positions within international DTOs.

In *United States v. Alfredo Beltran Leyva*, the D.C. Circuit upheld a life sentence that the defendant received after pleading guilty without a plea agreement and following a contested sentencing hearing. 916 F.3d 14, 20–21 (D.C. Cir. 2019). Beltran and his two brothers ran a Mexico-based DTO closely allied with the Sinaloa Cartel. *Id.* at 19. Beltran's organization "purchased cocaine from Colombian manufacturers through brokers and then shipped the drugs via land, air, or water for sale throughout Mexico; the cartel also imported some of that cocaine to the United States . . . ." *Id.* The organization also "engaged gunmen to kill members of rival

---

[15] Section 3553(a)(6) does not require that the sentencing judge engage in a case-by-case comparison. This sentencing provision is aimed at national disparities; and courts have held that "the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18–19 (1st Cir. 2006); *see also United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Gallegos*, 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall*, 977 F.2d 861, 863–64 & n.4 (4th Cir. 1992); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir. 1991).

cartels." *Id.* Beltran's base offense level was thirty-eight, based upon the quantity of drugs involved. *Id.* at 20. The district court applied five sentencing enhancements, including a four-level enhancement because the defendant was an organizer or leader and two-level enhancements each for possession of a dangerous weapon, violence, bribing a law enforcement official, and being a leader or organizer directly involved in the importation of a controlled substance. *Id.* at 20–21. Beltran's total offense level prior to any acceptance of responsibility was fifty, and he had a criminal history score of zero, resulting in a criminal history category I.[16] *Id.* at 21. After considering the 3553(a) factors, the court found no basis for a downward departure and imposed a life sentence. *Id.*

In *United States v. Eliu and Waldemar Lorenzana-Cordon*, the court sentenced Eliu and Waldemar Lorenzana to life in prison after a jury found them guilty of conspiring to import five kilograms or more of cocaine into the United States. Dkt. No. 998, Dkt. No. 1002 at 50–51, Dkt. No. 1010, and Dkt. No. 1018 at 34–35, Case. No. 03-cr-00331-CKK (D.D.C.). The Lorenzana brothers were leaders of a Guatemala-based DTO for 13 years, distributing thousands of kilograms of cocaine from cartels in Colombia to Mexican buyers for importation into the United States. Dkt. No. 1002 at 44 and Dkt. No. 1018 at 30–31, Case. No. 03-cr-00331-CKK (D.D.C.). Both brothers had a base offense level of thirty-eight, and a total offense level of forty-six with enhancements for possession of a firearm, use of a noncommercial aircraft, and being a leader or organizer of the criminal activity. Dkt. No. 1002 at 7–8 & Dkt. No. 1018 at 6, Case. No. 03-cr-00331-CKK (D.D.C.). Neither of the Lorenzana brothers had a prior U.S. conviction or enhancements for use of violence. *See id.* Given the seriousness of the drug trafficking offense, the court sentenced both

---

[16] Prior to sentencing, Beltran Leyva unsuccessfully attempted to withdraw his guilty plea. *Id.* at 21. The court ultimately held the defendant did not qualify for a downward adjustment for acceptance of responsibility. *Id.*

brothers to life imprisonment. Dkt. No. 1002 at 50–51 & Dkt. No. 1018 at 34–35, Case. No. 03-cr-00331-CKK (D.D.C.).

Finally, in *United States v. Gerardo Gonzalez-Valencia*, this Court sentenced the Defendant's uncle Gerardo to life imprisonment after he pleaded guilty to conspiring to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine for importation into the United States. Dkt. No. 188 at 1–2, Case No. 16-CR-65-BAH (D.D.C.). Gonzalez, along with the Defendant's uncles Abigael and Jose Gonzalez Valencia, ran Los Cuinis DTO, of which the Defendant was a part and with the help of which the Defendant and his father launched the CJNG. Dkt. No. 170 at 3. This Court found that Gonzalez's base offense level was thirty-eight based on drug quantity and a total offense level of forty-eight without acceptance of responsibility because Gonzalez possessed a firearm, used violence, was an organizer and leader, and used submersible or semi-submersible vessel. Dkt. No. 185 at 5–6. Because Gonzalez had a prior drug conviction and was on escape status, his criminal history category was III. *Id.* at 5. Even though Gonzalez pleaded guilty, this Court sentenced him to life in prison, citing the "tonnage quantities of cocaine" for which he was responsible, "his leadership role," and his "threats of violence and actual violence." *Id.* at 6.

Anything less than consecutive life sentences in this case would create an unwarranted sentencing disparity because the Defendant's criminal culpability surpasses each of these defendants described above. To begin, as in each of these cases, the Defendant was responsible for sending drugs to the United States, the Defendant was a leader and organizer, and the Defendant possessed a weapon. And, as in each of these cases, the Defendant has a total offense level that is higher than forty-three—the highest possible offense level—and thus a guideline range of life in prison. But unlike Beltran and Gonzalez, the Defendant has not taken any steps to accept

responsibility. Unlike any of the other defendants, the Defendant is responsible for trafficking almost $12.6 billion worth of drugs. Dkt. No. 209 at 6–12. And unlike any of the other defendants, the Defendant is a mass murderer who personally butchered five bound men, shot a subordinate in the head, and ordered his sicarios to shoot down a military helicopter—resulting in at least nine deaths and the permanent disfigurement of a Mexican Federal Police officer. A conviction for any of those first-degree murders, if within the jurisdiction of the United States, would have been punished by death or at a minimum life in prison. *See* 18 U.S.C. § 1111(b). Indeed, mass murderers like the Defendant have often been sentenced to death in this country.[17]

Accordingly, only a sentence of consecutive terms of life imprisonment is sufficient to avoid unwarranted sentencing disparities.

## IV.    CONCLUSION

In sum, this Court should impose consecutive sentences of life in prison, which is reasonable and is appropriate to the severity of the crimes committed by the Defendant. It is the only sentence that is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, to promote respect for the law, to deter the Defendant and others from committing similar serious crimes, and to protect the public of the United States. Finally, the Court should order the Defendant to forfeit $12,599,026,000. *See* Dkt. No. 209-1.

---

[17] *See, e.g., Kidnapper-Slayer Executed in Texas*, DESERETNEWS (Nov. 19, 1992), https://www.deseret.com/1992/11/19/19016990/kidnapper-slayer-executed-in-texas/; *'Hollywood Ripper' Sentenced to Death for Killing, Mutilating Women*, 4 LOS ANGELES (Jul. 16, 2021), https://www.nbclosangeles.com/news/local/man-dubbed-hollywood-ripper-sentenced-to-death-for-killing-mutilating-two-women/2640599/; *Serial killer trying to get off death row*, MERCURY (Sept. 24, 2021), https://www.pottsmerc.com/2007/08/08/serial-killer-trying-to-get-off-death-row/.

Respectfully Submitted,

MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By: */s/ Jonathan R. Hornok*
Jonathan R. Hornok
Lernik Begian
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 514-0917

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant on February 14, 2025.

By: /s/ *Jonathan R. Hornok*
Jonathan R. Hornok
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice