UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16-CR-229-BAH |
| v. | : | |
| RUBEN OSEGUERA-GONZALEZ, | : | |
| Defendant. | : | |

**PROPOSED ADDENDUM TO STATEMENT OF REASONS**

The following additional facts justify the sentence in this case:

1. The Court personally observed the testimony of the following witness, each of whom provided credible testimony: Oscar Nava Valencia; Elpidio Mojarro Ramirez; Juan Perez; Herminio Gomez Anciro; Maria Hernandez; Ivan Morales Corales; DEA Special Agent Kevin Novick; Mario Ramirez Trevino; Jose Antonio Torres Marrufo; DEA Special Agent Steve Paris; Jesus Contreras Arceo; ATF FEO John Miller. The testimony of each of these witnesses was corroborated by the testimony of other witnesses, the exhibits admitted into evidence, and the Defendant's statements in his signed statement of facts, Dkt. No. 146-3. Additionally, each of these witnesses were subject to cross examination.

2. The Defendant's offense conduct involved 450 kilograms or more of cocaine and 45 kilograms or more of methamphetamine based upon credible evidence, including the following:

   a. The Defendant admitted that the amount of cocaine and methamphetamine involved in this conspiracy for which he had actual knowledge and involvement was more than 450 kilograms of cocaine and more than 45 kilograms of methamphetamine. Dkt. No. 146-3 at 6.

   b. Mr. Nava credibly testified that the Defendant directly supervised the distribution of at least 24,000 kilograms of cocaine and at least 1,666 kilograms of methamphetamine. Trial Tr., Sept. 9, 2024, AM ("Sept. 9 AM Trial Tr.") at 53, 64–68, 71.

   c. Intercepted BlackBerry Messenger (BBM) communications, as credibly interpreted by Agent Paris, establish that the Defendant directly supervised the distribution of at least 452 kilograms of cocaine during June 2013. GX 20A; GX 22A; GX 36A; GX 69A; Sept. 18 AM Trial Tr. at 11–17; Dkt. No. 146-3 at 5.

   d. Mr. Gomez credibly testified that the Defendant directly supervised the distribution of at least 25,850 kilograms of cocaine and at least 1,044,000 kilograms of methamphetamine. Sept. 11 PM Trial Tr. at 26–38.

3. An object of the Defendant's offense was the distribution of a controlled substance in a prison based upon credible testimony by Mr. Ramirez that the Defendant directed the distribution of drugs in a prison in Mexico to maintain his control of his drug trafficking organization. Transcript of Deposition (Feb. 21, 2024) ("Feb. 21 Depo. Tr.") at 25, 27.

4. The Defendant's offense involved importation of methamphetamine based upon credible evidence, including the following:

   a. The Defendant admitted that methamphetamine produced at the laboratories that he supervised was transported to the United States and that he assisted with the operation of the methamphetamine laboratories, knowing and intending that the majority of the methamphetamine would be imported into the United States. Dkt. No. 146-3 at 3–4.

   b. Mr. Nava credibly testified that the Defendant supervised five laboratories that produced methamphetamine that was distributed in the United States. Sept. 9 AM Trial Tr. at 71–72.

   c. Mr. Gomez credibly testified that the Defendant told him that the methamphetamine he was producing was going to the "Blondies" in the United States. Sept. 11 PM Trial Tr. at 40. Mr. Gomez described an incident when the Defendant executed five men who owed the Defendant money. Sept. 12 AM Trial Tr. at 25. The Defendant explained to Mr. Gomez that the five men owed him money in the United States for drugs. *Id.* Finally, the Defendant directed Mr. Gomez to deliver a pickup truck, the bed of which was full of American money— 100- and 50-dollar bills packed in clear plastic. Sept. 11 PM Trial Tr. at 42–43. The Defendant said the money was from the United States. *Id.* at 43.

   d. Mr. Contreras credibly testified that the Defendant expressed his concern about the falling price of methamphetamine in the United States. Sept. 18 AM Trial Tr. at 52.

   e. Mr. Torres credibly described meeting with the Defendant and his father, who wanted Mr. Torres to traffic methamphetamine through Juarez into the United States. Sept. 17 AM Trial Tr. at 16.

5. The Defendant attempted to bribe a law enforcement officer to facilitate the commission of the offense based upon the Defendant's own admission that in approximately 2012, he attempted to bribe a Mexican federal police officer in order to obtain a copy of Mexican law enforcement's evidence of Mencho's criminal conduct. Dkt. No. 146-3 at 5. The Defendant attempted to obtain this information to help Mencho evade capture so that Mencho could continue leading the CJNG. *Id.*

6. The Defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance based upon credible evidence, including the following:

   a. Intercepted BBM communications, as credibly interpreted by Agent Paris, establish that the Defendant controlled an "office," which was a premises he used to kidnap

      a person who stole drugs. GX 19A; GX 36A; GX 42A; GX 43A; Sept. 16 AM Trial Tr. at 58, 92–93; Sept. 18 AM Trial Tr. at 15; Dkt. No. 146-3 at 5.

    b. Mr. Nava credibly testified that the Defendant controlled five laboratories, which produced methamphetamine that was imported into the United States. Sept. 9 AM Trial Tr. at 53, 71.

    c. Mr. Gomez credibly testified that the Defendant controlled seven laboratories, which produced methamphetamine that was imported into the United States. Sept. 11 AM Trial Tr. at 15–17, 38–39.

7. The Defendant committed at least seven first-degree premeditated murders, pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1(a), 18 U.S.C. § 1111(a), and Criminal Jury Instructions for D.C. Instruction § 4.201 (2024), based upon credible evidence, including the following:

    a. Mr. Gomez credibly testified that the Defendant slashed the throats of the five bound men who owed him drug money. Sept. 12 AM Trial Tr. at 25–28. Each of these five murders were undertaken to further the profits and operations of the charged drug conspiracy.

    b. The following facts highlight the Defendant's premeditation and deliberation with respect to each of the five murders: the Defendant traveled to meet the victims in a remote mango field; the victims were waiting for the Defendant, bound, on their knees, and with their heads being held back by sicarios; the Defendant spoke to each victim individually; the Defendant used a knife that appears to have been specific to the purpose of execution; and the Defendant killed the five victims in succession—giving him time to reflect between each murder.

    c. Mr. Gomez's testimony is corroborated by, among other evidence, Mr. Contreras testimony that the CJNG used acid to dissolve the bodies of murder victims all the time. Sept. 18 AM Trial Tr. at 65.

8. The Defendant's victims were physically restrained based upon credible evidence, including the following:

    a. The Defendant admitted to kidnapping thirteen people, acknowledging that he used the BBM moniker "Billy the kid." Dkt. No. 146-3 at 5.

    b. Intercepted BBM communications establish that the Defendant—using the moniker "Billy the kid"—kidnapped thirteen people who he had tied up. GX 76A at 2; GX 19A; Sept. 16 AM Trial Tr. at 77.

    c. Mr. Gomez credibly testified that the Defendant slashed the throats of five men who were tied by the hands. Sept. 12 AM Trial Tr. at 26–27.

9. The Defendant was second-in-command of the CJNG and was accordingly an organizer and leader based upon credible evidence, including the following:

   a. The Defendant admitted that during the course and in furtherance of the conspiracy charged in Count One, the Defendant was a leader of the CJNG. Dkt. No. 146-3 at 3. The Defendant gave orders to CJNG plaza bosses regarding drug distribution, the movement of narcotic proceeds, and the use of violence. Approximately 300 CJNG members, who were subordinate to the Defendant, operated the Guadalajara plaza. *Id.* at 4.

   b. Mr. Nava credibly testified that the Defendant was the second-in-command of the Milenio Cartel in Puerto Vallarta and that he was managing about two hundred people. Sept. 9 AM Trial Tr. at 64–65.

   c. Mr. Perez credibly testified that the Defendant was arrested while carrying a weapon emblazoned with "CJNG" and the Defendant's monikers: "Menchito," "02," and "JR." GX 367; Sept. 11 AM Trial Tr. at 46, 49, 55–56.

   d. Mr. Gomez, Mr. Ramirez, Mr. Torres, and Mr. Contreras credibly testified that the Defendant was second-in-command of the CJNG. Sept. 11 PM Trial Tr. at 26; Feb. 21 Depo. Tr. at 17; Sept. 17 AM Trial Tr. at 12–13; Sept. 18 AM Trial Tr. at 47.

10. The Defendant personally committed or directed acts of violence, including multiple murders, using firearms and destructive devices to further the profits and operations of the charged drug conspiracy based upon credible evidence, including the following:

    a. The Defendant admitted that, in approximately 2008, he personally shot and killed a member of a rival cartel. Dkt. No. 146-3 at 5.

    b. Mr. Gomez credibly testified that in April 2015, the Defendant personally shot a subordinate in the head when the man failed to obey quickly. Sept. 11 PM Trial Tr. at 29.

    c. Mr. Gomez credibly testified that on May 1, 2015, the Defendant personally gave the order to shoot down a Mexican military helicopter. Sept. 11 PM Trial Tr. at 67. As a direct and foreseeable result of the Defendant's order, nine of the eighteen Mexican officials on board the helicopter died and one sustained serious bodily injury, including permanent disfigurement from burns covering seventy percent of his body. Sept. 16 AM Trial Tr. at 12–19; GX 100; GX 366. Mr. Gomez's testimony is corroborated by physical evidence recovered near the scene of the helicopter crash, including the following: Hats with a CJNG logo similar to the one the Defendant was wearing at the time of his arrest, GX 365; GX 244; Sept. 11 AM Trial Tr. at 50. A belt with the Defendant's moniker "JR" embroidered on it. GX 307. A luxury watch with a map of Jalisco on the dial similar to the one the Defendant was wearing on the day of Mr. Gomez's wedding. GX 410; *see also* GX 320; Sept. 11 PM Trial Tr. at 62. Mr. Gomez's testimony is also corroborated by the credible testimony of Mr. Morales, who described how the helicopter was shot down. Sept. 16 AM Trial Tr. at 12–19; GX 100; GX 366. Mr. Gomez's testimony

is also corroborated by the credible testimony of Mr. Contreras, who said that the Defendant told him about the helicopter being shot down a short time after it happened. Sept. 18 AM Trial Tr. at 72–74; GX 99. Finally, Mr. Gomez's testimony is corroborated by the credible testimony of Mr. Torres, who said that the Defendant bragged that one of his people shot down the helicopter. Sept. 17 AM Trial Tr. at 35–41.