**ANTHONY E. COLOMBO, JR.**
California Bar No. 218411
The Senator Building
105 West F Street, Suite 312
San Diego, California 92101
Telephone: (619) 236-1704
Email: anthonycolombolegal@gmail.com

Attorney for Ruben Oseguera-Gonzalez

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

**(HONORABLE BERYL A. HOWELL)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 16cr229-BAH |
| Plaintiff, | ) | |
| | ) | DATE:   March 7, 2025 |
| | ) | TIME:    9:30 a.m. |
| v. | ) | |
| RUBEN OSEGUERA-GONZALEZ, | ) | **DEFENDANT'S SENTENCING** |
| | ) | <u>MEMORANDUM</u> |
| | ) | |
| Defendant. | ) | |

TO:    JONATHAN R. HORNOCK, ASSISTANT UNITED STATES ATTORNEY.

Defendant, Ruben Oseguera-Gonzalez ("Mr. Oseguera"), by and through his counsel, Anthony E. Colombo, Jr., and Jan E. Ronis, hereby file the following Sentencing Memorandum.

**I.**

**INTRODUCTION**

Mr. Oseguera is respectfully requesting the Court impose the minimum mandatory sentence of 40 years custody.[1]  Mr. Oseguera maintains that in examining his particular circumstances and the offenses of conviction, the requested sentence is sufficient, but not greater than necessary to achieve all the goals of sentencing.

---

[1]    Count 1 - 10 year minimum mandatory, plus Count 2 - 30 year minimum mandatory, mandatory consecutive to Count 1.

The Government requests the Court impose two consecutive life sentences for the two counts of conviction. *See* ECF 225 at 1.

In considering the Government's request, the Court must consider two questions. First, is the proven conduct of Mr. Oseguera at a time when he must be considered a youthful offender comparatively so severe that only a life sentence is reasonable? Second, is Mr. Oseguera, at the age of 35, totality incapable of rehabilitation that only a life sentence is reasonable? The answers to both questions are the same. NO.

The Court should reject the Government's request for two consecutive life sentences and impose the minimum mandatory sentence of 40 years custody.

The reasons why will be addressed in this memorandum.

## II.

## SENTENCING FACTORS CONSIDERED

### A.    Current Law

The Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220, 224-25, 259-60 (2005); *United States v. Hantzis*, 625 F.3d 575, 582 (9th Cir. 2010). Accordingly, this Court is authorized to impose a sentence below the Guidelines range. *Booker*, 543 U.S. at 245. The Supreme Court has established a framework for approaching the sentencing process post-*Booker*. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 551 U.S. 1113 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Under this framework, the sentencing court must consider all of the factors listed in 18 U.S.C. § 3553(a) when imposing sentence. *Id.*

The overarching statutory charge under 18 U.S.C. § 3553(a) is to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Those purposes are the need:

- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
- to afford adequate deterrence;
- to protect the public from future crimes of the defendant; and
- to provide the defendant with necessary educational or vocational training, medical care, or other correctional treatment.

All sentencing proceedings are to begin by determining the applicable Guidelines range. *Carty*, 520 F.3d at 991. The Guidelines are the starting point and the initial benchmark, and are to be kept in mind throughout the process. *Id*. Furthermore, the parties must be given a chance to argue for a sentence they believe is appropriate. *Id*.

The sentencing court must then consider the factors outlined in 18 U.S.C. § 3553(a) to  determine if they support the sentence suggested by the parties, specifically:

- the nature and circumstances of the offense, § 3553(a)(1);
- the history and characteristics of the defendant, § 3553(a)(1);
- the kinds of sentences available, § 3553(a)(3);
- the sentencing guidelines range, § 3553(a)(4);
- pertinent Sentencing Commission policy statements, § 3553(a)(5);
- the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and
- the need to provide restitution to any victims of the offense, § 3553(a)(7).

When considering these factors and determining the appropriate sentence, the sentencing court may not presume that the Guidelines range is reasonable, nor should the Guidelines factor be given more or less weight than any other. *Nelson v. United States*, 129 S.Ct. 890, 892 (2009); *Carty*, 520 F.3d at 991.

This court is "empowered to disagree with the Guidelines, when the circumstances in an individual case warrant." *United States v. Mitchell*, 624 F.3d 1023, 1028 (9th Cir. 2010). Although "[n]o judge is *required* to sentence at a variance with a Guideline" . . . "every judge is at liberty to do so." *Id*. at 1030 (citing *United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010)). Under these principles, the court is at liberty to tailor a sentence to the individual defendant. *United States v. Chavez*, 611 F.3d 1006 (9th Cir. 2010) (citing *Kimbrough*, 552 U.S. at 101). Given the application and balancing of the factors in 18 U.S.C. § 3553(a), the sentencing process necessarily involves an exercise in judgment, not a mathematical proof. *United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008). Indeed, rigid mathematical formulas for reviewing outside-guidelines sentences are barred. *Gall*, 552 U.S. at 47.

Furthermore, one of the goals of sentencing remains rehabilitation. *United States v. Moreland*, 568 F. Supp. 2d 674, 687 (S.D. W. Va. 2008). This goal cannot be served if a

1  defendant has nothing to look forward to beyond imprisonment. *Id*. Accordingly, a judge

2  should hesitate to impose a sentence so severe that she "destroys all hope and takes away

3  the possibility of useful life." *Id*. (citing *United States v. Carvajal*, 2005 WL 476125 at *6,

4  2005 (S.D.N.Y. 2005)). Instead, the district court "shall impose a sentence sufficient, but

5  not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §

6  3553(a).  As the Supreme Court explained in *Pepper*, "the punishment should fit the

7  offender and not merely the crime including taking into account a person's life[,]

8  characteristics and rehabilitation." *See Pepper v. United States*, 562 U.S. 476, 487-88

9  (2011).

10  **B.    Applicable Sentencing Guidelines[2]**

11    Mr. Oseguera maintains the following Sentencing Guidelines are applicable and

12  appropriately applied in this case:

13    Base Offense Level [U.S.S.G. § 2D1.1(c)(1)]                    38

14    Acceptance of Responsibility [U.S.S.G. § 3E1.1(a)]             -2[3]

15    Total Adjusted Offense Level                                   36

16    Mr. Oseguera has zero criminal history points, and he is therefore in a Criminal

17  History Category I.  The Sentencing Guideline range for an adjusted offense level of 36, and

18  a Criminal History Category I, is 188-235 months custody.   However, the minimum

19  mandatory of 40 years is applicable in this case, and thus, 480 months custody becomes the

20  guideline sentence.  *See* U.S.S.G. § 5G1.1(b) (2024) ("Where a statutorily required

21  minimum sentence is greater than the maximum of the applicable guideline range, the

22  statutorily required minimum sentence shall be the guideline sentence.").  Mr. Oseguera

---

[2]    Mr. Oseguera objected to the draft Presentence Investigation Report's guideline calculations and analysis prepared by the United States Probation Department and maintains his objections to the final report which adopted all of the Government's requests which are addressed herein.

[3]    To the extent the Court considers the Joint Statement of Facts in relation to the offense conduct, the Court then can also consider this statement in relation to acceptance of responsibility, and grant a -2 level reduction pursuant to U.S.S.G. § 3E1.1(a).

1  maintains that a 480 month, or 40 year sentence, is sufficient, but not greater than necessary
2  to achieve the goals of sentencing.  Mr. Oseguera opposes the Government's numerous
3  upward adjustments in totality and maintains for the reasons addressed below any
4  application of those upward adjustments would be in violation of both his Fifth and Sixth
5  Amendment rights under the United States constitution.

6          **1.      U.S.S.G. § 2D1.1(b)(2) (violence) should not apply because it is based
                      on entirely foreign conduct**

7          The Government recommends a +2 level increase pursuant to U.S.S.G. § 2D1.1(b)(2)
8  (use of violence).  *See* ECF 225 at 4.  This upward adjustment should not be applied because
9  it is based entirely on foreign conduct.

10         The analysis here begins with *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991).
11  There, the Second Circuit explained that "[t]he Guidelines section on base offense levels is
12  broadly worded to include all such acts and omissions that were part of the same course of
13  conduct or common scheme or plan, but does not explicitly address the issue of foreign
14  crimes and activities. U.S.S.G. § 1B1.3(a)(2).  However, the Guidelines elsewhere note that
15  foreign sentences may not be used for upward departures from the otherwise applicable
16  range.  *See* U.S.S.G. §§ 4A1.2(h), 4A1.3(a)."  *Id.*

17         The Second Circuit concluded, "[f]rom the provisions, it follows that Congress, while
18  it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited
19  role. We decline to find that Congress intended to require that foreign crimes be considered
20  when calculating base offense levels simply because Congress did assign foreign crimes a
21  role in fixing upward departures, while remaining silent on their role in calculating base
22  offense levels.  Not every congressional silence is pregnant.  In general, congressional
23  consideration of an issue in one context, but not another, in the same or similar statutes
24  implies that Congress intends to include that issue only where it has so indicated."  *Id.*
25  Thus, the Second Circuit "decline[d] to create the complexities that the inclusion of foreign
26  crimes in the base offense level would generate."  *Id*. at 18.

27
28

Following *Azeem*, in *United States v. Chunza-Plazas*, 45 F.3d 51, 57-58 (2d. Cir. 1995), the Second Circuit further determined that even when foreign conduct is part of the same conspiracy, it should not be used to increase the defendant's offense level. "The same considerations considered in *Azeem* with respect to base offense level, should guide our determination of whether Chunza's conduct in Colombia may be considered for an upward departure. . . Chunza's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation." *Id.* at 57.

The District of Columbia ("D.C.") Circuit Court reached an analogous conclusion in *United States v. Flores*, 912 F.3d 613 (*Flores I*) (D.C. Cir. 2019). In *Flores*, the defendant "appeal[ed] his sentence, arguing the District Court erred when it considered his murder of a Mexican national in Mexico when calculating his sentence under the Sentencing Guidelines." *Id*. at 615. The D.C. Circuit Court "agree[d] with Flores" and vacated his sentence. *Id*. In doing so, the Court explained that the "murder of the Mexican kidnap victim" could not be used to support the relevant guidelines enhancement under U.S.S.G. § 2E1.1. *Id*. at 621.

Here, the conduct underlying the violence and bribes is purely foreign conduct, and in fact, no evidence was presented at trial that anything at all occurred in the United States. The violence and the bribes were, as assumed by the Court, extrinsic, to the offense against the United States, the importation which formed the basis of the conviction. *See* ECF 167, at 7. Thus, to borrow from the Second Circuit, those "activities in [Mexico] were not crimes against the United States, and therefore should not be included in the guideline calculation." *Chunza-Plazas*, 45 F.3d at 57. Here, there is no constitutionally permissible basis to impose sentencing enhancements for purely foreign conduct that did not economically impact the United States. *See In re Sealed Case*, 936 F.3d 582, 590 (D.C. Cir. 2019) ("Doubt certainly exists as to Congress's ability under the Foreign Commerce Clause to criminalize conduct with no effect on the United States.").

This conclusion finds considerable support in the basic premise of our legal system that, in general, United States law governs domestically but does not rule the world. This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. The question is not whether we think Congress would have wanted a statute to apply foreign conduct if it had thought of the situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute would do so. When a statute gives no clear indication of an extraterritorial application, it has none. *See RJR Nabisco, Inc. V. European Cmty.*, 579 U.S. 325, 335 (2016).

Applying these principles to the Guidelines reveals no clear indication that the violence and bribery enhancements in sections 2D1.1(b)(2) and 2D1.1(b)(11), or any of the other enhancements addressed below, were intended to have extraterritorial application. The provisions do not state they apply extraterritorially. Nor does the commentary. This is strong evidence supporting the presumption. However, there is more.

Under the doctrine of negative implication (*expressio unius est exclusio alterius*), courts should presume that where the drafters include particular language in one part of a statute or guidelines provision, but omit it in another, the omission is intentional. *See United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008); *United States v. Huang*, 687 F.3d 1197, 1205-06 (9th Cir. 2012). In other words, "[u]nder the maxim of *expressio unius est exclusio alterius*, there is a presumption that . . . all omissions should be understood as exclusions." *Copeland v. Ryan*, 852 F.3d 900, 908 (9th Cir. 2017). Certainly the Sentencing Commission knows how to make a Guidelines provision extraterritorial when it wants. *See e.g.*, Section 2B1.1(b)(10)(B) (+2 level increase when "a substantial part of a fraudulent scheme was committed from outside the United States"). The lack of any extraterritorial language to the violence and bribery enhancements strengthens the conclusion that they do not apply to conduct entirely outside of the United States. As such, they should not be

applied in this case.

### 2.    U.S.S.G. § 2D1.1(b)(4) (drugs in prison) should not apply because it is based on entirely foreign conduct and lacks evidentiary support

The Government recommends a +2 increase pursuant to U.S.S.G. § 2D1.1(b)(4) (drugs in prison). *See* ECF 225 at 4. This upward adjustment should not be applied because it is based entirely on foreign conduct. For the same reasons stated above, the increase is not appropriate.

In addition, this upward adjustment lacks credible evidentiary support. The language of § 2D1.1(b)(4) reads as follows: "If the object of the offense was the distribution of a controlled substance in a prison . . . increase by 2 levels."

First, Mr. Oseguera was never charged with distribution of a controlled substance in a prison. He was charged with distribution of a controlled substance for importation into the United States. The object of the distribution being the importation into the United States, not into a Mexican prison. Any alleged distribution of drugs into a Mexican prison was not intrinsic in the indictment and it was collateral to the charges in the indictment.

Second, the evidence relied upon by the Government does not rise to the level of a preponderance of the evidence as it is not based upon reliable or credible testimony. Here, the Government relies upon the testimony of Mario Ramirez-Trevino to establish that while in custody in a prison in Mexico he participated in a meeting with Mr. Oseguera to determine who would control the sale of drugs within the prison. *See* ECF 207 at 1-2.

There are three points that the Court must consider that determine Ramirez-Trevino's testimony is not reliable or credible and cannot support the upward adjustment requested.

The first point is obvious, "[a] witness seeking [] leniency may have an interest in cooperating with the Government, even if it means giving a false account." *Robinson v. Cheney*, 876 F.2d 152, 158 (D.C. Cir. 1989). Courts have rightly "stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy." *United States v. Estrada*, 904 F.3d 854, 865 (9th Cir. 2018). At the very least, "the testimony of witnesses receiving anything from the Government in return for the

witness's cooperation must be examined with greater caution than that of other witnesses." *Id*. As the Court is aware Ramirez-Trevino is terminally ill and faces a potential life sentence. He will say anything to get out of custody before he dies, including fabricating his testimony. He is clearly someone with no moral compass or conscious as he was the boss of the Gulf Cartel responsible for countless murders and over saw the "cooks" cooking the bodies of his cartel victims in the "kitchens." *See* February 21, 2024 Video Deposition Transcript at 56-60, 74. Ramirez-Trevino was extradited to the United States in December of 2017, and began his cooperation with the Government in January of 2018. Given his lack of credibility it should come as no surprise that it took two years of cooperation and eight meetings before Ramirez-Trevino, at a debrief on February 2, 2021, first mentioned Mr. Oseguera. *See id*. at 52.

The second point, one that is not so obvious requires a careful examination of Ramirez-Trevino's testimony. Ramirez-Trevino and Mr. Oseguera were housed in the "Special Treatment Unit" of a "Maximum Security" prison in Altiplano, Mexico. *See* February 21, 2024 Video Deposition Transcript at 24-25. It's the number one federal prison in Mexico according to Ramirez-Trevino. *See id*. at 62. As argued by the Government, Ramirez-Trevino testified that he attended a meeting with Mr. Oseguera to determine who would control the sale of drugs in the prison. What the Government wants the Court to overlook is the reasonableness and reliability of Ramirez-Trevino's testimony relating to who facilitated the meeting. Ramirez-Trevino testified, "The attorneys would organize them [the meetings] with the secretaries or the prosecutor's office." *See id*. at 25. "[P]eople from the prosecution's office, the secretaries" were present during the meeting. *See id*. at 28. The Court even itself needed clarification and in response to the Court's question about members of the Mexican prosecution's office being present at the meeting, Ramirez-Trevino responded, "the secretary to the prosecution's office [] they were to the side -- off to the side." *Id*. at 29. According to Ramirez-Trevino it was the prosecutor's office that organized the meeting, and the prosecutor's secretaries, although they didn't participate in the meeting, they were off to the side. The Court should be skeptical about Ramirez-Trevino's claim that

in Mexico's most secure maximum security prison Mexican prosecutors organized a meeting for inmates to discuss the control and distribution of drugs in the prison. This claim does not seem reasonable, but most importantly it is not corroborated.

The third point the Court must consider in evaluating the evidence to support the upward adjustment is simply that it is based entirely upon the uncorroborated testimony of Ramirez-Trevino a cooperating Government witness with nothing to lose and much to gain by fabricating his testimony. The Government presented no documents, surveillance, or testimony from law enforcement or other cooperating witness. Tellingly, although Torres-Marrufo, another cooperating witness for the Government was in custody with Mr. Oseguera for over a year, Torres-Marrufo mentioned nothing at all about Mr. Oseguera's involvement with distributing drugs in the prison. If it were an object of the conspiracy to distribute drugs inside a prison then wouldn't Torres-Marrufo have had a similar experience as Ramirez-Trevino or at least some information to corroborate Ramirez-Trevino's testimony? Torres-Marrufo didn't have such an experience or other information whatsoever as it related to distributing drugs in the prison. The lack of corroboration for Ramirez-Trevino's testimony should require the Court to deny the Government's request for an upward adjustment pursuant to § 2D1.1(b)(4).

### 3. U.S.S.G. § 2D1.1(b)(11) (bribery) should not apply because it is based on entirely foreign conduct And lacks evidentiary support

The Government recommends a +2 level increase pursuant to U.S.S.G. § 2D1.1(b)(11) (use of bribery). *See* ECF 225 at 5. This upward adjustment should not be applied because it is based entirely on foreign conduct. For the same reasons stated above, the increase is not appropriate.

In addition, this upward adjustment lacks evidentiary support. Neither the Government or the United States Probation Department have cited to any evidence in the record that demonstrates Mr. Oseguera was involved with payment of bribes. They simply cannot as the Government did not present any evidence at trial in relation to bribes.

16cr229-BAH

In fact, Hermino Gomez-Ancira, the former head of public security for Villa Purificacion, Mexico, who was a cooperating Government witness relied extensively upon by the Government to support the recommendation of two consecutive life sentences, denied ever accepting bribes. When questioned about being bribed or paid for his help transporting drugs as a police officer, Gomez-Ancira stated, "I've always said it and I say it again: I have always worked for a salary of 8,000 pesos every two weeks, and nobody has paid me anything to work for them. . . . Nobody ever paid me a peso." *See* September 12, 2024 Transcript (Afternoon session) at 14-15.

The only other relevant discussion worth mentioning relating to bribes was from cooperating witness Elipidio Mojarro-Ramirez who conceded that during his reign as the boss of the Milenio Cartel he paid bribes to Mexican law enforcement and the Mexican military to conduct raids against his rival the CJNG, and to arrest Mencho. *See* September 11, 2024 Transcript (Morning session) at 15-18. He also conceded that he continued to pay these bribes to the Mexican military after he left the Milenio Cartel to facilitate his drug trafficking activities until he began cooperating in 2015. *See id*. at 21. Coincidentally, Mojarro-Ramirez began cooperating in May of 2015, only a few days after the military helicopter incident which occurred on May 1, 2015. The timing of Mojarro-Ramirez's decision to cooperate is uncanny. There is really only one reasonable explanation for it. It's highly likely the very bribes paid by Mojarro-Ramirez to the Mexican military to hunt Mencho is what set off the series of events that occurred on May 1, 2015.

**4.    U.S.S.G. § 2D1.1(b)(12) (maintained premises) should not apply because it is based on entirely foreign conduct and lacks Evidentiary support**

The Government recommends a +2 level increase pursuant to U.S.S.G. § 2D1.1(b)(12) (maintaining premises for the purpose of manufacturing or distributing a controlled substance). *See* ECF 225 at 5. This upward adjustment should not be applied because it is based entirely on foreign conduct. For the same reasons stated above, the increase is not appropriate.

In addition, the Court should deny the Government's request to apply this upward adjustment as it lacks evidentiary support.  "Subsection (b)(12) applies to a defendant who knowingly maintains a premise (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for distribution." *See* U.S.S.G. § 2D1.1 Application Note 17.  "Among the factors the court should consider in determining whether defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g. owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id*.  "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principle uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises.  In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id*.

The Government failed to present any evidence at trial that would allow the Court to make the factual findings required, even by a preponderance of evidence.

First, where was/were the premise/premises located?  What exactly was/were the type of premise/premises?  Were they homes, buildings, enclosures?  Were they only under a tarp or a canopy?  If so, this would not qualify as a premise as defined by the sentencing guidelines.  In a normal case the Court would have photographic evidence or video surveillance of the location used to manufacture or distribute the controlled substances.  Here there is nothing. No physical evidence whatsoever.  If the Government's witness testimony was truthful, particularly, Gomez-Ancira's testimony about "labs" or a "warehouse," couldn't the Government have at least pinpointed these premises with a satellite image?  Couldn't they have obtained at least one photograph?  How many warehouses could be located in Villa Purificacion, a very "small little town" in a "rural" area.  *See* September 11, 2024 Transcript (Afternoon session) at 4.  Gomez-Ancira bragged during his testimony he knew the area "[b]etter than anyone." *See id*. at 5.  He should have

12                                    16cr229-BAH

easily been able to pinpoint the "warehouse" on Google maps. However, he did not. The Court is left only to speculate and must speculate to fill in the evidentiary gaps left by the Government's evidence.

Second, what exactly was Mr. Oseguera's possessory interest in the property? The Court is again left to speculate as there is no corroborative evidence for the Court to evaluate. In a normal case there would indicia of dominion and control over a property through either a real estate title, mail retrieved at the property etc... Here, there is nothing at all and no evidence to corroborate the cooperating witness testimony. Interestingly, and contrary to Mr. Oseguera having a possessory interest in a warehouse, Gomez-Ancira testified that the "warehouse" used "[was] my warehouse in Palenque [Villa Purificacion] that I had a business of table dance." *See* September 11, 2024 Transcript (Afternoon session) at 16-17. Apparently, Gomez-Ancira while the head of public security in Villa Purificacion also owned and operated a strip club. Here, the Government simply wants the Court to dispense with the evidentiary requirement to establish the upward adjustment and replace it with speculation and conjecture.

Third, the Government argues that the intercepted Blackberry messages revealed Mr. Oseguera maintained an "office" that he used to operate the CJNG. *See* ECF 207 at 4. However, "[s]ubsection (b)(12) applies to a defendant who knowingly maintains a premise (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for distribution." *See* U.S.S.G. § 2D1.1 Application Note 17. Therefore, pursuant to subsection (b)(12) the Government must prove the "office" was specifically used for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for distribution. The evidence here does not establish the office referred to by the Government was used for this specific purpose.

**5.    U.S.S.G. § 2D1.1(b)(16)(E) (criminal livelihood ) should not apply because it is based on entirely foreign conduct and lacks evidentiary support**

The Government recommends a +2 level increase pursuant to U.S.S.G. § 2D1.1(b)(16)(E) (pattern of criminal conduct engaged in as a livelihood).[4]  *See* ECF at 5. This upward adjustment should not be applied because it is based entirely on foreign conduct.  For the same reasons stated above, the increase is not appropriate.  It also lacks evidentiary support.

For the purposes of subsection (b)(16)(E), pattern of criminal conduct and engaged in as a livelihood have the meaning given such terms in § 4B1.3 (Criminal Livelihood) of the sentencing guidelines.  § 4B1.3, Commentary Application Notes, defines a "pattern of criminal conduct" as "planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses."  U.S.S.G. § 4B1.3, Commentary Application Notes: 1. Pattern of criminal conduct (2024).  "'Engaged in as a livelihood' means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve month period (*e.g.*, the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct)".  *See id*. at Commentary Application Notes: 2. Engaged in as a livelihood.

Here, the Government has not presented any evidence to support the above required findings the Court must make to establish the upward adjustment for criminal livelihood.

---

[4]    This upward adjustment is only applicable upon a finding of aggravated role pursuant to U.S.S.G. §3B1.1, and thus, the argument here will assume the Court has made such a finding.

**6.    U.S.S.G. § 3A1.3 (restraint of a victim) should not apply because it is based on entirely foreign conduct and lacks evidentiary support**

The Government recommends a +2 level increase pursuant to U.S.S.G. § 3A1.3 (restraint of a victim). *See* ECF at 5. This upward adjustment should not be applied because it is based entirely on foreign conduct. For the same reasons stated above, the increase is not appropriate. It also lacks evidentiary support.

The Government relies upon the testimony of Gomez-Ancira to establish the applicability of the upward adjustment for restraint of a victim. *See* ECF 207 at 6. However, Gomez-Ancira's testimony is a complete fiction. He is not credible and his testimony should be rejected by the Court. Furthermore, Gomez-Ancira's testimony was vague on supportive details, and entirely lacks any corroboration. For example, we do not have any physical descriptions of the victims, ages, names, etc... nothing. According to Gomez-Ancira these alleged murders occurred in April of 2015, in an encampment in Alvarado "amongst the mangoes." *See* September 12, 2024 Transcript (Afternoon session) at 26-27. There are no corroborative reports of these murders. These five people apparently were murdered and went missing and not one single person reported it? And this having occurred in a small rural area as described by Gomez-Ancira. His claims simply do not add up and entirely lack corroboration.

The Government also relies upon two Blackberry messages to establish the applicability of the upward adjustment for restraint of a victim. However, the Government's interpretation of the Blackberry messages lacks evidentiary support in the trial record. The Government did not present any evidence from any participant in the alleged restraint, and also did not present any evidence from any of the alleged 12 victims, including the "engineer" who was allegedly kidnaped and held. The Court, without any corroborative evidence is left to speculate what the Blackberry messages mean. For example, "tied up" or "put away" in the context of the Blackberry messages could easily mean prevented from working in manufacturing or distributing drugs, not literally "tied up" and "put away." Again, without corroborative evidence the Court is left to speculate. The Court should not

engage in such speculation and should deny the Government's request for an upward adjustment pursuant to § 3A1.3, restraint of a victim.

### 7.    The Court should not apply U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1(a)

"The Sentencing Guidelines provide that a defendant's drug offense level will be increased to the maximum offense level of 43 if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." *United States v. Bostick*, 791 F.3d 127, 158 (D.C. Cir. 2016) (citing U.S.S.G. § 2D1.1(d)(1); U.S.S.G. § 2A1.1(a) (First Degree Murder)). The Government has requested that the Court apply this alternative minimum offense level. *See* ECF 225 at 17-20. The Court should decline to impose the application of this alternative minimum offense level. First, this request is based entirely on foreign conduct and for the same reasons stated above, the increase is not appropriate. In addition, and again, the Government's request lacks evidentiary support and should be denied.

*United States v. Bostick*, the sole case cited by the Government in support of its argument, is entirely distinguishable from the case here, and is an example of the evidence required to establish the application of §§ 2D1.1(d) and 2A1.1(a). In *Bostick* the defendants were charged in a massive drug distribution organization in Southeast Washington, D.C. *See Bostick*, 791 F.3d 127 at 134-35. The organization sold crack cocaine and other drugs, and committed numerous murders and other violent crimes. *See id*. Several murders were specifically charged and proven at trial. *See id*. at 158-59. In upholding the District Court's application of §§ 2D1.1(d)(1) and 2A1.1(a), the D.C. Circuit found the defendants' arguments without merit as defendant "Marbury directly participated in and was convicted of two of the five murders for which he was held accountable – the killing of Payton and Keys[, and] Johnson [was] convict[ed] for the murder of Payton and for the use of a firearm in the murder of Edgar Watson." *See id*. at 158-59.

In contrast to *Bostick*, here, Mr. Oseguera was not charged with a murder or murders. In addition, unlike here, in *Bostick*, evidence was presented before the District Court to establish that the murders actually occurred and were not the delusional fantasy of a cooperating witness. In *Bostick* there was "overwhelming" evidence of the murders. *See*

*id*. at 159.  The District Court was presented with evidence of ***real*** people, "Anthony Payton, Damien Jennifer, Robert Keys, Sherman Johnson, and Edgar Watson" all of whom were actually murdered and demonstrably dead.  *See id*. at 158-59.  Here, the  Court has been presented with no such evidence.  Here, unlike in *Bostick*, the Court has no names and no bodies.  Here, the District Court, absent reliable or credible evidence, or corroborative evidence, is being asked to punish Mr. Oseguera for something that very well may not have happened, something that is a complete fiction.  It is worth reminding the Court that courts have rightly "stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy." *United States v. Estrada*, 904 F.3d 854, 865 (9th Cir. 2018).  At the very least, "the testimony of witnesses receiving anything from the Government in return for the witness's cooperation must be examined with greater caution than that of other witnesses." *Id*.  Given Gomez-Ancira's uncorroborated testimony, and that his testimony at times was proven to be contradicted and false by another more credible Government witness, *i.e.* Maria Hernandez, the Court should not apply the alternative minimum offense level of 43.

### C.    Applicable Factors Pursuant to 18 U.S.C. § 3553(a)

#### 1.    Nature and Circumstances of the Offense

The trial record provides sufficient information for the Court to consider when evaluating the nature and circumstances of the offense.  Much of the trial testimony relied upon by the Government to justify their recommendation of two consecutive life terms is unreliable, not credible, uncorroborated, and should be discounted by the Court.  "[D]ue process requires that a defendant be sentenced on the basis of accurate information.  Thus, a district court may consider any relevant information, 'provided that information has sufficient indicia of reliability to support its probable accuracy,'" *United States v. Brewster*, 116 F.4th 1051, 1060 (9th Cir. 2024) (citing *United States Alvarado-Martinez*, 556 F.3d 732, 734-35 (9th Cir. 2009) (citation omitted) (quoting U.S.S.G. § 6A1.3(a))).  Below is an analysis and cited examples that illustrate this point, *i.e.*, much of the testimony relied upon

by the Government does not have sufficient indicia of reliability.[5]

It is important to note in the first instance in summarizing the Government's cooperating witness testimony is that Mr. Oseguera, the purported "Narco Prince" as labeled by the Government, was an after thought for every single one of the Government's cooperating witnesses. Although each of the Government's cooperating witnesses had been cooperating for years, and they had engaged collectively in 100 or more debriefs, none of them mentioned anything about Mr. Oseguera until specifically prompted to do so by the Government. For example, Oscar Nava-Valencia, aka "El Lobo" immediately began cooperating with they Government upon his extradition to the United States in 2011. *See* September 9, 2024 Transcript (Afternoon session) at 49. He engaged in dozens of debriefs with the Government and specifically discussed the CJNG, Mencho, Los Cuinis, but never once mentioned Mr. Oseguera until 2017 (after Mr. Oseguera was indicted). *See id*. at 49-63. The same can also be said of the Government's other cooperating witnesses including Elipidio Mojarro-Ramirez, Hermino Gomez-Ancira, Mario Ramirez-Trevino, Jose Antonio Torres-Marrufo, and Jesus Contreras-Arceo. Mr. Oseguera was an after thought for each one. The case against Mr. Oseguera was largely manufactured after he was indicted.

The Government's reliance upon Gomez-Ancira is unique in this case as the vast amount of the evidence relied upon by the Government to establish the elements of the offenses charged, and to justify their sentencing recommendation, relies upon Gomez-Ancira's testimony.

The Government relies upon Gomez-Ancira to establish Mr. Oseguera was involved with the distribution of "25,850 kilograms of cocaine over four separate occasions from 2012 to 2015[, and] over a million kilograms of methamphetamine." *See* ECF 209 at 7-8. The Government also relies upon Gomez-Ancira to establish Mr. Oseguera shot "one of [the defendant's escorts [] because he had not moved a truck from a location when [the

---

[5]    As noted in Defendant's Objections to the Presentence Investigation this would include the Joint Statement of Stipulated Facts as although signed by Mr. Oseguera was translated for him and never reviewed with him by the Court.

defendant] told him to[, and] the defendant slash[ed] the throats of five men who were bound and forced to kneel." *See* ECF 210 at 11, 14. Finally, the Government also relies upon Gomez-Ancira to establish "on May 15, 2015, the defendant 'himself' gave the order to 'shoot down the helicopter' while he and his father were fleeing Mexican authorities." *Id*. at 14.

The Government's reliance upon Gomez-Ancira to establish the distribution of cocaine and methamphetamine is misplaced. In examining Mr. Gomez-Ancira's testimony none of it was corroborated by any other witness or evidence. In relation to the drug distribution and Mr. Oseguera, Gomez-Ancira did not have personal knowledge as to Mr. Oseguera's involvement, at least not to any transaction that occurred prior to April of 2015. With regard to the several transactions prior to April of 2015, Gomez-Ancira stated, "I could never talk to Menchito. No one could. Only the ones that were chosen. They would always put me in contact with him." *See* September 12, 2024 Transcript (Afternoon session) at 26. "The other person holds the phone here and then you talk." *Id*. "I did not have the ability to contact him [Menchito]." *Id*. at 27. "The communication was always through another person." *Id*. For any of the alleged transactions that occurred prior to April of 2015, prior to the time Gomez-Ancira claimed to have met Mr. Oseguera in person for the first time, Gomez-Ancira had no personal knowledge as to who was involved with these transactions. And again, there was no corroboration.

With regard to the methamphetamine distribution for example, if Gomez Ancira was responsible for transporting over a million kilograms of methamphetamine between 2012 and 2015 and picked up hundreds of barrels of methamphetamine from the various labs as he claimed, then how can it be explained that Jesus Contreras-Arceo, another government cooperating witness, who claimed to have been "in charge of the [methamphetamine] kitchens" didn't know or have any interaction with Gomez-Ancira? It is an impossibility that the person in charge of transportation of the product from the labs or kitchens for a four year period would have no interaction with the person running those labs or kitchens. In addition, during his testimony, Gomez-Ancira stated that, " I would [] bring[] whatever the

[methamphetamine] cooks would need, things like that." September 11, 2024 Transcript (Afternoon session) at 14-16. Again, if this were true, he would have been known to Contreras-Arceo, the person in charge of the "kitchens." However, neither knew each other or had any involvement with each other.

With regard to the two events in April of 2015, a 5 ton cocaine load, and a 20 ton cocaine load, Gomez-Ancira would like the Court to believe that he and about a dozen or more other municipal police officers, the entire municipal police department from Villa Purificacion, while in full uniform, carried by hand the ton quantities of cocaine in the sand on the beach from boats to the awaiting trucks on shore. *See* September 12, 2024 Transcript (Afternoon session) at 28-31. Setting aside the general implausibility of the entire municipal police department from Villa Purificacion, in uniform, hand carrying on the beach tons of cocaine from the boats to the awaiting trucks, the question must be asked, if Mencho controlled the port of Puerto Vallarta, why would he off-load ton quantities of cocaine on the beach? This method of operation would appear to be inconsistent with the known operations of the CJNG that utilized and controlled the port in Puerto Vallarta. And again, of course, no corroborative testimony or evidence to support Gomez-Ancira's "ton" tale.

With regard the two described incidents of violence, Gomez-Ancira's testimony is pure fiction. Gomez-Ancira testified that all six purported murders occurred in the same month, April of 2015, five in Alvarado, Jalisco, and one at Gomez-Ancira's wedding in Villa Purificacion, Jalisco. Certainly there would have been some official reports generated by either the disappearance or murder of these six individuals. Certainly some family member or loved one would have reported something. Given the narrowed dates and locations certainly some corroboration of these events would exist. Certainly, given that over 10,000 people, the entire residency of Villa Purificacion, were in attendance at Gomez-Ancira's wedding that at least one person would have reported the murder described by Gomez-Ancira. Assuming Mr. Oseguera was on trial for these murders there can be no question any rational trier of fact would reject Gomez-Ancira's uncorroborated claims. It is also important for the Court to consider that Gomez-Ancira, prior to his testifying in

Court, never mentioned anything about Mr. Oseguera killing five people with a knife. Not in any of his debriefs did he ever mention anything about this event. And again, the account he testified to at trial is not in his "journal." There is a logical and reasonably explanation for all of the above, and that is simply it was made up, pure fiction. It just never happened.

Now, in addition to the outlandish fictional claims uncorroborated by any evidence there are a few things the Court must remember about Gomez-Ancira. He is a paid Government witness. He was paid $86,500.00 dollars by the Government. *See* September 12, 2024 Transcript (Afternoon session) at 62. He has also been granted asylum to remain in the United States despite having multiple felony convictions and having been deported in the past. He has committed identity theft. *See* September 11, 2024 Transcript (Afternoon session) at 6; *see also* September 12, 2024 (Morning Session) at 33. The content of his testimony was likely the result of searching "Jalisco, State of Fear," on the internet. *See* September 12, 2024 Transcript (Morning session) at 50-51. He was aware, "[i]t's in the news and everything." September 12, 2024 (Morning Session) at 42. According to Gomez-Ancira all of his experience with the cartel from 2011 to 2015 was "public information[,] [i]t's in the news and everything." *See id*. at 41-42.

Although Gomez-Ancira claimed to be illiterate, he was not. Although he claimed to be illiterate, he also claimed to have a "journal" that was a contemporaneous record of his experiences with Mr. Oseguera, but it was not. *See* September 12, 2024 (Morning Session) at 41-47.[6] He said he needed the journal "because my memory is not so good that I can remember every single thing exactly, which is why I make notes to remember things." *See id*. at 45. Everything he testified about during direct, "[i]t [was] all there [in the journal]." *Id*. at 47. It was not. The problem for this Court when evaluating Gomez-Ancira's credibility and trustworthiness is that absolutely nothing seems plausible, is not corroborated, and was not memorialized in his "journal." Despite having met with law

---

[6]
    He also claimed his original notes were "damaged" and about a year before the trial he rewrote his "journal." *See* September 12, 2024 Transcript (Afternoon session) at 5-6.

enforcement in 2016 he stated nothing about the above. In fact, the first claims of any of the above didn't exist until years later in 2020 after news of Mr. Oseguera's extradition to the United States.

Furthermore, when evaluating Gomez-Ancira's credibility, Gomez-Ancira contradicted himself several times during his testimony. When asked about the photographs in his briefcase at the time he met with the FBI in 2016 he stated "In terms of photographs, there were photographs of the people, of the parties, things such as that[,]" but then later on during his testimony when asked to describe the pictures from the parties in his briefcase he stated, there were "no[] pictures of the parties because no one could take pictures at the parties where they were at, although someone did make a video of my wedding." *See* September 12, 2024 Transcript at 48-49, 75. Of course he didn't have any photographs nor did he have a wedding video. Despite 10,000 people in attendance at his wedding[7], and not one photograph or video exists. *Id*. at 75-80. It is important to note for the Court, according to Gomez-Ancira, the contents of the briefcase in which he claimed to have material that corroborated his testimony at trial would have been available to him at the time he began cooperating with the Government in this case. *See* September 12, 2024 Transcript (Afternoon session) at 6 (Q - "So the contents of your briefcase were available to you a year ago [?]" A - "Yes.").

The Court should also take into account that Gomez-Ancira claimed that in June of 2016, when he was interviewed by two FBI agents, he specifically told the interviewing agents he "wanted to talk about [] the Cartel Jalisco Nueva Generacion, [] specifically El Mencho." *See* September 12, 2024 Transcript (Afternoon session) at 7. Gomez-Ancira told the FBI about Mencho and about the cartel being trained by members of ISIS. *See id*. Specifically, Commander Israel and Commander Pakistan. *See id*. at 12. Despite the FBI

---

[7] Gomez-Ancira explained there were 10,000 people at his wedding because "In Villa Purificacion, I am the son of the people. Everyone loves me there[,] [a]nd everyone was there." *See* September 12, 2024 Transcript (Morning session) at 76. It was a "very expensive" affair that his "godfather" Mencho paid for, and Gomez-Ancira even received a message from Mencho's wife, "You are my Godson." *See id*.

agents knowing who El Mencho was, and that according to Gomez-Ancira he had a briefcase full of corroborating documents and a contemporaneous "journal" of his experience with El Mencho, the FBI agents surprisingly were "not interested." *See id*. Surprisingly, rather than develop Gomez-Ancira as a cooperating witness, the FBI referred him for prosecution for illegal entry. *See id*. This decision shockingly would have been after May 1, 2015, when the CJNG shot down a military helicopter in Mexico using .50 calibers machine guns and an RPG rocket launcher. Reason and common sense tells us the FBI would be very interested in information about a drug cartel receiving material support from a terrorist organization especially when that support had just resulted in the take down of a Mexican military helicopter. The FBI would want to develop the source of information, especially if that source had corroborative documents and was a percipient witness to such events (as Mr. Gomez-Ancira claimed during his testimony). However, the FBI would only be interested if, and only if, that source was reliable and credible. The FBI quickly (but not too quickly as they allegedly kept Gomez-Ancira's briefcase and its contents for months for evaluation) came to the same conclusion as the defense, and the same conclusion the Court must make, Gomez-Ancira's story is more fiction than fact, a fantasy really. *See* September 12, 2024 Transcript (Afternoon session) at 8-10 (briefcase held). Gomez-Ancira himself conceded the FBI could not verify any of his claims in relation to Mexican cartel operations or ISIS. *See id*. at 10. The FBI couldn't verify any of Gomez-Ancira's claims because they were fiction, an exaggerated fantasy.

It is important to also add that Gomez-Ancira told immigration authorities the same story after he was referred by the FBI to immigration, and they "just laughed[, as] [t]hey must have thought I was crazy in my mind." *See id*. at 16. Although not clear, according to Gomez-Ancira after he told his story to the immigration officials, "[T]hey decided to do that [evaluate him] when I told them that [the story about Commanders Israel and Pakistan training the cartel]." *See id*. "They only kept me there for a week, and then they just took me out with the rest of the people, like normal." *Id*. Similar to the FBI, immigration authorities did not credit Gomez-Ancira's claims. Neither should this Court.

Finally, the Government also relies upon Gomez-Ancira to establish "on May 15, 2015, the defendant 'himself' gave the order to 'shoot down the helicopter' while he and his father were fleeing Mexican authorities." *Id*. at 14. There's nothing in his "journal" about that extraordinary event. Gomez-Ancira's testimony is not only inconsistent and internally contradictory, but also demonstrably false.

Gomez-Ancira claimed on May 1, 2025, while in the hospital in Guadalajara, Mexico, suffering from life-threatening pneumonia, he received a radio call on "loud speaker" from "Menchito [], Pelon, my godfather Cuate and Abram." *See* September 11, 2024 Transcript (Afternoon session) at 66. "All of them were there. They were already out of danger, but they were upset." *Id*. Gomez-Ancira, then testified during that communication, Mr. Oseguera said, "you know, shoot down the helicopter." *Id*. at 67. According to Gomez-Ancira when this order was given "they", meaning "Menchito [], Pelon, [his] godfather Cuate and Abram" "were already somewhere else." *See id*. Gomez-Ancira then "pass[ed] along the order they gave" while he was in the hospital. *Id*. He would later add during redirect testimony, inconsistent with the above, that he heard Mr. Oseguera and his father "speaking at the same time" over the speaker phone, "[b]ut [he] could hear Menchito giving the order at the same time as his father." *See* September 12, 2024 Transcript (Afternoon session) at 71. Gomez-Ancira had not previously identified Mr. Oseguera's father, Mencho, as being on the "speaker phone." Gomez-Ancira also testified, "[It] was 'Beto' who fired the RPG that took down the helicopter." September 12, 2024 Transcript (Afternoon session) at 58. Gomez-Ancira's testimony was a mixture of researched facts, "public information [] in the news and everything[,]" but a fiction as to the role he played in the events. *See* September 12, 2024 Transcript (Afternoon session) at 42.

First, according to Gomez-Ancira when Mr. Oseguera gave the order to "shoot down the helicopter" they were "out of danger." *Id*. at 66. This does not track at all with the testimony of the surviving witness from the helicopter, Ivan Morales, who explained the helicopter was attacked immediately upon arriving upon the caravan of trucks allegedly occupied by Mr. Oseguera, his father, and other members of the CJNG. *See* September 16,

2024 Transcript (Morning session) at 14-16. Morales explained, "They started shooting at us. We did not fire shots at any point." *Id*. at 15. "We were welcomed with shots. We were downed, and we were never the ones who were the aggressors." *Id*. at 29-30[8] "Time" went by "very fast" between the time the helicopter was attacked and when it went down. *Id*. at 33. If Mr. Oseguera was "out of danger" this would have been then after the helicopter was already shot down. Gomez-Ancira's time-line and testimony just do not track with the events that occurred on May 1, 2015. The inconsistency between Gomez-Ancira's testimony is only the result of his fabricated fantasy.

Second, Gomez-Ancira's insertion of himself into the chain of command and passing along orders makes little sense at all. Why would Mr. Oseguera need to radio Gomez-Ancira in the hospital an order to "shoot down the helicopter" only to be relayed to members of the caravan if Mr. Oseguera was among the members of the caravan himself? Of course radio equipment was recovered from the trucks in the caravan and among the debris surrounding the abandoned trucks used by the CJNG. Wouldn't it make more sense that Mr. Oseguera was in radio contact with the other trucks in the caravan, and any order to "shoot down the helicopter" could be directly relayed to those other trucks in the caravan? There was no reason to use Gomez-Ancira as a conduit in the command structure which would seem an inefficient way to communicate emergency commands from one truck in the caravan to another truck in the caravan. Gomez-Ancira inserted himself into the chain of command because he was the star in his own fantasy story. The Court should not accept or believe his fantasy.

Gomez-Ancira also testified that on May 1, 2015, the day of the helicopter incident, despite being hospitalized in Guadalajara, Mexico, he had driven three and half hours to the

---

[8]   It is important to note that Gomez-Ancira stated during his news interview that the helicopter attacked the convoy and opened fire first, and then confirmed when he testified the statement he made during the news interview was true as "It was the helicopter that started shooting there [at] them [the cartel convoy], that they [the cartel convoy] were resting. *See* September 12, 2024 Transcript (Afternoon session) at 56-57. This of course was in contradiction to Ivan Morales' testimony.

helicopter crash site. He "was very sick[, with] [] an infection in 50 percent of [his] lungs." *See* September 11, 2024 Transcript (Afternoon session) at 68. He was "deathly ill with pneumonia." *See* September 12, 2024 Transcript (Morning session) at 54. While in the hospital he was ordered by Mencho to return to Villa Purificacion "to the place where they shot down the helicopter [] [to] pick up all the weapons there."[9] *See* September 11, 2024 Transcript (Afternoon session) at 68. During this time, according to Gomez-Ancira, there were approximately "16,000" military and law enforcement agents in the area, "maybe even more than 20,000." *See* September 12, 2024 Transcript (Morning session) at 60. However, according to Gomez-Ancira, he gathered up all of the weapons as ordered, right under their noses, including those specifically in Government's exhibits 138 and 159 (RPG launcher[10] and rocket round), put them in a black bag, and hid them in a cave. *See id*. at 62-68. During this time, he also moved some of the trucks in the CJNG convoy. *See* September 11, 2024 Transcript (Afternoon session) at 70. Gomez-Ancira, also during this time, according to his testimony, managed to rescue "47 or 50" of Mencho's injured soldiers, "17" of which were wounded with "serious injuries" from being "shot in the belly and in the feet." *See* September 12, 2024 Transcript (Morning session) at 70. The injured soldiers were all taken to Gomez-Ancira's home in the center of town in Villa Purificacion. *Id*. at 71. They were given "a change of clothes [and] money," and sent off in a taxi or an ambulance. *Id*. In

---

[9]

    It is important to mention that Jesus Contreras-Arceo, aka "Canasto," another cooperating witness for the Government, testified in contradiction to Gomez-Ancira's claim about receiving orders over a radio that "Mencho" never used a radio himself and no one would ever hear "Mencho's" voice over a radio. *See* September 18, 2024 Transcript (Afternoon session) at 24-25.

[10]

    It is important to note for the Court when determining Gomez-Ancira's credibility and reliability that Gomez-Ancira claimed that the RPG he retrieved and then hid in the cave was exactly that used to take down the helicopter. *See* September 12, 2024 Transcript (Afternoon session) at 61-65. Multiple RPGs were recovered in the area. According to Gomez-Ancira at the time the RPG was fired to take down the helicopter he was in a hospital in Guadalajara hours away. How would he know which RPG was used? He wouldn't, and he couldn't. He "was not at the location where the clash took place." *Id*. at 58-59. And, just to mention, Gomez-Ancira's fingerprints weren't on the RPG. Again, this all just leads to one undeniable conclusion, Gomez-Ancira's testimony is pure fantasy.

addition, Gomez-Ancira testified that in a truck purportedly used by the cartel that he had moved were gold bars (between 50 and 100), and money which he left in the truck. *See id*. at 72. Somehow, despite dying of pneumonia, after having recovered weapons, moved convoy trucks, and having rescued injured cartel soldiers, all right under the noses of tens of thousands of law enforcement officers, Gomez-Ancira managed to sit for a television news interview for a network covering the helicopter incident. *See id*. at 73. He seemed cool, calm, and collected during the interview for someone dying of pneumonia and under the threat of death to following out Mencho's orders to recover the weapons, rescue the cartel soldiers, and move the convoy trucks. Gomez-Ancira's story is just so implausible that it reeks of someone suffering from a mental illness, a person who can readily weave fact with fiction convinced the fiction is fact.[11] Someone, who is, as Gomez-Ancira stated, "crazy in [the] mind." *See* September 12, 2024 Transcript (Afternoon session) at 16. Of course, and again it is worth noting, none of the above can be found in Gomez-Ancira's "journal."

In direct contradiction to Gomez-Ancira's testimony, Maria Hernandez, a prosecutor for the Attorney General's Office of Mexico, testified on behalf of the Government, and she stated unequivocally, she and her team used placards and photographs to indicate where evidentiary items were found, and Government exhibits 138 and 159 were not found in a black bag in a cave. *See* September 13, 2024 Transcript (Afternoon session) at 62-71. In fact, no weapons were found in a black bag, or a cave, or in a black bag in a cave. She also did not find gold bars or money, and if found, the gold bars or money would have been

---

[11] Delusional Disorder is an illness where a person manifests delusions that are a mix of reality and fantasy, where they firmly believe the fabricated parts are real, and even when confronted with evidence to the contrary of their false beliefs they cannot accept it. These delusions generally involve grandiosity, such as in Gomez-Ancira's case believing Mencho is his godfather, having a wedding with over 10,000 attendees as he was the son of the people and everyone loved him, making a promise to Mencho that he would only get married after Mencho's son, Menchito, was released from custody, playing a critical role in a sensational news event like the helicopter incident etc..., or persecution, such as in Gomez-Ancira's case believing that he was kidnaped along with five other people who were killed in front of him and he was the lone survivor.

secured as evidence in the investigation. *See id*. at 71. Her testimony simple cannot be reconciled with Gomez-Ancira's. What motivation could she have to fabricate where the weapons were found? She had none. If she found the weapons in the cave and then scattered them about the fields and placed them back in the trucks, which was suggested by Gomez-Ancira, she couldn't have done it alone. *See* September 12, 2024 Transcript (Morning session) at 66. The weapons, as witnessed by the Court, were numerous and heavy. Now, when Mr. Gomez-Ancira was confronted with this contradiction, his response was, "I am telling you I never lie." *Id*. at 67. Given the irreconcilable contradiction between Gomez-Ancira's testimony and that of Maria Hernandez, the Court must conclude, Gomez-Ancira lied. He lied about material facts to the Court and to the jury, and thus, the totality of his testimony should be ignored.

There is still more to doubt Gomez-Ancira's testimony. After the helicopter incident on May 1, 2015, Gomez-Ancira was detained by state authorities in Jalisco, Mexico for investigation. They detained Gomez-Ancira as the Director of Public Security for Villa Purificacion along with all 20 of the officers in the department of Public Security. *See* September 12, 2024 Transcript (Afternoon session) at 50-51. The Director of Public Security, Daniel Ruelas-Zuazo, for an adjacent municipality, Union de Tula, was also detained with all of his officers for investigation. *Id*. at 51. Gomez-Ancira claimed that it was at this time, along with the other officers, that he was kidnaped and tortured by "El Viente." *See* September 11, 2024 Transcript (Afternoon session) at 17-20; *see also* September 12, 2024 Transcript (Afternoon session) at 34-39. He then claimed that the group of special forces killed five of the other officers he was with, but despite being tortured and "severely beaten" for seven days suffering a broken collar bone, a broken hand, broken feet, being shot in both the head and leg, losing a lot of blood, and still suffering from pneumonia, somehow he "dragged [himself], as fast as [he] could, to a cane field nearby." *See id*. at 20; *see id*. at 39. His kidnapers "didn't even count the bodies" of the dead and "it's for that reason" Gomez-Ancira survived. *Id*. at 20. It was at this time Gomez-Ancira fled to the United States with his then pregnant wife. During his three month

journey to the United States he "healed [himself] with the pulp of aloe vera[,]" as that was "all [he] could eat." *See* September 12, 2024 Transcript (Afternoon session) at 43; *see also* September 11, 2024 Transcript (Afternoon session) at 20. He also healed himself with "powdered penicillin, with the leaves of the guava fruit and chewing those leaves." *See* September 12, 2024 Transcript (Afternoon session) at 43. He healed his pneumonia with "ten lemons, one pineapple, two cinnamon sticks, honey from bees, [and] a chunk of ginger root." *Id*. at 44. Upon arriving in the United States Gomez-Ancira did not seek medical treatment or request asylum. *Id*. at 43.

Again, the above fantastical tale was not corroborated by any evidence or testimony. Gomez-Ancira did not have any physical scars consistent with a gun shot wound to his head or leg. Most notably, there are no reports of any missing or murdered police officers as claimed by Gomez-Ancira. Reason and common sense again dictates that if there were multiple murders of police officers from either Villa Purificacion or Union de Tula, there would have been reports of the murders. It should be easy to verify or establish that multiple police officers were kidnaped and murdered in the aftermath of the helicopter incident. The Government had access to Maria Hernandez, a Mexican Federal prosecutor, who lead the investigation of the helicopter incident, and there was absolutely no information that corroborated Gomez-Ancira's tale.

Also of note is that Gomez-Ancira although detained by Mexican law enforcement after the incident for investigative reasons, was released, and not charged. Reason and common sense dictates that if Gomez-Ancira was in fact the person who relayed the command to take down the helicopter, or provided the transportation to the cartel, while in official police uniform with the entire police department, of ton quantities of cocaine and a million kilograms of methamphetamine, or tampered with the crime scene after the helicopter incident by moving weapons and convoy trucks, or provided assistance to cartel soldiers who were injured in the shootout with the helicopter, Gomez-Ancira would have been charged, as many others were in Mexico, with crimes relating to the helicopter incident. Gomez-Ancira was released without prosecution because all of his claims were

fictional and not fact.  Nothing about Gomez-Ancira's story adds up, or was corroborated in the most simple terms, and thus, must be entirely ignored by the Court.

Yet the Government repeatedly relied upon Gomez-Ancira's testimony at trial to establish several elements of the charged offenses, and relies in its sentencing memorandum on Gomez-Ancira's testimony to justify a recommendation of two consecutive life sentences.  Given the absurdity of Gomez-Ancira's testimony and that his testimony was demonstrably false, the Government was obligated to correct or withdraw his testimony rather than doubling down on it.  *See Napue v. Illinois*, 360 U.S. 264 (1959) (The prosecution's introduction of false testimony deprives a defendant of a fair trial).  Indeed, "[t]he Government's use of knowingly misleading testimony [] is deeply disappointing and troubling behavior, unbefitting those who litigate in the name of the United States." *United States v. Straker*, 800 F.3d 570, 604 (D.C. Cir. 2015).

Other Government cooperating witness testimony is problematic as well.

According to Oscar Nava-Valencia, a man admittedly responsible for the torture and murder of countless people, he began cooperating with the Drug Enforcement Administration in 2011 and was asked about the hierarchy of the cartel.  *See* September 9, 2024 Transcript (Afternoon Session) at 49-64.  He did not mention anything at all about Mr. Oseguera.  Nava-Valencia did not have any personal knowledge of drug trafficking activity that occurred in the cartel after October of 2009.  *See id*. at 27.  Although Nava-Valencia had been cooperating for approximately six years he failed to mention anything at all during his prior 50 or so debriefs about Mr. Oseguera until 2017, after, Mr. Oseguera-Gonzalez was arrested in Mexico.  *See id*.  Six years after his cooperation had begun, Nava-Valencia then claimed Mr. Oseguera was made second in command to "Mencho," Mr. Oseguera's father, of the Puerto Vallarta plaza, even though he would have only been 14 or 15 years old at the time.  *See id*. at 63-64.

In contradiction to the testimony of Nava-Valencia, and likely closer to the truth, according to Elipidio "Pilo" Mojarro-Ramirez, in the 2009 and 2010 period, Mr. Oseguera was "too young and not involved with drug trafficking." *See* September 10, 2024 Transcript

(Afternoon Session) at 61.  Mr. Oseguera was not part of the hierarchy of the cartel.  *See id*. at 59.  He was simply present and listened to conversations. *See id*. at 61.  After May of 2010, "Pilo" had no personal knowledge as to the drug trafficking activities of Mr. Oseguera.  *See id*. at 12.  At most, if the Court were to believe anything "Pilo" testified to, Mr. Oseguera was a courier picking up either cocaine or money.  *See* September 10, 2024 Transcript (Morning session) at 61-63.  And according to "Pilo's" ledger, Mr. Oseguera picked-up only 1 kilogram of cocaine.

Antonio Torres-Marrufo, aka "The Jaguar," an admitted sicario, or hitman, responsible for personally caring out dozens of murders (several of which were at a wedding), sentenced to 40 years custody, testified that he attended a meeting in 2010, and speculated that Mr. Oseguera played "an important role" in the cartel, "second to his father," because when Torres-Marrufo asked "Mencho" for "some weapons," "Mencho" told Mr. Oseguera to talk to his "compadre" to get the weapons for Torres-Marrufo.  *See* September 17, 2024 Transcript (Morning session) at 13-14.  Torres-Marrufo also testified that while in prison together in Mexico he witnessed Mr. Oseguera sign paintings Mr. Oseguera made with "RO II" which he believed "the Number 2 is his level in the organization."  *Id*. at 28-29.  Again, however, no corroboration of the purported meeting, and no corroboration of any painting.  Importantly, similar to with Nava-Valencia, despite Torres-Marrufo's cooperation for years, these stories were delayed and only conveyed to the Government years after his cooperation began.  In addition, and in contradiction, Mario Ramirez-Trevino, another cooperating witness for the Government, was also in custody with Mr. Oseguera and Torres-Marrufo at the same time, yet Ramirez-Trevino didn't testify about anything relating to signed paintings prepared by Mr. Oseguera.

Finally the Court heard the testimony of Jesus Contreras-Arceo, aka "Canasta."  He was sentenced to 35 years custody.  *See* September 18, 2024 Transcript (Afternoon session) at 13.  Contreras-Arceo testified he "was the one in charge of the [methamphetamine]

kitchens."[12]  *See* September 18, 2024 Transcript (Morning session) at 50.  He testified, "My thing [was] kitchens."  *Id*. at 51.  Contreras-Arceo said he "didn't know anything about anything.  Just [his] thing [were] the kitchens, and that's it."  *Id*. at 89.  Despite claiming not to "know anything about anything," Contreras-Arceo testified that beginning in 2009, Mr. Oseguera was the Number 2 leader of the cartel, second only to Mr. Oseguera's father, and above his older step-brother, "Pelon."  *See id*. at 10-11.  However, Contreras-Arceo did not have any direct contact with Mr. Oseguera as he was in communication with "Gary[,]" Mr. Oseguera's father's "secretary."  *See id*. at 11.  Mr. Oseguera accompanied his father to meetings attended by Contreras-Arceo.  *See id*. at 15-16.

Contreras-Arceo, like all of the other cooperating witnesses who testified on behalf of the Government, testified with the hope of receiving some benefit.  He wanted to avoid the life-plus 20 years he was facing as a result of his guilty plea.  *See id*. at 49.  However, he contradicted himself by also claiming he had no hope for any reduction in his sentence.  *See* September 18, 2024 Transcript (Afternoon session) at 9-10.  Contreras-Arceo conceded that in his very detailed factual basis, although it states his relationship to Mr. Oseguera's father as the head of the cartel, it mentions nothing about Mr. Oseguera himself.  *See* September 18, 2024 Transcript (Morning session) at 54-55.  He also conceded he never directly communicated with Mr. Oseguera.  *See id*. at 55-56.  Again, the evidence presented by the Government was unreliable and should not be relied upon by the Court when considering any fact of consequence at sentencing.

### 2.    History and Characteristics of the Defendant

Pursuant to 18 U.S.C. § 3553(a), this Court should consider Mr. Oseguera's personal history when determining the appropriate sentence for his offense.  There are aspects of Mr. Oseguera's history and characteristics the Court should focus on that are mitigating.

---

[12]    These "kitchens" are distinguishable from the "kitchens" used by Mario Ramirez-Trevino and his cartel members to "cook" people.

The United States Probation Department in the Presentence Investigation Report provided a cursory, yet accurate summary of Mr. Oseguera's background:

"[Mr. Oseguera] has no prior convictions[,] he is married and has three [minor] children ranging in age from 9 to 14.  Medically speaking, [Mr. Oseguera] is in good health[,] but reports ongoing issues with anxiety and insomnia[.] [He has] expressed willingness to seek mental health services going forward.  He [does not] hav[e] any drug use history or excessive alcohol since 2015. [He] lacks a high school diploma or GED and reports previously working in landscaping."  *See* ECF 211 at 2.  What the summary excludes, however, and what should be considered here is that Mr. Oseguera is viewed as a loving father, brother, and friend.  *See* Exhibit A - Sentencing Support Letters.  In addition, he grew up in an unstable environment wrought with violence and corruption, an environment dominated by his father who it appears recruited Mr. Oseguera's participation in the conspiracy at the age of 14 when he was only a minor.  Mr. Oseguera is as much as anyone both a product and a victim of that environment.  What the summary excludes, and counsel has experienced, is that Mr. Oseguera is a quiet, thoughtful, respectful young man that enjoys reading (both fiction and non-fiction), and discussing all that he has read.

Although Mr. Oseguera is currently 35 years old, he's been in custody for ten years, and the Court must consider at sentencing the age he was at the time of the offense, not his age now.  To the extent that any of the Government's cooperating witnesses' testimony can be credited, Mr. Oseguera was about 14 or 15 years old when he was recruited to participate in the conspiracy.[13]  At the time of his arrest in 2015, he was 25 years old.  The Court then must consider that during the course of the conspiracy Mr. Oseguera was either a minor or a youthful offender, but never an adult.

Pursuant to U.S.S.G. § 5H1.1 Age (Policy Statement):

Age may be relevant in determining whether a departure is warranted.

---

[13]     The Superseding Indictment alleges the conspiracy began in and around 2007, and continued to 2017.  *See* ECF 6.  Therefore, according to the Government's own allegations, Mr. Oseguera was 17 years old at the time conspiracy began.

> A downward departure [] may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance abuse, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-curve, one of the most-consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

*See* U.S.S.G. § 5H1.1 Age (Policy Statement) (2024). The Supreme Court has affirmed that "developmental differences in juveniles make them categorically less culpable than adults." *Roper v. Simmons*, 543 U.S. 551, 574 (2005). Specifically, the Supreme Court has cited their lack of maturity and impulsiveness; limited control over their environment; increased vulnerability to peer pressure; and unformed character. *See id*. "[A]s any parent knows and as the scientific and sociological studies ... tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *United States v. Lara*, 658 F.Supp.3d 22, 30 (Dist. C. Rhode Island 2023) (citing *Roper*, 543 U.S. at 578). It has been noted that "adolescents are over-represented statistically in virtually every category of reckless behavior." *See id*. Youthful offenders "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," and youthful offenders also do not have a well formed character. *See id*. at 30-31 (citing *Roper*, 543 U.S. at 578).

The Supreme Court has further stated:

> Developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults. It remains true that from a moral standpoint it would be misguided to

equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.

*See Graham v. Florida*, 560 U.S. 68-69 (2010).

The Supreme Court recently concluded:

> *Roper* and *Graham* establish that children are constitutionally different from adults for sentencing purposes. Their "'lack of maturity and '"underdeveloped sense of responsibility'" lead to recklessness, impulsivity, and heedless risk taking. *Roper*, 543 U.S. at 569. They "are more vulnerable ... to negative influence and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And because a child's character is not as "well formed" as an adult's, his traits are "less fixed" and his actions are less likely to be "evidence of irretrievabl[e] depravit[y]." *Id*., at 570. *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.

*Miller v. Alabama*, 567 U.S. 460, 464, 471-472 (2012). Thus, the Supreme Court instructs that juveniles or youthful offenders who commit even the most serious or violent crimes can change their behaviors. *See e.g.*, *Graham*, 560 U.S. at 68-69; *Roper*, 543 U.S. at 569.

In other words, youthful offenders are salvageable as the evolving character of emerging adults leads to a higher likelihood of reformation. "[Y]outh is more than a chronological fact." *Miller v. Alabama*, 567 U.S. at 476 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). "It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.'" *Id*. (citing *Johnson v. Texas*, 509 U.S. 350, 368 1993). "It is a moment and 'condition of life when a person may be most susceptible to influence and psychological damage.'" *Id*. (citing *Eddings*, 455 U.S. at 115). And its "signature qualities" are all "transient." *Id*. (citing *Johnson*, 509 U.S. at 368).

While there is no Supreme Court precedent that examines emerging adults (age 18 to early 20s) specifically, there is case law surrounding sentencing emerging adults. The Supreme Court has reminded us that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *United States v. Lara*, 658 F.Supp.3d 22, 30-31 (Dist. C. Rhode Island) (citing *Roper*, 543 U.S. at 574). Over the last two decades, scientists, society, and the courts have all recognized that youthful offenders have a different

level of culpability than do adult offenders. "Youth matters in sentencing." (citing *Tennessee v. Booker*, 656 S.W.3d 49, 60, 63 (Tenn. 2022) (internal quotation marks omitted) (citation omitted)). This is reflected in U.S.S.G. § 5H1.1 Age (Policy Statement) as cited above.

*United States v. Felton*, 587 F.Supp.3d 366 (W.D. Virginia 2022), is analogous to this case, is an example of application of the above at sentencing, and should be considered by the Court. Gregory Felton was a member of a large scale drug conspiracy in Charlottesville, Virginia. *See id*. at 368. He was an "enforcer" who during the course of the conspiracy shot and killed a drug user they believe has stolen from members of the conspiracy. *See id*. The District Court in *Felton* reasoned that a "defendant's youth at the time of the offense is []  of special importance to the Court's determination." *Id*. at 374. The defendant was "20 years old at the time of the underlying conduct." *Id*. Following Supreme Court precedent, the District Court in *Felton* determined, "[t]he Supreme Court has recognized, in the sentencing context, the diminished culpability of juvenile offenders given their lack of maturity, vulnerability to social pressures, and malleable identities." *Felton*, 587 F.Supp.3d at 374 (citing *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) (citation omitted)). The District Court noted, "in Felton's case[], [w]hile certainly not a minor, [he] was surrounded by co-conspirators much older than he[, and there was a] negative influence [] played out in Felton's relationship with Alonzo Trice, the apparent leader of the conspiracy who treated Felton as an adopted son." *Id*. at 374. Felton referred to Trice as "Dad." *See id*. Felton was ultimately sentenced to 360 months custody.

Here, there are parallels to *Felton*. Beginning at the age of 14, or possibly younger, Mr. Oseguera was immersed into the cartel culture. Here, Mr. Oseguera was clearly recruited into the criminal conspiracy by both is father and uncles. He was recruited at a time when he was a minor. This was of course at "a moment and 'condition of life when a person [is] most susceptible to influence and psychological damage.'" *Miller v. Alabama*, 567 U.S. at 476 (citing *Eddings*, 455 U.S. at 115). As in *Felton*, Mr. Oseguera was surrounded by co-conspirators much older than he, and in more aggravation than *Felton*, it

was Mr. Oseguera's father that apparently recruited Mr. Oseguera into the criminal conspiracy, and not just a "father-figure" as in *Felton*. Mr. Oseguera, unlike *Felton*, and in aggravation, did not have control over his environment and lacked the ability to extricate himself because of the familial relationship involved in the conspiracy. Unlike in *Felton* where the defendant had the ability to turn to others outside of the conspiracy for help or guidance, Mr. Oseguera could not, as his father, uncles, and step-brother were all apparently older members of the conspiracy.

The decisions cited above "rest[] not only on common sense – on what 'any parent knows' – but on science and social science as well." *Miller v. Alabama*, 567 U.S. at 471 *(*citing *Roper*, 543 U.S. at 569). In *Roper*, the Supreme Court cited studies showing that "'[o]nly a relatively small portion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior.'" *Id*. at 471 (citing *Roper*, 543 U.S. at 570). "And in *Graham*, the Supreme Court noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds [in] parts of the brain involved in behavior control.'" *Id*. at 471-72 (citing *Graham*, 560 U.S. at 68). The Supreme Court reasoned that those findings of transient rashness, proclivity for risk, and inability to assess consequences both lessened a child's moral culpability and enhanced the prospect that, as years go by and neurological development occurs, his "'deficiencies will be reformed.'" *Id*. at 472 (citing *Graham*, 560 U.S. at 68, and *Roper*, 543 U.S. at 570).

"*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "'[t]he heart of the retribution rationale'" relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult.'" *Miller v. Alabama*, 567 U.S. at 472 (citing *Graham*, 560 U.S. at 71 (quoting *Tison v. Arizona*, 481 U.S. 137, 149 (1987); *Roper*, 543 U.S. at 571). "Nor can deterrence do the work in this context, because "'the same characteristics that render juveniles less culpable than adults' – their immaturity, recklessness, and impetuosity – make them less likely to consider potential punishment [at the time of the offense]." *Id*. at 472 (citing

*Graham*, 560 U.S. at 72 (quoting *Roper*, 543 U.S. at 571)). "Deciding that a 'juvenile offender forever will be a danger to society' would require '[m]aking a judgment that [he] is incorrigible' – but 'incorrigibility is inconsistent with youth.'" *Id*. at 472-73 (citing *Graham*, 560 U.S. at 72-73 (citation omitted)). "[F]or the same reason, rehabilitation could not justify that sentence, [as] [l]ife without parole 'foreswears altogether the rehabilitative ideal.'" *Id*. at 473 (citing *Graham*, 560 U.S. at 74).

"Imprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.'" *Miller v. Alabama*, 567 U.S. at 474-75 (citing *Graham*, 560 U.S. at 69). This lengthiest possible incarceration is an "'especially harsh punishment [],' because he will almost inevitably serve 'more years and a greater percentage of his life than an adult offender.'" *Id*. (citing *Graham*, 560 U.S. at 70). As an illustrative example of the above, the Government argues that a life sentence is warranted in Mr. Oseguera's case in order to avoid unwarranted sentencing disparities. *See* ECF 225 at 32-36. The Government cites three cases wherein the defendants received life sentences - *United States v. Alfredo Beltran-Leyva*, *United States v. Eliu and Waldemar Lorenzana-Cordon*, and *Gerardo Gonzalez-Valencia*. *See id*. Each of the defendants in these cases were adults at the time of their respective offenses, and the defendants in these cases are between 15 years and 25 years older than Mr. Oseguera (Beltran-Leyva Year of Birth ("YOB") - 1971; Eliu and Waldemar Lorenzana-Cordon YOB - 1972 and 1965 respectively; Gonzalez-Valencia YOB - 1976). Not only is age at the time of the offense a distinguishing factor demonstrating Mr. Oseguera is not similarly situated as each case cited by the Government, but these case cited by the Government also serve to illustrate the disparity of imposing a life sentence on a youthful offender as opposed to an adult. If the Court imposes a life sentence, Mr. Oseguera "will almost inevitably serve 'more years and a greater percentage of his life than adult offender[s]'" such as Beltran-Leyva, the Lorenzana brothers, and his uncle, Gonzalez-Valencia. *See Miller v. Alabama*, 567 U.S. at 474-75 (citing *Graham*, 560 U.S. at 70). This is an "especially harsh punishment." *See id*. A punishment that is "rare" and imposed on less than 1% of cases in federal court. *See Life Sentences in the Federal System*, United

States Sentencing Commission (July 2022) (www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Life.pdf) (There are numerous federal criminal statutes authorizing a sentence of life. While convictions under these statutes are common, sentences of life imprisonment are rare (less than 1% of the federal sentencing caseload).

### 3. Need to Provide Just Punishment and Respect for the Law

#### a. Incarceration has a Greater Significance for First-time Offenders

Prior to his incarceration associated with the instant case, Mr. Oseguera had never been incarcerated. Given Mr. Oseguera's prior inexperience with the criminal justice system, a lesser period of imprisonment is required to deter him from future criminality. *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend); *see also United States v. Baker*, 445 F.3d 987, 990 (7th Cir. 2006) (first experience with prison would mean more to defendant and have greater impact than to a defendant who had prior convictions).

Compounding the effects of incarceration have been the conditions of confinement Mr. Oseguera has been subjected to during his period of pretrial confinement. While in custody in Mexico, Mr. Oseguera was subject to physical torture. *See* PSR at 20. Upon being extradited to the United States[14] Mr. Oseguera was placed into administrative segregation for his own safety and totally isolated from everyone. He remained in isolation for over three years. While in isolation Mr. Oseguera was subject to a 23 hour lock-down in his cell, denied outdoor exercise, denied regular showers, and regular access to commissary. He did not have access to any programing. This "psychological torture []
negatively impacted his mental health[,]" and "he [] developed migraines and vertigo from

---

[14] Mr. Oseguera-Gonzalez was brought from Sonora, Mexico, to a local jail in Alexandria, Virginia.

being in [administrative] isolation." *Id.* at 21.

"More than a century ago, the Supreme Court recognized the adverse consequences to inmates' mental health posed by the prolonged detention in conditions akin to solitary confinement." *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019) (citing *In re Medley*, 134 U.S. 160, 168 (1890)). "In recent years, advances in understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions." *Id.* Justice Kennedy and Justice Breyer authored separate opinions highlighting the serious psychological and emotional harm caused by solitary confinement. *See Ruiz v. Texas*, 580 U.S. 1191, 1246-47 (2017) (Breyer, J., dissenting) (stating there are "symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 576 U.S. 863, 926-27 (2015) (Breyer, J., dissenting) ("it is well documented that . . . prolonged solitary confinement produces numerous deleterious harms"); *Davis v. Ayala*, 576 U.S. 257, 289-90 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago [that] isolation exact[s] a terrible price").

It is clear and undeniable, "Prolonged solitary confinement exacts a heavy psychological toll [on] [] an inmate's mind." *Porter v. Clarke*, 923 F.3d at 357 (citing *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015)). The "robust body of scientific research on the effects of solitary confinement [has found] such confinement is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term ... damage." *Id.* (citing *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549, 566-67 (3d. Cir. 2017)). "[S]olitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill. . . . These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement." *Id.* (citing *Grissom v. Roberts*, 902 F.3d 1162, 1176-77 (10th Cir. 2018)).

Of particular relevance to the Court's analysis here, "several courts have found–based on the empirical evidence set forth– that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment." *Porter v. Clarke*, 923 F.3d at 357 (citing *see e.g.*, *Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Ashker v. Brown*, No. C09-5796, 2013 WL 1435148, at *4-5 (N.D. Cal. Apr. 9, 2013); *Wilkerson v. Stadler*, 639 F.Supp.2d 654, 678-79 (M.D. La. 2007) ("It is obvious that being housed in isolation in a tiny cell for 23 hours a day [] results in serious deprivations of basic human needs"); *McClary v. Kelly*, 4 F.Supp.2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science"). Still other courts have found that leniency may be warranted "to acknowledge the qualitatively different conditions to which [a] defendant was subjected for an extended period of time." *United States v. Francis*, 129 F. Supp.2d 612, 619 (S.D.N.Y. 2001) (granting a downward departure based on pre-trial conditions of confinement); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (pre-trial conditions of confinement constitute an appropriate sentencing factor); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (same); *Clark v. Floyd*, 80 F.3d 371, 374 (9th Cir. 1996) (same). The United States Supreme Court has also agreed. In *Reno v. Koray*, 515 U.S. 50, 56-58 (1995), the Supreme Court awarded additional credits to Federal prisoners who were being held in non-Federal or contract detention facilities.

Accordingly, based upon the pretrial conditions of confinement experienced by Mr. Oseguera for an extended period of time, the Court should take into account the conditions of pretrial confinement when determining the appropriateness of a 40 year sentence.

**b. The Requested Sentence is Appropriate to Avoid an Unwarranted Sentencing Disparity**

When considering Mr. Oseguera's request for the minimum mandatory sentence of 40 years, this Court should consider a district court's sentence must be determined in light of the factors set forth in 18 U.S.C. § 3553(a) which specifically include the "need to avoid unwarranted sentencing disparities." *See* 18 U.S.C. 3553(a)(6) (2024); *see also* 28 U.S.C. Section 991(b)(1)(B); U.S.S.G. Ch.1, Pt.A, ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders."). In the D.C. Circuit, when assessing unwarranted sentencing disparities, courts frequently look to the sentences of co-defendants, rather than draw comparisons with defendants in unrelated cases. *See*, *e.g.*, *United States v. Joseph*, 399 F.App'x 599, 600-01 (D.C. Cir. 2010). Here, Mr. Oseguera is not charged with any co-defendants. As a result, Mr. Oseguera suggests in analyzing whether a disparity would exist if the Court were to impose a life sentence, the Court should examine the sentences imposed on the Government's cooperating witnesses[15], all of whom can be considered co-conspirators, and in addition examine the sentences of other similarly situated defendants for an appropriate benchmark of sentences imposed in similar cases.

The following are similar cases the Court may consider to avoid an unwarranted disparity in sentence:

1. *United States v. Lopez-Falcon, 8-CR-57 (D.D.C. 2008)* - (216 months custody - conspiracy to manufacture and distribute minimum mandatory amounts of cocaine and marijuana);
2. *United States v. Fernando-Borda, 7-CR-65 (D.D.C. 2007)* - (300 months custody, Criminal History Category III - conspiracy to distribute minimum mandatory amounts of cocaine);

[15] Those sentences are analyzed in part C. 5. of this memorandum. To summarize, none of the cooperating witnesses were sentenced to life despite the admission of engaging in very violent conduct.

3. *United States v. Lerna-Plata, 11-CR-238 (D.D.C. 2011)* - (151 months custody, Corrupt high-ranking Mexican police commander - conspiracy to distribute ton quantities of cocaine and marijuana);

4. *United States v. Uribe-Jimenez, 12-CR-603 (E.D.N.Y. 2012)* - (240 months custody, Criminal History Category IV - conspiracy to distribute minimum mandatory amounts a multiple controlled substances);

5. *United States v. Enrique Palomera, 14-CR-5394 (W.D. Wash. 2014)* - (240 months custody - conspiracy to distribute minimum mandatory amounts of methamphetamine and possession of a firearm - high-level cartel member also accused of murdering a co-conspirator);

6. *United States v. Celaya-Valencia, 11-CR-84 (D.N.H. 2011)* - (210 months custody - conspiracy to distribute minimum mandatory amounts of controlled substances after trial - senior member of the Sinaloa Cartel);

7. *United States v. Jose Maria Corredor-Ibague, 09-CR-00156 (D.D.C. 2009)* - (194 months custody - conspiracy to distribute minimum mandatory amounts of cocaine, also accused of providing material support to a terrorist organization);

8. *United States v. Ediel Lopez-Falcon, 08-CR-00057 (D.D.C. 2008)* - (216 months custody - conspiracy to distribute minimum mandatory amounts of cocaine and marijuana);

9. *United States v. Luis Hernando Gomez-Bustamonte, 02-CR-01188 (E.D.N.Y. 2002)* - (360 months custody - conspiracy to distribute 500,000 kilograms of cocaine - leader of North Valle Cartel);

10. *United States v. Reymundo Villareal-Arelis, 16-CR-254 (W.D. Tex. 2016)* - (240 months custody - conspiracy to distribute minimum mandatory amounts of cocaine and money laundering - Los Piojos Cartel member - jury trial);

11. *United States v. Jesus Raul Beltran-Leon, 09-CR-383 (N.D.Ill. 2009)* - (336 months custody - conspiracy to distribute minimum mandatory amounts of controlled substances - attempted to arrange for the killing of a government witness while in custody);

12. *United States v. Victor Emilio Cazares-Gastellum, 07-CR-00449 (S.D.C.A. 2007)* - (180 months custody - conspiracy to distribute minimum mandatory amounts of controlled substances - labeled by the Government as a "drug kingpin" and one of the most notorious and violent drug traffickers in the Sinaloa Cartel);

13. *United States v. Raul Flores-Hernandez, 17-CR-00051 (D.D.C. 2017)* - (262 months - conspiracy to distribute minimum mandatory amounts of controlled substances - 30 year trafficking history and powerful enough to operate independently of the controlling cartels in Mexico);

14. *United States v. Benjamin Arellano-Felix, 97-CR-2520 (S.D.C.A. 2011)* - (300 month sentence. Notorious leader of the Arellano-Felix Organization - charged with 25 separate murders - conspiracy to distribute minimum mandatory amounts of controlled substances);

15. *United States v. Jaime Antonio Mandujano-Eudave, 12-CR-00237 (D.D.C.)* - (156 months custody - conspiracy to distribute minimum mandatory amounts of controlled substances - major coordinator of boat shipments for the Sinaloa Cartel for two decades - millions of kilograms trafficked).

The above are only a few examples of similar cases, but many more could be cited as the imposition of a life sentence is rare. In fact, as noted by the United States Probation Department in the Presentence Investigation Report, according to the available Judiciary Sentencing Information (JSIN), the average sentence imposed for someone convicted of trafficking in methamphetamine with a final offense level of 43 and a Criminal History Category of I, was 324 months custody. *See* ECF 210 at 28. Importantly, unlike the above

cases, and a factor that is not reflected in JSIN, are the mitigating circumstance that exist here.  Mr. Oseguera was recruited into the criminal conspiracy at the time he was a minor and he was a youthful offender throughout the course of the conspiracy, unlike all of the above cases.  Here, the Court must impose a fair and just sentence. To avoid an unwarranted sentencing disparity for all the reasons cited in this memorandum the Court should impose the minimum mandatory sentence of 40 years custody.

c.  **Mr. Oseguera Cannot be Punished for Exercising his Right to Trial**

While Mr. Oseguera chose to exercise his constitutional right to trial he cannot be punished more severely for doing so, and the Government's life recommendation reflects exactly that, *i.e.*, a more sever punishment for having exercised his constitutional right to trial.  As the Court is aware, on May 6, 2024, prior to trial, the Government proposed a resolution to the case that stated in exchange for a guilty plea to Counts One and Two of the superseding indictment, "The Government would in turn: Agree to recommend a sentence of forty years' imprisonment, the mandatory minimum sentence for a conviction on Counts One and Two of the [Superseding] Indictment."  *See* ECF 122 at 2.  The testimony at trial resulted in no great reveal of aggravating conduct the Government was unaware of in May of 2024 at the time it agreed to recommend a sentence of 40 years, not life, was an appropriate punishment for the crimes in the indictment.  Quite to the contrary of revealing aggravating conduct the government was previously unaware of, the trial testimony did not support a number of the allegations asserted pretrial by the Government, but also highlighted the unreliability of the cooperating witness testimony offered by the Government.

For example, in contradiction to the Government's 404(b) notice, the Court did not hear evidence Mr. Oseguera "frequently bragged about killing people and showed other CJNG members photographs of dead people whom the defendant had ordered kidnaped and murdered."  *See* ECF 132 at 3.  In contradiction to the Government's 404(b) notice, the Court did not hear evidence "after Mexican law enforcement seized a shipment of chemicals

that the CJNG had intended to use to manufacture methamphetamine, the Defendant ordered those responsible for transporting the chemicals to be tied up and drowned in a swimming pool." *See id*. In contradiction to the Government's 404(b) notice, the Court did not hear evidence "[t]he Defendant participated in the torture of two men suspected of providing information about the CJNG to Mexican law enforcement and later displayed photos of the men's dead bodies." *See id*. In contradiction to the Government's 404(b) notice, the Court did not hear evidence presented by the Government related to Mr. Oseguera's involvement with bribery. *See id*. at 4. The Court must question why although proffered by the Government, the Court did not hear such evidence. The answer is quite simple, the information proffered to the Court by the Government was not reliable.

As addressed above, the trial highlighted the unreliability of the Government's cooperating witnesses. For example, much of the Government's case relied upon the testimony of Hermino Gomez Ancira, a convicted felon and paid Government witness. He is totally unworthy of belief, and his testimony was uncorroborated and unreliable. Surely the Court after having heard Gomez Ancira's testimony and having observed his demeanor on the witness stand should have concerns about the reliability of his testimony. Certainly, absent any corroborative testimony or evidence, the Court should have concerns about the reliability of his testimony. The Court has an obligation to separate fact from fiction, and Gomez Ancira's testimony was more fiction than fact.

"Representative government and trial by jury are the heart and lungs of liberty. Without them we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle and fed and clothed like swine and hounds." John Adams, 1774. Punishing Mr. Oseguera for having exercised his constitutional right to trial as the Government wishes to do is unfair and unjust, and is nothing other than a cancer infecting the lungs of liberty. The Supreme Court has repeatedly emphasized that "to punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Hayes*, 434 U.S. 357, 363 (1978)). A "defendant's right to contest guilt before a jury is protected by the

Constitution, and his decision to do so cannot be held against him." *United States v. Ramos-Medina*, 706 F.3d 932, 940 (9th Cir. 2013) (internal quotation marks and citation omitted). It is "well established under the so-called unconstitutional conditions doctrine that a defendant may not be subjected to more severe punishment for exercising his or her constitutional right to stand trial." *United States v. Hernandez*, 894 F.3d 1104, 1110 (9th Cir. 2018) (citations omitted).

Here, the 40 year minimum mandatory is punishment enough. It was a sufficient but not greater than necessary punishment for the Government prior to trial, and should be viewed by the Court as a sufficient but not greater than necessary sentence now.

### 4. <u>The Proposed Sentence will Promote Deterrence</u>

#### a. <u>Specific Deterrence is Achieved with a 40 Year Sentence</u>

Here, there can be no question the minimum mandatory sentence of 40 years is sufficient to specifically deter Mr. Oseguera from engaging in any future criminal conduct. The time already incarcerated, almost 10 years, the additional incarceration to be served, approximately another 30 years, and the threat of further incarceration if Mr. Oseguera does not comply with his conditions of supervised release are all deterrence enough. Mr. Oseguera will be 35 years old at the time of sentencing, and thus, if the Court were to impose the minimum mandatory sentence of 40 years, Mr. Oseguera will be approximately 65 years old at the time of his release from custody. Defendants "over the age of forty ... exhibit markedly lower rates of recidivism in comparison to younger defendants." *See Measuring Recidivism*: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004). Post-*Booker* courts have noted that recidivism is markedly lower for older defendants. *See e.g., United States v. Eberhard*, 2005 WL 1384038 (S.D.N.Y. June 5, 2005); *United States v. Coleman*, 370 F.Supp.2d 661, 681 (S.D. Ohio 2005); *Simon v. United States*, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005); *United States v. Hernandez*, 2005 WL 1242344 (S.D.N.Y. May 24, 2005); *United States v. Carmona-Rodriguez*, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005); *United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005).

Further incarceration beyond the mandatory minimum of 40 years is not necessary to promote specific deterrence, or general deterrence.

**b. A Sentence to Promote General Deterrence Must be Weighed Against Individualizing the Sentence**

Few legal principles are either as ancient or deeply etched in the public mind as the notion that punishment should fit the crime. *See United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The familiar maxim, however, is only half-true. "[I]n the present century the pendulum has been swinging away from ... the philosophy that the punishment should fit the crime and toward on that the punishment should [also] fit the criminal." W. LaFave & A. Scott, Handbook on Criminal Law § 5 at 25 (1972). The concept of the notion of individualized sentencing is firmly entrenched in our present jurisprudence. As the Supreme Court observed, "[p]unishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). While general deterrence is a legitimate consideration in passing sentence and must be considered by the Court under 3553(a), it is subject to limitation. "Tailoring punishment to the individual criminal may reduce the efficacy of [general] deterrence, but that reduction is an inevitable cost of a system that eschews mechanistic punishment." *Barker*, 771 F.2d at 1368. As the Supreme Court explained in *Pepper*, "the punishment should fit the offender and not merely the crime including taking into account a person's life [,] characteristics and rehabilitation." *See Pepper v. United States*, 562 U.S. 476, 487-88 (2011). "[G]eneral deterrence for the benefit of society is served when a person is convicted of a serious crime, thus deterring others from making the same mistake." *United States v. Onuoha*, 820 F.3d 1049, 1057 (9th Cir. 2016).

"[T]here is little doubt about the direction of society's evolution: For most of the 20th Century, American sentencing practices emphasized rehabilitation of the offender and the availability of parole. But by the 1980s, outcry against repeat offenders, broad disaffection with the rehabilitative model, and other factors led many legislatures to reduce or eliminate the possibility of parole, imposing longer sentences in order to punish criminals and prevent them from committing more crimes." *Miller v. Alabama*, 567 U.S. 460, 497 (2012)

(Roberts, Chief, J., dissenting). Here, the 40 year minimum mandatory penalty is reflective of society's shift towards punishment, and is so significant of a penalty that it inherently promotes general deterrence. The Court, however, must consider individualizing the sentence to Mr. Oseguera and in doing so must consider that he was either a juvenile or an emerging adult[16] at the time of his involvement in the conspiracy, was surrounded by negative influences of older family members, and that "emerging adults who have committed crimes tend to cease that behavior as they age." *United States v. Lara*, 658 F.Supp.3d 22, 34 (2023) (citation omitted).

In the instant case when weighing the need to impose a just sentence to promote general deterrence against the need to individualize the sentence, Mr. Oseguera maintains general deterrence is satisfied with the 40 year minimum mandatory sentence. The recommended sentence is the appropriate individualized sentence. A judge should hesitate to impose a sentence so severe that he "destroys all hope and takes away the possibility of useful life." *United States v. Carvajal*, 2005 WL 476125 at \*6, 2005 (S.D. N.Y. 2005)). The 40 year minimum mandatory, although very severe, does not take away all possibility of a useful life.

### 5.  **The Proposed Sentence is Sufficient to Protect the Public**

Relevant to the sentence, the Court is required to impose a sentence that best protects the public. Mr. Oseguera is a first-time felony offender. As a first-time felony offender, Mr. Oseguera. presents a low risk of recidivism. *See United States v. Duane*, 533 F.3d 441, 453 (6th Cir. 2008). Recidivism rates of first-offenders are significantly lower than those for other defendants in higher criminal history categories. *See* Michael Edmund O'Neill, *Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System*, 42 B.C.L. Rev. 291 (2001) (suggesting a different Criminal History Category be created for "true first-time offenders").

---

[16]
Depending upon which cooperating witness testimony the Court credits, as the accounts conflict, at the earliest, Mr. Oseguera was recruited into criminal activity as early as 14 years old.

Importantly, when considering the need to protect the public, the Court should consider Mr. Oseguera's conduct while in pretrial confinement.  As noted above, Mr. Oseguera has been in pretrial confinement in the United States for a little over 5 years.  While in pretrial confinement he has been a model detainee.  He has not engaged in additional criminal conduct.  It is telling that for years the Government has monitored Mr. Oseguera's phone calls while in pretrial confinement and not one call supports any continued involvement in criminal conduct.  To the extent he's been able, as there are limited resources in the pretrial facilities, he's been focused on rehabilitating himself.  For example, Jose Dolores Aguayo Gonzalez, a member of the Parish of Saint John Crisostomo, in Guadalajara, Mexico, who has served as Mr. Oseguera's spiritual coach for the last two years through letters and phone calls has advised the Court that Mr. Oseguera "has reflected on his future a great deal[,] [d]espite the mistakes he may have committed [he is] radically changed."  *See* Exhibit A - Sentencing Support Letters.

This is obviously a stark contrast from the testimony of the Government's cooperating witnesses.  Two cooperating Government witnesses claimed to have been incarcerated in Mexico with Mr. Oseguera.  They claimed while Mr. Oseguera was in custody in Mexico he engaged in drugs and weapons trafficking, and otherwise terrorized everyone in the Mexican jails where he was confined.  Although the Court should consider that Mr. Oseguera's conduct while in custody in the United States undermines the Government witnesses' claims, even if their claims were true, for over a period of 5 years Mr. Oseguera has distanced himself from his past and has focused on rehabilitation.

The Government argues in it's sentencing memorandum that a life sentence is required to protect the public as Mr. Oseguera "was able to lead the CJNG because of his family, relationships, knowledge, and brutality[,] resources [] [he] will be able to maintain and cultivate despite incarceration. [] The Defendant's actions demonstrate that if he is ever released and returns to Mexico, he will return to his criminal empire."  *See* ECF 225 at 32.  First, as addressed above, over the course of the last 5 years while in pretrial confinement Mr. Oseguera has not shown any inclination to "maintain and cultivate despite [his]

incarceration" involvement in, or control of, the CJNG. The evidence is simply not there and does support the Government's claim. Second, as noted by the Government in its sentencing memorandum, Mr. Oseguera is a United States citizen and if the Court were to impose a term of years in custody rather than life, to protect the public the Court can order a life term of supervised release requiring that Mr. Oseguera reside in the United States subject to the jurisdiction of the Court and the supervision of the United States Probation Office. *See* ECF 225 at 32, n.14. Mr. Oseguera need not go back to Mexico and the Court can specifically order him not do so as a condition of supervised release. Again, nothing in Mr. Oseguera's conduct over the course of the last 5 years in pretrial confinement supports that upon release from custody after having served a 40 year custodial term that "he [would] return to his criminal empire." *See id*. at 32. A 40 year custodial term followed by a life term of supervised release is a sufficient, but not greater than necessary sentence to protect the public.

The Government has labeled Mr. Oseguera "a mass murderer [] [who] engaged in unconscionable violence[,]" and has argued a life sentence is "the only sentence that is sufficient, but not greater than necessary, to hold Defendant accountable for his crimes, to promote respect for the law, to deter the Defendant and others from committing serious crimes, and to protect the public of the United States." *See* ECF 225 at 29, 36. There is a certain hypocrisy in this argument as at least four of the Government's cooperating witnesses by the Government's definition are "mass murder[s] [] [who] engaged in unconscionable violence" but yet the Government did not request that any of them receive a life sentence nor have any of them received a life sentence.

The Government's first cooperating witness, Oscar Nava-Valencia, aka "El Lobo," began his career in drug trafficking in 1988. *See* September 9, 2024 Transcript (Afternoon session) at 20. He worked with the Sinaloa Cartel leveraging the relationships he had with notorious cartel leaders such as Arturo Beltran-Leyva, Joaquin "El Chapo" Guzman, and Ismael "Mayo" Zambada. *Id*. at 20-21. In 2004, Nava-Valencia would take the helm of his own cartel, the Milenio Cartel. *Id*. at 21. He was the boss of the Milenio Cartel from 2004

to 2009, up until his arrest. *Id*. at 22, 46. During this five-year period of time Nava-Valencia made over a billion dollars. *Id*. at 26. To maintain his cartel empire, Nava-Valencia ordered the murders of at least "200" people. *Id*. at 74-75. Nava-Valencia denied ever having killed anyone himself (very likely a lie), but he did admit he was present when some of the individuals he ordered were killed. *Id*. at 78-79. In true sociopathic fashion, during trial testimony Nava-Valencia laughed while being questioned about the hundreds of murders he ordered. *See id*. at 79. Some of the murders were by decapitation, and some after the victims were tortured. *See* September 10, 2024, Transcript (Morning session) at 5-6, 10-11. Nava-Valencia would "occasionally" participate in the torture of victims by "kicking and punching" them when he was "angry." *See id*. at 11-12. Sometimes the torture included physical beatings, disfigurement (*e.g.*, cutting off limbs or ears), and electrocution. *See id*. at 13.

Nava-Valencia was initially sentenced to 25 years custody. *See id*. at 18. He served only 14 of his 25 year sentence and he was released. *Id*. at 18. He was released despite having tortured and murdered hundreds of people, despite being, according to the Government, a mass murderer, someone indistinguishable from Mr. Oseguera. Somehow though, because Nava-Valencia agreed to cooperate he is now wrapped in a United States flag which magically erased his past. Is it only individuals who cooperate with the Government that are capable of rehabilitation and worthy of leniency (a 40 year sentence cannot be considered lenient)? Is it that anyone who has exercised his constitutional right to trial is then by default incapable of rehabilitation and is unworthy of leniency? This simple cannot be the case. The Court must see the hypocrisy in demanding two consecutive life sentences for Mr. Oseguera, but yet someone like Nava-Valencia is not only free to walk the streets of any city or town in the United States, but can do so while enjoying the billion dollars he earned from his cartel leadership. The reality is, contrary to the Government's argument, Mr. Oseguera is capable of rehabilitation and having exercised his right to trial doesn't change that in the least. When the Court considers the Government's sentencing arguments as they relate to Mr. Oseguera the Court should consider that other defendants,

defendants related to this case, engaged in similar conduct but have not received a life sentence.

Jose Antonio Torres-Marrufo, aka "Jaguar," another Government cooperating witness is a convicted narcotrafficker. *See* September 17, 2024 Transcript (Morning session) at 6. He plead guilty to a conspiracy to commit murder. *See id*. He was sentenced to 480 months, or 40 years custody. *See id*. at 7. He began trafficking drugs in the 1990s for the Sinaloa Cartel. *See id*. at 7-8. He was a "sicario" or hitman for the Sinaloa Cartel. *See id*. at 10. He lead seven to ten groups of other sicarios. *See id*. As a leader of multiple sicario groups, the "Artistas Asesinos," or "Murder Artists," he would execute or kill as necessary. *See id*. at 11, September 17, 2024 Transcript (Afternoon session) at 17. Torres-Marrufo's primary responsibility in leading the "Murder Artists" was to kidnap, torture, and kill on command. *See* September 17, 2024 Transcript (Afternoon session) at 18, 56. The bodies of those murdered by Torres-Marrufo and his "Murder Artists" were often mutilated or dismembered and put on public display as a warning to others in the community that they might receive the same fate. *See id*. at 19. As a result of his enforcement actions innocent people died. *See* September 17, 2024 Transcript (Morning session) at 11. In one particularly unconscionable event Torres-Marrufo ordered the kidnaping, torture, and murder of two brothers and their uncle, all United States citizens. *See* September 17, 2024 Transcript (Afternoon session) at 19-21. The two brothers and their uncle were picked up at a wedding in the United States, and during their abduction a fourth person who was in attendance at the wedding was murdered. *See id*. at 20-21. This was all over the loss of 670 lbs. of marijuana. *See id*. at 20. Of course there were others. *See id*. At 56-57 (for example, Torres-Marrufo lead his "Murder Artists" on a raid of a drug rehabilitation center in a swift action to kill suspected members of a rival cartel).

Mario Ramirez-Trevino, AKA "Pelon," is also a convicted narcotrafficker having plead guilty to conspiracy to distribute controlled substances. *See* February 21, 2024 Video Deposition Transcript at 8. He is the former boss of the Gulf Cartel. *See id*. at 10. His career in drug trafficking began in 2001 when he was a judicial police officer in Tamaulipas,

Mexico. *See id*. He began his work for the Gulf Cartel providing security for cartel operations. *See id*. Over time his rank rose slowly until he became the Gulf Cartel's boss in 2012. *See id*. During this ten year period he engaged in violent acts such as killing other cartel and rival cartel members. *See id*. at 11-12. Ramirez-Trevino personally killed so many people that when asked he couldn't recall exactly how many there were. *See id*. at 56. During his tenure with the Gulf Cartel and as its leader, "kitchens" would be utilized by "cooks" to dispose of the bodies of the victims murdered by members of the Gulf Cartel. *See id*. at 57-60. The bodies "were placed in containers full of diesel" and cooked. *See id*. at 59. There were apparently so many bodies of murdered victims that needed to be "cooked" by Ramirez-Trevino and the Gulf Cartel that "[t]here were several locations [of the kitchens] in the different cities [in their territory]." *See id*. at 58. Ramirez-Trevino did not deny that he was present when the "cooks" cooked the bodies in the "kitchens," he rather just said, "No, I am not denying it. I don't remember very well." *See id*. at 74. Ramirez-Trevino is facing a terminal illness and apparently has not been sentenced yet.

Jesus Contreras-Arceo, aka "El Canasto" also testified on behalf of the Government as a cooperating witness. *See* September 18, 2024 Transcript (Morning session) at 39. He was evasive, derisive, and continually snickered and smirked at defense counsel during his testimony. *See e.g.*, September 18, 2024 Transcript (Afternoon session) at 18-19. Contreras-Arceo was convicted of a conspiracy to manufacture methamphetamine for importation into the United States and money laundering. *See id*. at 39-40. At Contreras-Arceo's direction "CJNG sicarios, or assassins, [] carried out numerous acts of violence, including murders, kidnaping, tortures, and the forceful collection of drug debts." *See id*. at 87-90. Contreras-Arceo personally shot a wheel-chair bound man in the head for stealing several kilograms of "ice" and then disposed of his body in acid. *See id*. at 64-65, 93. Although the factual basis of Contreras-Arceo's signed plea agreement which was reviewed with the District Court Judge assigned to his case stated, Mr. Contreras-Arceo "personally murdered at least one individual and arranged for the murder of other individuals[,]" he backtracked and denied arranging for the murder of other individuals. *See id*. at 92-98.

Contreras-Arceo claimed this latter portion of his plea agreement was not accurate. *See id*.[17] The Government at Contreras-Arceo's sentencing hearing advised the District Court, "The defendant directed the countless - - murder of countless individuals over the course of his involvement in the conspiracy." *See* September 18, 2024 Transcript (Afternoon session) at 11 (citing Sentencing Transcript from *United States v. Jesus Contreras-Arceo*, 12-cr-398 (E.D. Virgina May 14, 2021) at 8). Contreras-Arceo's own counsel described his case as follows, "So, unlike an ordinary case, where there's the ability of a defense counsel to at least try to present a human face to conduct, that doesn't exist in this case." *See id*. at 12 (citing Sentencing Transcript from *United States v. Jesus Contreras-Arceo*, 12-cr-398 (E.D. Virgina May 14, 2021) at 13-14). Yet, Contreras-Arceo did not receive a life sentence, he received a sentence of 420 months, or 35 years in custody. This was, of course, prior to any reduction for his cooperation.

Given the sentences imposed in the cases of Nava-Valencia, Torres-Marrufo, Ramirez-Trevino, and Contreras-Arceo, the Government's argument that requires a two consecutive life term for Mr. Oseguera rings hollow.

Finally, a point worth making is that education and employment are both tools that can be utilized to protect the public. Education and employment are conditions that can be ordered during any period of supervised release. Education and employment, rather than a life term of incarceration, are more effective ways to protect the public and prevent recidivism when the Court weighs the need for punishment versus the need for

---

[17]
It is important for the Court to be reminded of this as the Government wants to utilize the Joint Stipulation of Fact signed by Mr. Oseguera in determining Mr. Oseguera's sentence, but Mr. Oseguera maintains that not everything in that joint stipulation is accurate, and is therefore not reliable. Unlike Contreras-Arceo's situation where the plea agreement was reviewed with the District Court during a Rule 11 plea colloquy, that is not the case here. Importantly though if the Government takes the position that everything in a factual basis in a plea agreement is accurate because a defendant has reviewed it and signed it, then the Government must admit their own cooperating witness lied during his trial testimony by falsely denying facts laid out in a signed plea agreement. The Government's knowing presentation of false testimony is a due process violation. *See Napue v. Illinois*, 360 U.S. 264 (1959). The Court should not apply a double standard as it appears the Government wishes to apply in this case.

rehabilitation.  This is particularly true in Mr. Oseguera's case as it appears his recruitment into cartel activities was at the very young age of 14-15, and he was otherwise denied the opportunity to explore educational and employment opportunities.  Sure, the Court could impose two consecutive life sentences as requested by the Government, but according to the Government this sentence will do nothing to protect the public as Mr. Oseguera will continue to cultivate his criminal empire "despite incarceration."  However, if the Court does not impose a life sentence and rather imposes the minimum mandatory sentence which gives Mr. Oseguera the hope of one day being released from custody, the latter sentence has a mush greater deterrent for Mr. Oseguera from engaging in future criminal activity, and thus, is a more appropriate sentence to protect the public.  Therefore, Mr. Oseguera urges the Court, for good reason, to avoid imposition of a sentence beyond the statutory minimum mandatory of 40 years.  It is simply not necessary to impose a more severe sentence to protect the public, and in many ways, is a more logical and sensible sentence to protect the public when considering the arguments advanced by the Government.

### III.

### THE COURT SHOULD NOT ORDER A $12 BILLION DOLLAR FORFEITURE

The Government seeks entry of a money judgment in the amount of $12,599,026.000.  This $12 billion dollar request for forfeiture lacks evidentiary support and if imposed would be in violation of the Eighth Amendment's excessive fines clause.

### IV.

### SENTENCING RECOMMENDATION

Based on the foregoing facts and law, Mr. Oseguera respectfully requests this Court impose the minimum mandatory sentence of 40 years custody.

Respectfully Submitted,

*/s/ Anthony E. Colombo, Jr.*

DATED: February 19, 2025          **ANTHONY E. COLOMBO, JR.**

Attorney for Mr. Oseguera-Gonzalez