**ANTHONY E. COLOMBO, JR.**
California State Bar No. 218411
The Senator Building, Ste. 312
105 West "F" Street
San Diego, CA 92101
Tel: (619) 236-1704
Email: anthonycolombolegal@gmail.com

Attorney for Ruben Oseguera-Gonzalez

UNITED STATES DISTRICT COURT

DISTRICT COURT OF COLUMBIA

(**HONORABLE BERYL A. HOWELL**)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**RUBEN OSEGUERA-GONZALEZ**,<br><br>Defendant. | CASE NO. 16cr00229-BAH<br><br>**DEFENDANT'S RESPONSE AND OPPOSITION TO THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FORFEITURE** |

TO: JONATHON HORNOK, ASSISTANT UNITED STATES ATTORNEY.

## I.

## **RESPONSE AND OPPOSITION**

The Government has requested a $12,599,026,000.00 money judgment forfeiture against Mr. Oseguera-Gonzalez ("Mr. Oseguera"). *See* ECF 209 at 1. This $12 billion dollar request for forfeiture lacks sufficient evidentiary support and if imposed would be in violation of the Eighth Amendment's excessive fines clause.

The Government principally relies upon two witness in an attempt to establish support for it's request for a money judgment, Oscar Nava-Valencia, and Herminio Gomez-Ancira.

A.    **Nava-Valencia's Testimony does not Support the Requested Forfeiture**

Nava-Valencia was the undisputed head of the Milenio Cartel between 2004 up until his arrest in 2009. *See* September 9, 2024 Transcript (Afternoon session) at 22. During this time Nava-Valencia's second-in-command was his brother, Juan Carlos Nava-Valencia, and his third-in-command, and bookkeeper/accountant was Elipidio Mojarro-Ramirez. *See id*. at 22-23. Nava-Valencia did not have any personal knowledge of drug trafficking activity that occurred in the cartel after October of 2009, after his arrest. *See id*. at 27.

In 2009, according to Nava-Valencia, Mr. Oseguera and his father, "Mencho," were in charge of Puerta Vallarta for the Milenio Cartel. *See* September 9, 2024 Transcript (Morning Session) at 64-66. "They provided security. And they also addressed the retail sales, drugs (cocaine). And they were also in charge of receiving the drugs that we were dealing with and, also, selling them to us." *Id*. at 66. In addition, in 2008, according to Nava-Valencia, Mencho proposed to Nava-Valencia that the Milenio Cartel start manufacturing methamphetamine. *See id*. at 70. Mencho proposed this idea to Nava-Valencia because Nava-Valencia was the "leader" of the cartel. *See id*. After Nava-Valencia approved this plan, he put Mr. Oseguera and his father Mencho in charge of production. *See id*. at 71. Nava-Valencia when asked about the chain of command for the methamphetamine production stated everyone involved in the production of methamphetamine in the labs reported "Mainly to me." *See id.* The methamphetamine was owned by the Milenio Cartel as Nava-Valencia would supply the precursor chemicals to produce the methamphetamine. *See id*. at 72. According to Nava-Valencia, "They ***could*** produce up to a ton," not that they did produce a ton during this time frame. *Id*. at 73 (emphasis added).[1] Nava-Valencia claimed that he allowed Mr. Oseguera and his father, Mencho, to keep 50% of the methamphetamine produced. When asked "exactly how much of the methamphetamine belonged to Mencho versus the defendant (Mr. Oseguera)[,]" Nava-Valencia testified, "I don't know exactly." *See id*. at 75-76.

---

[1]    The Government's calculations are based upon a "ton" production. *See* ECF 209 at 7, n.1

Assuming the Court were to accept as accurate all of the above claims by Nava-Valencia, and for good reason the Court should not as will be addressed below, the Government is requesting the Court impose "joint and several" liability for the forfeiture in the same way as has already been rejected by the Supreme Court in *United States v. Honeycutt*, 581 U.S. 443 (2017). In *Honeycutt*, the Supreme Court held that forfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime and does not permit forfeiture be applied jointly and severally. *See id*.

The case here, as it relates to the evidence provided by Nava-Valencia, is analogous to both *United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015), and *United States v. Moya*, 18 F.4th 480, 485-86 (5th Cir. 2021).

In *Cano-Flores*, the defendant, "Cano-Flores was responsible for guarding shipments of marijuana and cocaine, and he several times completed drug sales. In late 2005 or early 2006, Cano-Flores became a "plaza commander" in Los Guerra, a town near Miguel Aleman that also borders Texas. As a 'trusted man' in the cartel, he was in charge of transporting, storing, and distributing drugs in his territory, as well as accounting for the drugs and money that moved across the border." *See Cano-Flores*, 796 F.3d at 85. The District of Columbia Court of Appeals rejected a "joint and several" forfeiture theory as requested by the Government. The *Cano-Flores* court noted, "A forfeiture equal to a cartel's gross take of $ 15 billion, imposed on a mid-level manager such as Cano-Flores [] within a conspiracy–a result which appears to be commanded under the Government's interpretation of § 853(a)(1)–poses serious Eighth Amendment concerns. *Id*. at 94 (citing *United States Bajakajian*, 524 U.S. 321, 334-44 (1998) (outlining inquiry for determining whether a fine is unconstitutionally excessive)).

Here, as it relates to the evidence provided by Nava-Valencia, in the 2008 to 2009 period, the role Mr. Oseguera played was analogous to that in *Cano-Flores*, a "mid-level manager." As Cano-Flores was a "plaza commander," that is exactly the role Nava-Valencia explained Mr. Oseguera and his father, Mencho, played at the time. The Court then cannot impose a joint and several calculation procedure which would include amounts not obtained

by Mr. Oseguera. Forfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime and cannot be imposed on a joint and several basis. *See Honeycutt*, 581 U.S. 443; *see also Cano-Flores*, 796 F.3d at 94.

    *In Moya*, the defendant, Armando Moya, was involved in distributing drugs throughout the United States. *See Moya*, 18 F.4th at 481. The proceeds of the drugs would be delivered to Don Roberto, "the boss down in Mexico." *See id*. The value of the drugs Moya and his co-conspirators moved was between $3.9 and just over $5 million dollars. *See id*. The District Court imposed a $4 million dollar forfeiture as requested by the Government. *See id*. at 485. However, the Fifth Circuit Court of Appeals vacated the $ 4 million forfeiture and remanded the case back to the district court for further proceedings. *See id*. at 486. The Fifth Circuit rejected the Government's argument that based upon Moya's having been a "midlevel manager in the drug conspiracy" he was responsible for the $4 million forfeiture. *See id*. at 485-86. The Fifth Circuit held, it is not Moya's slot on the organizational chart that determines the scope of the forfeiture under § 853(a)(1), "[r]ather, it is the amount of tainted property Moya himself actually acquired as the result of the crime." *Moya*, 18 F.4th 480, 486 (citing *Honeycutt*.581 U.S. 443). The Fifth Circuit further reasoned, "To be sure, if Moya's high-level role in the conspiracy meant he personally took a bigger slice of the pie, then he could be made to forfeit that bigger slice. But the evidence excludes any notion that Moya 'actually acquired' the entire $4 million reaped by the conspiracy." *Id*. (citations omitted). The Fifth Circuit also rejected the Government's reliance upon *United States v. Leyva*, 916 F.3d 14 (D.C. Cir. 2019), which found forfeiture of $529.2 million proper where the defendant was a "'leader of [the] organization,' and the forfeiture pertained 'only [to] proceeds from activities directly supervised by [him].'" *Leyva*, 916 F.3d at 31.[2] The Fifth Circuit determined Moya, as a "mid-level manager[,]" should not

---

    [2] To the extent the Court determines Mr. Oseguera was a "leader of the organization" and the *Leyva* exception applies, Mr. Oseguera would maintain the *Leyva* court's decision is nothing more than an imposition of joint and several liability in violation of *Honeycutt*.

wrongly be attributed the total "proceeds earned by the entire cartel." *See Moya*, 18 F.4th at 486. The Fifth Circuit reasoned, "The only way the entire conspiracy's proceeds could be attributed to [Moya] under § 853(a)(1) is to read the into the statute a joint and severally liability scheme already rejected by the Supreme Court." *Id*.

Here, as it relates to the evidence provided by Nava-Valencia, the Court must take the same approach as in *Moya*. It is the amount of tainted property Mr. Oseguera himself actually acquired as the result of the crime that must determine any forfeiture. *Moya*, 18 F.4th 480, 486 (citing *Honeycutt*.581 U.S. 443). Here, like in *Moya*, the Court must reject any reliance upon *Leyva's* "leader of the organization" argument as at this time Mr. Oseguera was not the leader of the Cartel, but rather Nava-Valencia was the undisputed leader according to his testimony. "The only way the entire conspiracy's proceeds could be attributed to [Mr. Oseguera] under § 853(a)(1) is to read the into the statute a joint and severally liability scheme already rejected by the Supreme Court." *Id*. As in *Moya*, the Government's request for forfeiture is not supported by sufficient evidence, and Mr. Oseguera cannot be assessed forfeiture based upon a joint and several theory.

As addressed above, the Court should not rely upon or credit Nava-Valencia's testimony. According to Oscar Nava-Valencia, a man admittedly responsible for the torture and murder of countless people, began cooperating with the Drug Enforcement Administration in 2011 and was asked about the hierarchy of the cartel. *See* September 9, 2024 Transcript (Afternoon Session) at 49-64. He did not mention anything at all about Mr. Oseguera. Although Nava-Valencia had been cooperating for approximately six years he failed to mention anything at all during his prior 50 or so debriefs about Mr. Oseguera-Gonzalez until 2017, after, Mr. Oseguera was arrested in Mexico. *See id*. Six years after his cooperation had begun, Nava-Valencia then claimed Mr. Oseguera was made second in command to "Mencho," Mr. Oseguera's father, of the Puerto Vallarta plaza, even though he would have only been 14 or 15 years old at the time. *See id*. at 63-64. Nava-Valencia to please the Government and secure his release from custody conveniently exaggerated Mr. Oseguera's role alongside his father.

According to Elipidio "Pilo" Mojarro-Ramirez, Nava-Valencia was the "the boss [of] [t]he entire [Milenio] cartel." *See* September 10, 2024 Transcript (Morning session) at 51. In contradiction to the testimony of Nava-Valencia, and likely closer to the truth, according to Elipidio "Pilo" Mojarro-Ramirez, in the 2009 and 2010 period, Mr. Oseguera was "too young and not involved with drug trafficking." *See* September 10, 2024 Transcript (Afternoon Session) at 61. Mr. Oseguera was not part of the hierarchy of the cartel. *See id*. at 59. He was simply present and listened to conversations. *See id*. at 61. According to Mojarro-Ramirez it was Mr. Oseguera's father, Mencho, who was a plaza boss for Nava-Valencia's Milenio Cartel, and not Mr. Oseguera. *See* September 10, 2024 Transcript (Morning session) at 55. At most, if the Court were to believe anything Mojarro-Ramirez testified to, and this is in contradiction to the testimony of Nava-Valencia, Mr. Oseguera during the 2009-2010 period was a courier picking up either cocaine or money. *See* September 10, 2024 Transcript (Morning session) at 59-63. And according to Mojarro-Ramirez's ledger, Mr. Oseguera picked-up only 1 kilogram of cocaine. Nava-Valencia testified it was "Pilo" who "maintained the records of drugs and money owed when he was the leader of the Milenio Cartel." *See* September 10, 2024 Transcript (Morning session) at 20. These records included the amounts of drugs and money relating to the "plaza boss[es]." *See* September 10, 2024 Transcript (Afternoon session) at 4-5. It is rare that a drug trafficking cartel would keep actual accounting records without destroying them, but here they did, and to the extent they did the records do not support the numbers or calculations represented by the Government. Importantly as well, although Mr. Nava-Valencia testified that his "compadre Pilo (Mojarro-Ramirez)" was present for the meetings relating to methamphetamine trafficking, Mojarro-Ramirez's testimony contradicted that of Nava-Valencia's in that according to Mojarro-Ramirez it was "Tuli" "Eduardo Mendoza" and "El Tio" who manufactured or produced the methamphetamine for the Milenio Cartel, not Mr. Oseguera and his father, Mencho. *See* September 10, 2024 Transcript (Morning session) at

66-68. In fact, according to Mojarro-Ramirez in the 2004 to 2009 time-frame Juan Carlos Nava-Valencia, Nava-Valencia's brother, was in charge of methamphetamine production. *See* September 11, 2024 Transcript (Morning session) at 28-29.

      Here, Mr. Oseguera has referenced several specific reasons why the Court cannot rely upon Nava-Valencia's testimony to calculate the forfeiture amount beyond just the general attacks on a cooperating witness's credibility.  Unlike in *Leyva* where the defendant's "attacks [on the witness's credibility were] too general, here, Mr. Oseguera has referenced several reasons not to trust Nava-Valencia's testimony, not the least of which is that it was contradicted and not corroborated by Nava-Valencia's third-in-command, Mojarro-Ramirez, during the relevant time-period. *See Leyva*, 916 F.3d at 26 (rejecting "general" attacks on cooperating witness credibility in upholding forfeiture order).

      **B.**    <u>**Gomez-Ancira's Testimony Does Not Support the Requested Forfeiture**</u>

      The Government also relied upon Gomez-Ancira to justify the money judgment forfeiture requested.  As addressed in Mr. Oseguera's sentencing memorandum extensively Gomez-Ancira's testimony was simply not credible and should be entirely ignored by the Court.  *See* ECF 226 at 17-30.  Gomez-Ancira's testimony was a fantasy woven with researched facts, but ultimately his testimony was not corroborated and contradicted on material points by other Government witnesses. *See id*.  Here, Mr. Oseguera has referenced several specific reasons why the Court cannot rely upon Gomez-Ancira's testimony to calculate the forfeiture amount beyond just the general attacks on a cooperating witness's credibility.  Again, as with Nava-Valencia above, unlike in *Leyva* where the defendant's "attacks [on the witness's credibility were] too general, here, Mr. Oseguera has referenced several reasons not to trust Gomez-Ancira's testimony, not the least of which is that it was contradicted on material points and not corroborated. *See Leyva*, 916 F.3d at 26 (rejecting "general" attacks on cooperating witness credibility in upholding forfeiture order).  Mr. Oseguera not only maintains Gomez-Ancira lied during his testimomy, but that the record is crystal clear that he lied. *See* ECF 226 at 27-28 (Gomez-Ancira's testimony simple cannot be reconciled with that of Maria Hernandez).

### C.     The Court should not Rely on the *Guzman Loera* Case

The Government also cites and relies upon *United States v. Joaquin Archivaldo Guzman Loera, aka "El Chapo"* - 09cr00466-BCM-RLM (E.D.N.Y.), wherein the district court adopted the Government's calculations based upon the quantity and value of the drugs trafficked and imposed a $12,666,191,704.00 forfeiture money judgment against defendant Guzman Loera. *See* ECF 650, 650-1 in *United States v. Joaquin Archivaldo Guzman Loera, aka "El Chapo"* - 09cr00466-BCM-RLM (E.D.N.Y. July 18, 2019). The Guzman Loera case is of no precedential or persuasive value to this Court in this case, and the reference to the Guzman Loera case should be ignored.

On February 12, 2019, "after a three-month jury trial," Guzman-Loera was found guilty "of conducting a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. §848(a)-(b). The CCE comprised a number of large-scale narcotics violations and a murder conspiracy. Guzman-Loera was also convicted of drug trafficking conspiracies, unlawful use of a firearm, and a money laundering conspiracy." *See United States v. Guzman Loera*, 24 F.4th 144, 149 (2nd Cir. 2022). "With respect to the CCE, the jury found that the defendant was a principle leader of the Sinaloa Cartel, trafficking in 150 kilograms or more of cocaine and obtained $10,000,000.00 or more in gross receipts within in a twelve-month period – findings that trigger[ed] the statutory mandatory penalty of life imprisonment." *See* ECF 648 at 1 in *United States v. Joaquin Archivaldo Guzman Loera, aka "El Chapo"* - 09cr00466-BCM-RLM (E.D.N.Y. July 10, 2019). "Of the 27 violations charged as part of the CCE, the jury found the defendant committed 25 of them. Among these, *the jury found* [beyond a reasonable doubt] that the defendant conspired to murder victims who posed a threat to the Sinaloa Cartel[,] [s]pecifically, the murder conspiracy targets included informants (or people the defendant [] believed to be informants), rival cartel members, law enforcement officers, close associates who betrayed the Sinaloa Cartel in some fashion, and even family members. During the course of trial, the Government presented evidence that the defendant ordered the murders of or, in some instances, personally tortured and murdered 26 individuals[]." *See id*. at 2. "Fourteen cooperating witnesses testified that the defendant was of the [Sinaloa]

Cartel's principle leaders" from 1990 to at least 2008. *Id*.; *see also* ECF 6634 in *United States v. Joaquin Archivaldo Guzman Loera, aka "El Chapo"* - 09cr00466-BCM-RLM (E.D.N.Y. July 5, 2019).

First, it is important to note in *Guzman Loera* the defendant did not contest the Government's request for a money judgment forfeiture. There was zero litigation in relation to the Government's forfeiture request, and therefore, the district court adopted the Government's forfeiture allegations without opposition.

Second, in Guzman Loera the defendant was convicted of a CCE and the jury made specific findings, proven beyond a reasonable doubt, the defendant "was a principle leader of the Sinaloa Cartel, trafficking in 150 kilograms or more of cocaine and obtained $10,000,000.00 or more in gross receipts within in a twelve-month period." *See* ECF 648 at 1 in *United States v. Joaquin Archivaldo Guzman Loera, aka "El Chapo"* - 09cr00466-BCM-RLM (E.D.N.Y. July 10, 2019). Here, Mr. Oseguera was not charged with a CCE. Here, the jury made no such specific findings similar to that in the Guzman Loera case relevant to the findings also required for forfeiture, *i.e.*, Guzman Loera was a principle leader who had trafficking in 150 kilograms of cocaine and obtained more than $10,000,000.00 in gross receipts in a twelve-month period. Forfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime and does not permit forfeiture be applied jointly and severally. *See United States v. Honeycutt*, 581 U.S. 443 (2017). Unlike here, in Guzman Loera the jury made specific findings beyond a reasonable doubt in relations to not only defendant's leadership position but also with regard to money personally obtained by the defendant. Even if the Court were to rely upon *United States v. Leyva*, 916 F.3d 14 (D.C. Cir. 2019), which determined where a defendant is a "'leader of [the] organization,' and the forfeiture pertained 'only [to] proceeds from activities directly supervised by [him]'" did not run afoul of the prohibition against imposing a forfeiture jointly and severally (*see United States v. Moya*, 18 F.4th 480, 486 (5th Cir. 2021) (citing *Leyva*, 916 F.3d at 31)), here, unlike in *Guzman Loera*, there is no jury finding in relation to the role Mr. Osguera may or may not have played at different times during the


conspiracy. Here, the Government wishes to "wrongly attribute[] the total 'proceeds earned by the entire cartel'" to Mr. Oseguera as occurred in both *United States v. Cano-Flores*, 796 F.3d 83, 91 (D.C. Cir. 2015)[3], and *United States v. Moya*, 18 F.4th 480, 485-86 (5th Cir. 2021). Here, Guzman Loera serves no precedential or persuasive vale to the Court given the lack of litigation and non-opposition by the defendant to the forfeiture, but is also distinguishable from Mr. Oseguera's case given the different charges of conviction and the specific factual findings made by the jury. The Court simple cannot order forfeiture of "property that was acquired by someone else." *Honeycutt*, 581 U.S. 443, 449-51. The property, to require forfeiture, must have "flowed through [the defendant's] hands." See *United States v. Davalos*, 2023 WL 453395 (5th Cir. July 13, 2023) at *5 (citation omitted)..

### D. The Forfeiture Requested Violates the Eighth Amendment

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed." The Excessive Fines Clause thus "limits the Government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609-610 (1993). The Eighth Amendment prohibits the imposition of excessive fines. The determination of whether a fine is excessive for purposes of the Eighth Amendment is based on the factors set forth in *United States v. Bajakajian*, 524 U.S. 321 (1998). "The touchstone of the constitutionality inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id*. at 334 (citing *Austin*, 509 U.S. at 622-23. "A punitive forfeiture violates forfeiture violates the Excessive Fines Clause if

---

[3] It is important to note in *Cano-Flores* the district court initially imposed a $15 billion dollar forfeiture based upon a theory of liability under *Pinkerton v. United States*, 328 U.S. 640 (1946), but the Circuit Court vacated the forfeiture order and remanded the case to the district court to determine the amount of property actually acquired by the defendant. *See Cano-Flores*, 796 F.3d at 95. Upon remand, the Government modified it's forfeiture request from $15 billion to only $21,600,000.00. *See* ECF 296 at 1 in *United States v. Aurelio Cano-Flores* - 08cr00057-BJR (D.C. April 22, 2016). The defendant stipulated to this forfeiture amount and the district court ordered the amount of $21,600,000.00 jointly stipulated to by the parties. *See* ECF 311.

it is grossly disproportionate to the gravity of defendant's offense." *Id*. In *Bajakajian*, "the Supreme Court discussed four factors" to consider in assessing proportionality: "(1) the essence of the crime; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could [be'] imposed; and (4) the nature of the harm caused by defendant's conduct." *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019).

Here, Mr. Oseguera was convicted of a conspiracy to possess cocaine and methamphetamine for distribution into the United States and using a dangerous weapon in furtherance of the conspiracy. He was not convicted of engaging in a RICO violation or a CCE. He was not convicted of murder or a conspiracy to commit murder. He was not convicted of money laundering. While he faces a punishment of life, most drug trafficking offenses carry such a penalty. The maximum fines Mr. Oseguera faces for the crimes of conviction are a $10,000,000.00 dollar fine for Count 1, and a $250,000.00 dollar fine for Count 2. *See* ECF 210 at 26. The Government's request for a $12 billion dollar forfeiture, even if supported by sufficient evidence, and it is not, is excessive as it would be approximately 1000 times greater than the maximum fine allowed for the counts of conviction. Furthermore, it is important to consider that Mr. Oseguera was 14-15 years old at the time he was recruited into te offense by his own father, and was a youthful offender at all times during the alleged conspiracy. A $12 billion forfeiture as requested by the Government is simply excessive under the Eighth Amendment and the Court should not impose such a money judgment forfeiture.

## II.

## CONCLUSION

For the reasons stated above, and in his sentencing memorandum, Mr. Oseguera-Gonzalez requests this Court deny the Government's request for a $12 billion dollar money judgment forfeiture.

                                                Respectfully submitted,

                                                /s/ Anthony E. Colombo, Jr.

Dated: February 25, 2025            **ANTHONY E. COLOMBO, JR.**

                                                Attorney for Mr. Oseguera-Gonzalez